# EXHIBIT A TO

# MAZIS MOTION IN LIMINE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VICTORIA'S SECRET STORES ) <br> BRAND MANAGEMENT, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> SEXY HAIR CONCEPTS, LLC, ) <br> ) <br> Defendant. ) <br> ) | CIVIL ACTION NO.:  07-CIV-5804 <br><br> JUDGE LYNCH |

**Expert Report of Michael B. Mazis, Ph.D.**

**January 2008**

1.      I was asked by Colucci & Umans, counsel for the plaintiff, to provide expert testimony in *Victoria's Secret Stores Brand Management, Inc. v. Sexy Hair Concepts, LLC*.  My objective is to assist the Court in assessing whether the defendant's use of SEXY when associated with hair care products has attained secondary meaning in the marketplace.  As part of my assignment, I conducted a survey following well-accepted procedures in the field.  The survey was designed to determine whether the word SEXY when applied to hair care products has acquired distinctiveness.  Thus, the survey sought to assess whether purchasers of hair care products associate SEXY with one company and whether that company is Sexy Hair Concepts.

## SUMMARY OF QUALIFICATIONS AND EXPERIENCE
### Credentials and Expertise

2.      I designed the consumer survey, and I oversaw all aspects of the data collection and data analysis.  (See Exhibit A for a detailed description of my professional qualifications.)  I have conducted marketing research surveys for over 30 years.  I am Professor of Marketing at American University's Kogod School of Business, where I have been a faculty member for over 25 years, including over 10 years as chair of the marketing department.  I have taught courses in consumer behavior, marketing research, marketing principles, marketing management, Internet marketing, and marketing and public policy.

3.      I received my B.S. degree in Economics from the Wharton School of University of Pennsylvania, my M.B.A. degree from New York University, and my Ph.D. in Business Administration degree, with a concentration in marketing, from Pennsylvania State University.  In addition, I was editor of the *Journal of Public Policy & Marketing* from 1992 to 1995, and I was Associate Editor of *The Journal of Consumer Affairs* from

1998 to 2001. I am a member of the American Marketing Association and a member and former director of the Association for Consumer Research.

4.       My research focuses on consumer perception of advertising, product labels, and other marketing materials and on the impact of information on consumer perceptions. I have published over 60 articles in academic publications, including *Journal of Marketing*, *Journal of Consumer Research*, *Journal of Marketing Research*, *Journal of Public Policy & Marketing*, *The Journal of Consumer Affairs*, *Journal of Personality and Social Psychology*, *Journal of Experimental Social Psychology*, and *Journal of the American Medical Association*.

5.       From 1976-79, I served as an in-house marketing expert at the Food and Drug Administration (FDA) and at the Federal Trade Commission (FTC), where I evaluated consumer perception of advertising and product labels, designed and conducted marketing research surveys, and evaluated surveys submitted by companies seeking to substantiate promotional claims. I continue to serve as a consultant for the FTC, having served as the FTC's principal marketing witness in *FTC vs. Novartis* in 1997, *FTC vs. Trans Union* in 1998, *FTC vs. Mercury Marketing* in 2003, and *FTC vs. Telebrands* in 2004. In addition, I have served as a consultant on marketing issues and on marketing research surveys for the FDA, Bureau of Alcohol, Tobacco, and Firearms, Consumer Product Safety Commission, Department of Justice, U. S. Mint, and the State of California. I have also spoken on designing consumer surveys at conferences sponsored by the American Bar Association, D.C. Bar Association, Better Business Bureaus, and American Marketing Association. (A list of cases in which I have testified in the last four years is attached as Exhibit B.)

### Compensation

6.     My work on this case is being billed at $500 per hour.

### RESEARCH OBJECTIVE

7.     The principal objective of the survey that I conducted was to assess the secondary meaning of the word SEXY when associated with hair care products.

### SUMMARY OF FINDINGS

8.     The secondary meaning survey that I conducted consisted of interviews in eight shopping malls across the U.S. with 308 purchasers of hair care products. Following well-established methodology for assessing secondary meaning, survey respondents were shown a card with "SEXY hair care products" on it. Then, they were asked whether they associated the word SEXY with hair care products from one company, more than one company, no company or whether they didn't know or had no opinion. Only 58 of 308 (18.8%) respondents indicated that SEXY was associated with one company. Of the respondents who answered "one company," only two mentioned "Big Sexy Hair," and three mentioned something about being aware of SEXY (1.6%). The majority of respondents (65.6%) associated SEXY hair care products with no company (25.3%) or indicated that they didn't know or that they had no opinion (40.3%). Therefore, the survey provides strong evidence that the word SEXY has not acquired secondary meaning among hair care product purchasers.

### PROCEDURE

#### Data Collection and Universe

9.     Target Research Group, Inc., was responsible for administering the data collection, which was conducted between January 4, 2008 and January 11, 2008. The survey was conducted in eight shopping malls in Boston, Cincinnati, Detroit, Houston, New York, Portland, Seattle, and Tampa. At Target Research Group, the project was

supervised by Larry Herman, Senior Vice President.  Mr. Herman has over 30 years

experience in the marketing research field.  Target Research Group, founded in 1986, is a

nationally recognized full-service marketing research company with headquarters in

Nanuet, NY.  Since 1999, Target Research Group has been part of the MVL Group.

10.     The universe for the study consisted of individuals 18 years of age and older who

over the past six months had purchased or had expected to purchase over the next six

months shampoo, conditioner, hair conditioning creme, hair gel, mousse, hair lotion, hair

spray, hair color, hair tint, or hair rinse.   The study was "double blind."  Neither the

interviewers nor the respondents were aware of the identity of the client or the purpose of

the study.

**Field Procedures, Coding, and Validation**

11.     Target Research Group (TRG), under my supervision, prepared separate

instructions for the interviewers and for their supervisors.  (See Exhibit C.)    To ensure

that the interviews were conducted properly, a set of established procedures were

implemented.  Before starting work on the study, each interviewer was required to read

the interviewer instructions, to attend a personal briefing at which interviewing

procedures were discussed in detail, and to complete a practice interview.  TRG was also

responsible for editing and coding the questionnaires.  The questionnaires were then

checked for accuracy and completeness by TRG.  The responses to all questions were

then entered into a data file using 100% keypunch verification – that is, all data were

keypunched twice to avoid any errors.

12.     Following standard protocol, validation was conducted by attempting to re-

contact respondents to verify that they had participated in the study and met key

screening criteria.  The names and telephone numbers of all respondents who had

provided this information were sent to Field Solutions, an interviewing service not affiliated with the Target Research Group, to conduct telephone validation. They attempted to validate 100% of the interviews, using a validation questionnaire that I developed. (See Exhibit D.)   In conducting the validation telephone calls, a minimum of three attempts were made to re-contact all respondents who had provided telephone numbers.  For the survey, 309 interviews were completed, and 269 respondents were contacted by telephone and all were successfully validated (87%).  During the editing process, one questionnaire was removed because it was not completed properly.  Thus, the final database for the secondary meaning survey contained 308 interviews.   This very high validation rate far exceeds the typical standard of 50% for legal surveys.

**Screening" Questionnaire**

13.     Interviewers used a "screening" questionnaire, which consisted of questions to determine whether potential respondents were qualified to participate in the study. (See Exhibit E.)   A potential survey participant had to be 18 years of age and older, and he or she had to have over the past six months purchased or expected to purchase over the next six months shampoo, conditioner, hair conditioning creme, hair gel, mousse, hair lotion, hair spray, hair color, hair tint, or hair rinse.  Potential respondents were excluded from participation if they worked in the mall where the interviewing was being conducted or if they had participated in a marketing research survey other than a political poll during the past three months.  Also, to eliminate the possibility that individuals with specialized knowledge might be included in the sample, potential respondents were excluded if they or members of their households worked for an advertising agency or public relations firm, for a marketing research firm, for a law firm, or for a manufacturer, distributor or retailer of hair care products.  They were also excluded if they wore eyeglasses or contact

6

lenses for reading but did not have their corrective eye wear with them at the time of the interview. Those potential respondents who were qualified to participate in the study based on their responses to the "screening" questionnaire were invited to participate in the study and were administered the "main" questionnaire.

**"Main" Questionnaire**

14.    At the outset of the "main" questionnaire, interviewers provided an introduction to respondents: (See Exhibit F.)

> As mentioned earlier, I'd like to ask you some additional questions about hair care products, such as shampoo, conditioner, hair conditioning creme, hair gel, hair mousse, hair lotion, hair spray, hair color, hair tint, or hair rinse. There are no right or wrong answers to my questions. I just want to know what you think and what opinions you might have. If you don't have an opinion or don't know an answer, please just tell me. Your responses will be completely confidential, so please just tell me what you think.

15.    Next, respondents were handed a card with "SEXY hair care products" on it. (See Exhibit G.) Then, half of the respondents were asked:

> Do you associate the word SEXY with hair care products from one company, more than one company, no company, you don't know or you have no opinion?

To control for order bias, the other half of the respondents were asked:

> Do you associate the word SEXY with hair care products from more than one company, one company, no company, you don't know or you have no opinion?

16.    Respondents who answered "one company" were asked:

> Why do you say that you associate it with one company? Any other reason? What is that company? Why do you say _____ (insert company name)? Any other reason?

17.    Respondents who answered "more than one company" were asked:

Why do you say that you associate it with more than one company?  Any other reason?  What are those companies?

For each company mentioned, respondents were asked:

Why do you say _____ (insert company name)?  Any other reasons?

18.    Respondents who answered "no company" were asked:

Why do you say that you don't associate it with any company?  Any other reason?

## RESULTS

19.    The findings of the secondary meaning survey are shown in the table below.  (See Exhibit H for complete tabulations.)

| Associate the word **SEXY** with hair care products from: | Number | Percentage |
|---|---|---|
| One Company | 58 | 18.8% |
| More than One Company | 48 | 15.6% |
| No Company | 78 | 25.3% |
| Don't Know | 69 | 22.4% |
| No Opinion | 55 | 17.9% |

Nearly two-thirds (65.6%) of respondents were unable to associate SEXY with any particular hair care company or product -- 25.3% answered "no company, 22.4% selected "don't know," and 17.9% replied "no opinion."  Another 15.6% associated the word SEXY with hair products from more than one company.  Only 18.8% of respondents associated the word SEXY with hair products from one company.

20.    Of those respondents who associated the word SEXY with hair products from one company, only five respondents (1.6%) made some reference to the defendant or the defendant's products:

I have seen the product in certain salons - The big sexy hair spray - I've seen this certain product in salons. (#06112)

8

I've heard of a company that has a name like that - The company has a name associated with sexy - I've seen it before when I've shopped. (#06135)

The name is too catchy to be for more than one company - Sexy - It is in bold letters. The name is memorable. It's catchy, no other Company name (#06804)

It's a brand name of a product for hair - Big Sexy hair - I've seen it, I use it also. (#06837)

It's the only one company I know that has it on the bottle - Just says sexy on the bottle - There are other words on the bottle but I don't know what they say. (#11114)

21.    Of those respondents who associated the word SEXY with hair products from more than one company, only one respondent (.3%) referred to the defendant or the defendant's products:

Big Sexy Hair - It just gives your hair body and fullness. (#03518)

## CONCLUSION

22.    In conclusion, my survey of over 300 hair care product purchasers found little evidence of secondary meaning for the word SEXY when it is associated with hair care products.  Of the 308 respondents in the survey, only five (1.6%) answered "one company" and linked SEXY to the defendant or to the defendant's products.   Only 18.8% of respondents associated the word SEXY with hair care products from one company.  Most respondents (65.6%) were unable to associate SEXY with any company or products.  Based on these results, I conclude that SEXY when it is associated with hair care products has not acquired secondary meaning in the marketplace.

_____                    _____
Michael B. Mazis, Ph.D.                            January, 30 2008
                                                                    Date

9

# Exhibit A

January 2007

# MICHAEL B. MAZIS

## WORK ADDRESS

Kogod School of Business
The American University
27 Kogod School of Business
4400 Massachusetts Avenue, N.W.
Washington, D.C.  20016-8044
(202) 885-1972
(202) 885-2691 (FAX)
e-mail address: mmazis@american.edu

## EDUCATION

B.S. in Economics, June, 1964
University of Pennsylvania, Wharton School

Master of Business Administration (M.B.A.) June 1966
New York University, Graduate School of Business Administration

Ph.D. in Business Administration, December 1971
The Pennsylvania State University
Major Field: Marketing
Minor Fields: Social Psychology/Quantitative Business Analysis

## CURRENT POSITION

Professor of Marketing, August 1981 - present
Chair, Department of Marketing, June 1980 - August 1989; May 1998 - May 1999;
        September 2004 - current
Associate Professor of Marketing, September 1979 - August 1981
The American University
Kogod School of Business
Washington, D.C.

PREVIOUS POSITIONS

Chief, Marketing and Consumer Research, July 1977 - August 1979
Office of Policy Planning and Evaluation
Federal Trade Commission
Washington, D.C.

Resident Consultant, February 1977 - July 1977
Division of National Advertising
Bureau of Consumer Protection
Federal Trade Commission
Washington, D.C.

Economist, June 1976 - February 1977
Division of Drug Advertising
Bureau of Drugs
Food and Drug Administration
Rockville, Maryland

Assistant Professor of Marketing, September 1971 - August 1974
Associate Professor of Marketing, September 1974 - June 1976
University of Florida
Gainesville, Florida

Marketing Research Analyst, September 1965 - August 1968
Warner-Lambert Pharmaceutical Company
Morris Plains, New Jersey


EDITORSHIPS

Editor, *Journal of Public Policy & Marketing*, 1992-1995

Michael B. Mazis., ed., *Journal of Public Policy & Marketing*, Vol. 10 (Number 1, 1991), special conference issue

Associate Editor, *The Journal of Consumer Affairs*, 1998-2001.

Michael B. Mazis, ed., Proceedings of 1982 American Psychological Association Conference, Division 23 (Consumer Psychology).

Louis Morris, Michael Mazis and Ivan Barofsky, eds., *Product Labeling and Health Risks*, Banbury Center, Cold Spring Harbor Laboratory, New York, 1980, 328 pages.

GRANTS

Michael B. Mazis, "Evaluating Health Warning Labels for Alcoholic Beverages," National Institute on Alcohol Abuse and Alcoholism, September 1989-September 1992 ($700,000) and grant supplement, 1990-1992 ($65,000).

Michael B. Mazis, "Marketing and Public Policy: Issues for the 1990's," American Marketing Association, to fund workshop in Washington, D.C., August 1990 ($500).

PROFESSIONAL PUBLICATIONS

1. Stephen Miller, Michael B. Mazis and Peter L. Wright, "Perceptual Distortion in the Development of Brand Attitudes: A Cognitive Model," in David L. Sparks (ed.), *Broadening the Concept of Marketing*, American Marketing Association, 1970, p. 119 (abstract).

2. Michael B. Mazis and Robert Green, "Implementing Social Responsibility," *MSU Business Topics*, Vol. 13 (Winter 1971), pp. 68-76 (Reprinted in W. P. Anthony, J.B. Haynes and P. L. Wilkens (eds.) *Social Responsibility of Business*, General Learning Press, 1972 and A.B. Carroll (ed.), *Managing Corporate Social Responsibility* Little, Brown and Company, 1977).

3. Stephen Miller, Michael B. Mazis, and Peter L. Wright, "The Influence of Brand Ambiguity on Brand Attitude Development," *Journal of Marketing Research*, Vol. 8 (November 1971), pp. 447-9.

4. Michael B. Mazis, "Decision-Making Role and Information Processing," *Journal of Marketing Research*, Vol. 9 (November 1972), pp. 447-9.

5. Michael B. Mazis, and Timothy W. Sweeney, "Novelty and Personality with Risk as a Moderating Variable," in Boris W. Becker and Helmut Becker (eds.) *Marketing Education and the Real World*, American Marketing Association, 1972, pp. 406-11.

6. Michael B. Mazis and R. Eugene Klippel, "Variable Modular Testing: A New Method for Increasing Student Motivation and Learning in Large Classes," in Boris W. Becker and Helmut Becker (eds.), *Marketing Education and the Real World*, American Marketing Association, 1972.

7. Michael B. Mazis and Robert B. Settle, "Consumer Reaction to Restriction of Choice Alternatives," in M. Venkatesan (ed.), *Proceedings*, Third Annual Association for Consumer Research Conference, 1972, pp. 417-27.

8. Michael B. Mazis and Marilyn Beutenmuller, "Attitudes Toward Women's Liberation and Perception of Advertisements," in M. Venkatesan (ed.), *Proceedings*, Third Annual Association for Consumer Research Conference, 1972, pp. 428-35.

9. Michael B. Mazis, "Cognitive Tuning and Receptivity to Novel Information," *Journal of Experimental Social Psychology*, Vol. 9 (July 1973), pp. 307-19.

10. Michael B. Mazis, Robert B. Settle and Dennis C. Leslie, "Elimination of Phosphate Detergents and Psychological Reactance," *Journal of Marketing Research*, Vol. 10 (November 1973), pp. 390-5.

11. Michael B. Mazis, Dan M. Smith and Kenneth C. Cosgrove, "The Influence of Personality, Interviewer Race and Respondent Race on Responses to a Racially-Oriented Questionnaire," in Thomas V. Greer (ed.), *Combined Proceedings*, American Marketing Association, 1973, pp. 309-13.

12. Michael B. Mazis and Dan M. Smith, "A Comparison of General and Product Specific Risk Measures in the Prediction of Gasoline Purchases," in Robert L. King (ed.), *Advances in Consumer Proceedings*, American Marketing Assoc., 1973, pp. 309-13.

13. Michael B. Mazis and R. Eugene Klippel, "Instrumentality Theories and Consumer Attitudes: Comparing Alternative Models," in Peter L. Wright (ed.), *Advances in Consumer Research*, Vol. 1, Association for Consumer Research, 1973, pp. 346-7 (abstract).

14. Michael B. Mazis and John Faricy, "Consumer Response to the Meat Boycott," in Ronald C. Curhan (ed.), *Combined Proceedings*, American Marketing Association, 1974, pp. 329-33.

15. Michael B. Mazis, "Anti-Pollution Measures and Psychological Reactance: A Field Experiment," *Journal of Personality and Social Psychology*, Vol. 31 (April 1975), pp. 654-60. (Abstract published in *Psychology Today* and *Human Behavior*; conducted radio interview on Canadian Broadcasting Corporation's "As It Is" concerning the article. Reprinted in *Exploring Social Psychology: The Readings*, Steve L. Ellyson and Amy Halberstadt, editors, McGraw-Hill, 1994.)

16. Michael B. Mazis, Review of David A. Aaker and George S. Day eds., *Consumerism: Search for the Consumer Interest, Journal of Marketing*, Vol. 39 (April 1975), p. 113.

17. Michael B. Mazis, Olli T. Ahtola and R. Eugene Klippel, "A Comparison of Four Multi-Attribute Models in the Prediction of Consumer Attitudes," *Journal of Consumer Research*, Vol. 2 (June 1975), pp. 38-52.

18. John Faricy and Michael B. Mazis, "Personality and Consumer Dissatisfaction: A Multivariate Approach," in Edward M. Mazze (ed.), *Combined Proceedings*, American Marketing Association, 1975, pp. 202-5.

19. Dan M. Smith and Michael B. Mazis, "Racial Self-Identification and Self-Concept by Means of Unobtrusive Measures," *The Journal of Social Psychology*, Vol. 98 (1976), pp. 221-8.

20. Michael B. Mazis and Janis Adkinson, "An Experimental Evaluation of a Proposed Corrective Advertising Remedy," *Journal of Marketing Research*, Vol. 13 (May 1976), pp. 178-83 (Reprinted in Richard J. Lutz, editor, *Contemporary Perspectives in Consumer Research*, Kent Publishing Company, 1981).

21. Michael B. Mazis and John H. Faricy, "Teaching the Consumer Behavior Course: A Proper Blend of Theory, Applications and Presentation," for Special Education Issue of *Marketing News* (July 30, 1976).

22. Joel B. Cohen, Olli T. Ahtola, Michael B. Mazis and Lawrence J. Severy, "Extended Expectancy-Value Approach to Contraceptive Alternatives" in *Proceedings of the 84th Annual American Psychological Association Convention*, American Psychological Association, 1976 (abstract).

23. Peter H. Rheinstein and Michael B. Mazis, "Regulation of OTC Advertising: The FDA 'Prescription'," *Journal of the American Pharmaceutical Association*, Vol. 16 (September 1976), pp. 505-6, 524-5.

24. Louis A. Morris, Michael B. Mazis and Evelyn Gordon, "A Survey of the Effects of Oral Contraceptive Patient Information," *Journal of the American Medical Association*, Vol. 238 (December 5, 1977), pp. 2504-8.

25. Michael B. Mazis, Louis A. Morris and Evelyn Gordon, "Patient Recall and Attitudes about Two Forms of Oral Contraceptive Patient Information," *Medical Care*, Vol. 16 (December 1978), pp. 1045-54.

26. Albert Wildt and Michael B. Mazis, "Determinants of Scale Response: Label vs. Position," *Journal of Marketing Research*, Vol. 15 (May 1978), pp. 261-7.

27. Michael B. Mazis and Dennis McNeill, "The Use of Marketing Research in FTC Decision making," Subhash C. Jain (ed.), *Research Frontiers in Marketing: Dialogues and Directions*, American Marketing Association, 1978, pp. 308-11.

28. Michael B. Mazis, "Overview of `Can and Should the FTC Restrict Advertising to Children's Workshop'," in William L. Wilkie (ed.), *Advances in Consumer Research*, Vol. 6, Association for Consumer Research, 1978, pp. 3-6.

29. Kenneth L. Bernhardt and Michael B. Mazis, "Evaluating Consumer Protection Programs," in Thomas C. Kinnear, et. al. (eds.), *Public Policy Issues in Marketing*, Division of Research, Graduate School of Business Administration, University of Michigan, 1979, pp. 48-62.

30. Michael B. Mazis, "Effects of Information on Product-Related Perceptions," in Jerry C. Olson, ed., *Advances in Consumer Research*, Vol. 8, Ann Arbor, Michigan: Association for Consumer Research, 1980, pp. 538-40.

31. Michael B. Mazis and Louis A. Morris, "Evaluation of the Food and Drug Administration's Patient Package Insert Program," *Proceedings*, 1980 American Psychological Association, Division 23.

32. Michael B. Mazis, "The Future of Consumer Protection Regulation" in Kent B. Monroe, ed., *Advances in Consumer Research*, Vol. 9, Ann Arbor, Michigan: Association for Consumer Research, 1981, pp. 455-7.

33. Kenneth Bernhardt, Thomas Kinnear, Michael Mazis and Bonnie B. Reece, "Impact of Publicity on Corrective Advertising Effects," in Kent B. Monroe, ed., *Advances in Consumer Research*, Vol. 9, Ann Arbor, Michigan: Association of Consumer Research, 1981, pp. 414-15.

34. Michael B. Mazis, "An Overview of Product Labeling and Health Risks," in Louis Morris, Michael Mazis and Ivan Barofsky, eds., *Labeling and Health Risks*, Banbury Center, Cold Spring Harbor Laboratory, Cold Spring Harbor, New York, 1980, pp. 1-9.

35. Michael B. Mazis, Richard Staelin, Howard Beales and Steven Salop, "A Framework for Evaluating Consumer Information Regulation," *Journal of Marketing*, Vol. 45 (Winter 1981), pp. 11-21.

36. Howard Beales, Michael B Mazis, Steven C. Salop and Richard Staelin, "Consumer Search and Public Policy," *Journal of Consumer Research*, Vol. 8, (June 1981), pp. 11-22.

37. Michael B. Mazis and Richard Staelin, "Information Processing Principles for Public Policy Making," *Journal of Public Policy & Marketing*, Vol. 1 (1982), pp. 3-14.

38. Michael B. Mazis, "Effectiveness of Required Information Disclosures to Consumers," in Paul N. Bloom, ed., *Consumerism and Beyond: Research Perspectives on the Future Social Environment*, Cambridge, Mass.: Marketing Science Institute, 1982, pp. 75-8.

39. Michael B. Mazis, Dennis McNeill and Kenneth Bernhardt, "Day-After Recall of Listerine Corrective Commercials," *Journal of Public Policy & Marketing*, Volume 2 (1983), pp. 29-37.

40. William L. Wilkie, Dennis McNeill and Michael Mazis, "Marketing's 'Scarlet Letter': The Theory and Practice of Corrective Advertising," *Journal of Marketing*, Vol. 48 (Spring 1984), pp. 11-31.

41. Michael B. Mazis, "Analysis of Medical Consumer Behavior," in Thomas Kinnear, ed., *Advances in Consumer Research*, Vol. 11, Ann Arbor, Michigan: Association for Consumer Research, 1984, pp. 235-7.

42. Ronald Hill and Michael B. Mazis, "Measuring Emotional Responses to Advertising," in Richard Lutz, ed., *Advances in Consumer Research*, Vol. 13, Association for Consumer Research, 1986, pp. 164-69.

43. Kenneth Bernhardt, Thomas Kinnear, and Michael Mazis, "A Field Study of Corrective Advertising Effectiveness," *Journal of Public Policy & Marketing*, Vol. 5, (1986), pp. 146-62.

44. Michael Mazis, "Overlooked Mechanisms for Conveying Information to Consumers" in E. Scott Maynes, ed. *The Frontier of Research in the Consumer Interest*, Columbia, Missouri: American Council on Consumer Interests, 1988, pp. 225-230.

45. Louis A. Morris, Michael B. Mazis and David Brinberg, "Risk Disclosures in Televised Prescription Drug Advertising to Consumers," *Journal of Public Policy & Marketing*, Vol. 8 (1989), 64-80.

46. Michael B. Mazis, "The Marketing of Alcohol: A Spirited Debate," in William L. Wilkie and Patrick E. Murphy, eds., *The Federal Trade Commission in the 1990's*, University of Notre Dame Press, 1990, 221-233.

47. Michael B. Mazis, "Priority Public Policy Research Needs for the 1990's," in William L. Wilkie and Patrick E. Murphy, eds., *The Federal Trade Commission in the 1990's*, University of Notre Dame Press, 1990, 369-373.

48. Michael B. Mazis, Louis A. Morris and John L. Swasy, "An Evaluation of the Alcohol Warning Label: Initial Survey Results," *Journal of Public Policy & Marketing*, Vol. 10 (Spring 1991), 229-41.

49. Michael B. Mazis, Review of Jef I. Richards, *Deceptive Advertising: Behavioral Study of a Legal Concept, Journal of the Academy of Marketing Science*, Vol. 20 (Winter 1992), 99-100.

50. Michael B. Mazis, Debra Jones Ringold, Elgin S. Perry, and Daniel W. Denman, "Perceived Age and Attractiveness of Models in Cigarette Advertisements," *Journal of Marketing*, Vol. 56 (January 1992), 22-37.

51. Louis A. Morris, John L. Swasy, and Michael B. Mazis, "Accepted Risk and Alcohol Use During Pregnancy," *Journal of Consumer Research*, Vol. 21 (June 1994), 135-144.

52. Manoj Hastak, Romana L. Horst, and Michael B. Mazis, "Consumer Perceptions About and Comprehension of Environmental Terms: Evidence From Survey Research Studies" in Debra Jones Ringold, ed., *Proceedings of the Marketing and Public Policy Conference*, Vol. 4, Baltimore, MD, May, 1994, 94-108.

53. Michael B. Mazis, "The Cellular Telephone Cancer Scare," in *When Lightning Strikes: A How-To Crisis Manual with Classic Case Studies*, Wayne L. Pines, ed., Washington, DC: Washington Business Information, Inc., 1994, 279-290.

54. Michael B. Mazis, "Conducting Research on Nontraditional Media in the Marketing of Alcoholic Beverages," Susan Martin, ed., *The Effects of the Mass Media on the Use and Abuse of Alcohol*, Research Monograph No. 28, NIH Publication 95-3743, Washington, DC: U. S. Department of Health and Human Services, 1995, 239-244.

55. Louis A. Morris, Manoj Hastak, and Michael B. Mazis, "Consumer Comprehension of Environmental Advertising and Labeling Claims," *Journal of Consumer Affairs*, Vol. 29 (Winter 1995), 328-350.

56. Gary T. Ford and Michael B. Mazis, "Informing Buyers of Risks: An Analysis of the Marketing and Regulation of All-Terrain Vehicles," *Journal of Consumer Affairs*, Vol. 30 (Summer 1996), 90-123.

57. Michael B. Mazis, "Copy-Testing Issues in FTC Advertising Cases," in Ronald Paul Hill and Charles R. Taylor, eds., *Proceedings of the Marketing and Public Policy Conference*, Vol. 6, Chicago, IL: American Marketing Association, 1996, 122-130.

58. Michael B. Mazis, Louis A. Morris and John L. Swasy, "Longitudinal Study of Awareness, Recall, and Acceptance of Alcohol Warning Labels," *Applied Behavioral Science Review*, 4 (1996, Number 2), 111-120.

59. Michael B. Mazis and Mary Anne Raymond, "Consumer Perceptions of Health Claims in Advertisements and on Food Labels," *Journal of Consumer Affairs*, Vol. 31 (Summer 1997), 10-26.

60. Michael B. Mazis, "Marketing and Public Policy: Prospects for the Future," *Journal of Public Policy & Marketing*, Vol. 16 (Spring 1997), 139-143.

61. Michael B. Mazis and Louis A. Morris, "The Channel," in Michael S. Wolgalter, John W. Brelsford, David M. DeJoy, and Kenneth R. Laughery, eds., *Warnings and Risk Communication*, London, England: Taylor & Francis, 1999, pp. 99-122.

62. Michael B. Mazis, "*FTC v. Novartis*: The Return of Corrective Advertising?," *Journal of Public Policy & Marketing*, Vol. 20 (Spring, 2001), 114-122.

63. Manoj Hastak, Michael B. Mazis, and Louis A. Morris, "The Role of Consumer Surveys in Public Policy Decision Making," *Journal of Public Policy & Marketing*, Vol. 20 (Fall 2001), 170-185. (Recipient of Thomas C. Kinnear*Journal of Public Policy & Marketing* Outstanding Article Award presented by American Marketing Association for articles published 1999-2001.)

PROFESSIONAL ACTIVITIES

Editorial Review Board, *Journal of Public Policy & Marketing*, 1982-present.
Editorial Review Board, *The Journal of Consumer Affairs*, 1998-present.
Editorial Review Board, *Journal of Current Issues & Research in Advertising*,
    2002-present
Editorial Review Board, *Journal of Marketing*, 1991-1996.

Board of Directors, Association for Consumer Research (ACR), 1979-81.

Leadership Board, "Marketing and Society," American Marketing Association (AMA)
Special Interest Group, 2003-present.

Manuscript reviewer for AMA Educator's Conferences, 1976-2006; ACR Conference,
1978-1996; Marketing and Public Policy Conference, 1992-2006; Academy of Marketing
Science Conference, 1994; American Academy of Advertising Conference, 1994; ACCI
Conference, 2004-2005; *Journal of Consumer Research*, 1980, 1985-1990, 2000;
*Decision Sciences*, 1977 and 1980; *Journal of Marketing*, 1981, 1987, 1990-1991, 1999,
2001-2004; *Journal of* Advertising, 2002 and 2004; **Journal** *of Marketing Research*,
1985-1987, 1992; *Journal of Consumer Affairs*, 1989, 1991-1992, 1995, 1997; *Journal
of Macromarketing*, 2005; **Psychology** *and Marketing*, 1990 and 1997; *Journal of
Business Research*, 1991; *Journal of the Academy of Marketing Science,* 1991;
*International Journal of Research in Marketing*, 1992; *Safety Science*, 1992;
*Alcoholism: Clinical and Experimental Research*, 1994; *Journal of Business Ethics*,
1997; *American Business Law Journal*, 1998, .

Conference Co-chair, Marketing and Public Policy Conference, Washington, DC, 2003.

Conference Director, AMA Workshop, "Marketing and Public Policy: Issues for the
1990's," Washington, D.C., August 1990.

Proposal reviewer for the National Science Foundation, 1978.  Discussant at AMA
Educators' Conference, 1976 and ACR Conference, 1979, 1981, and 1983.  Session
Chair, AMA Educators' Conference, 1981 and 1988.  Discussant at International
Conference on Research in the Consumer Interest, 1987 and at American Psychological
Association Conference, 1986.

Invited lecturer at University of Kentucky, University of South Carolina, Duke
University, University of Maryland, George Washington University, Penn State
University, Georgetown University, and Queen's University.

Presented papers at AMA Educators' Conference, 1970, 1975, 1978, 1988, 1992, and
1994; ACR Conference, 1972-1973, 1977, 1979-1980, 1983, 1985, 1992, and 1994;
Marketing and Public Policy Conference, 1990, 1992-2003; American Public Health
Association Conference, 1991; Southern Marketing Association Conference, 1972 and
1973; American Psychological Association Conference, 1976 and 1980; Academy of

Marketing Science Conference, 1992; AMA Doctoral Consortium, 1992 and 1993; AMA Faculty Consortium on Ethics and Social Responsibility, 1995; AMA mini-conference on Environmental Issues, 1996; AMA mini-conference on Teaching of Public Policy, 1997.

Presented papers at American Assembly of Collegiate Schools of Business, 1979; Association of National Advertisers' Annual Meeting, 1979; J.C. Penney Consumer Affairs Forum, 1979; American Marketing Association (Washington Chapter), 1979; U.S. Regulatory Council's Innovative Techniques Workshop, 1980; MSI Conference: "Consumerism and Beyond: Research Perspectives on the Future Social Environment," 1982; American Advertising Federation Spring Government Affairs Conference, 1989; "The Federal Trade Commission in the 1990's," University of Notre Dame, 1989; Federal Trade Commission Marketing Symposium, 1991 and 1992; Drug Information Association, 1992; American Bar Association Conference: "How to Launch or Defend Against Competitive Challenges to Advertising Claims," 1995; National Advertising Division Workshop on Consumer Perception Communications Surveys, Council of Better Business Bureaus, 1996; American Bar Association Consumer Protection Conference, 2007.

Organized special sessions at ACR Conference on children's advertising regulation, 1978, and on corrective advertising, 1980. Organized pre-conference workshop "Current Developments at the FTC and FDA" for 2000 Marketing and Public Policy Conference. Organized panel on disclosure research at FTC/NAD Conference "Disclosure Exposure," 2001.

Participated in writing, "Review of the Research Literature on the Effects of Health Warning Labels: A Report to the United States Congress," June 1987.

Wrote "The Effects of the FTC's Listerine Corrective Advertising Order" for Federal Trade Commission, 1981; "An Analysis of Homeowner Experiences with Ward-Corporation-Built Homes" for Federal Trade Commission, 1983; "An Analysis of All-Terrain Vehicle Advertising 1980-87" for Consumer Product Safety Commission, 1988; and "Summary and Analysis of Consumer Surveys on Environmental Claims in Advertising and Labeling" for Federal Trade Commission, 1992 (with Manoj Hastak and Romana Horst); "Consumers' Interpretation of Alternative Environmental Claims" for Federal Trade Commission, 1996 (with Manoj Hastak and Thomas J. Maronick).

Member of Advertising and Marketing Panel of the Surgeon General's workshop on Drunk Driving, 1989; Member of Working Group on the Effects of the Mass Media on the Use and Abuse of Alcohol, 1992.

<u>CONSULTANCIES</u>

Served as the FTC's principal marketing witness in *FTC vs. Novartis* in 1997, *FTC vs. Trans Union* in 1998, *FTC v. Mercury Mark*eting, 2003, and *FTC v. Telebrands*, 2004. Served also as a consultant on marketing issues for Federal Trade Commission, Food and

Drug Administration, Department of Justice, Consumer Product Safety Commission, and the State of California.

## HONORS

The American University Award as Outstanding Faculty Administrator (1985) and for Academic Program Development (1984)
Nominated for Teacher-Scholar Award (1983, 1985, 1989, and 1993)
Kogod College Award for Scholarship (1991)
Beta Gamma Sigma and Phi Kappa Phi
AACSB Federal Faculty Fellow, 1976-77

## COURSES TAUGHT

Undergraduate:  Consumer Behavior, Advanced Consumer Behavior, Marketing Research, and Principles of Marketing.

Graduate:  Consumer Behavior, Marketing Research, Marketing Management, Doctoral Seminar in Consumer Research, Marketing and Public Policy, and Internet Marketing.

## UNIVERSITY SERVICE

Elected to University Senate, 1980-1986, 1994-95.

University Senate Vice Chair, 1982-83, Parliamentarian, 1981-82, Nominating Committee, 1982-83, Executive Committee, 1981-83, Chair, Summer Sessions Committee, 1984-85, Secretary, The American University Club, 1988-89, Finance Committee, 1991-93.

AU 85 Committee on Faculty Utilization and Development, 1981-82
AU 100 Ad Hoc Committee, 1987; AU Smoking Task Force, 1988-92

Kogod College of Business Administration Faculty Evaluation Committee, 1979-80, Strategic Planning Committee, 1984-85, Chair, M.B.A. Committee, 1984-85, Rank and Tenure Committee, 1989-91 (chair), 2001-2004, Chair, Educational Policy Committee, 1991, MBA Task Force, 1991-1992 (chair) and 1994-96, Research Committee, 1993, 1996-98 (chair), MBA Oversight Committee, 1994-95, Member, Graduate Educational Policy Committee, 1996-1997, Member, Dean Search Committee, 1995-1996, Member, MBA Admissions Committee, 1995-98, Member, Search Committee for IT Center Director, 2001, Dean's Committee on Communication, 2001-2002, Member, Search Committee for Department of Management faculty member, 2006.

Developed "Marketing Week," 1981-1983.

Developed "Marketing Career Extravaganza," a networking event for students at five Washington, DC area universities, 2001.

# Exhibit B

## DEPOSITION AND TRIAL TESTIMONY
## FOR MICHAEL B. MAZIS

- FTC Rulemaking for Antacid Advertising, 1979

- FTC v. Southwest Sunsites, 1981

- FTC Rulemaking for Funeral Industry Practices, 1989

- Ingredient Communication Council, Inc. v. State of California, 1989

- Robinson v. McNeill, et al., 1990

- Feris v. Honda, 1990

- Bittner v. Honda, 1991

- Rangel v. Honda, 1991

- Larsen v. Honda, 1991

- USA v. Vit-a-Drops, 1992

- Tracy v. Ford, 1993

- Robson v. Jeep, 1994

- Bardsley v. Ford, 1995

- Glaxo Warner-Lambert v. Johnson & Johnson, 1996

- Ameritech v. MCI, 1996

- FTC v. Novartis Corp. (Doan's), 1997 – administrative proceeding (deposition and trial) – deceptive advertising case

- Abbott Laboratories v. Gerber Products and Novartis Corp., 1997 (deposition and trial – U.S. District Court for the Western District of Michigan (979 F.Supp. 569) – Lanham Act case

- FTC v. Trans Union, 1998 – administrative proceeding (deposition and trial) – Fair Credit Reporting Act case – consumer privacy interests

- Shannon Davis v. American Home Products, 1998 – Texas state court (deposition) – products liability case

- FTC v. United Industries (Spectracide Terminate), 1999 – U.S. District Court for the District of Maryland (MJC 98-3455) (deposition) – deceptive advertising case

- U.S. (FTC) v. Alpine Industries, 1999 – U.S. District Court for the Eastern District of Tennessee (deposition) – deceptive advertising case

- S. C. Johnson v. The Clorox Company, 1999-2000 (trial) – U. S. District Court for the Southern District of New York (99 Civ. 11079) – Lanham Act case

- The Working Group on Carcinogens and Immune Suppressing Chemicals (CISC) v. Baxter Healthcare Corp (Proposition 65 – IV Sets), 2000 (deposition) – products liability case

- Bartholdi Cable Co., Inc. v. Time Warner Inc. et al., 2001 – U. S. District Court for the Eastern District of New York (Civ. No. 96-2687) (deposition) – antitrust case

- Fernandez v. Honda Motor Company, 2001 – New Mexico state court (D-0117-CV-9802730) (deposition) – products liability case

- Mary Beth Rohrer, et al. v. Yamaha Motor Corporation and Town & Country Yamaha, 2001 – Kentucky state court, Graves Circuit Court (Civil Action No. 99-CI-361) (deposition) – products liability case

- Digital Performance Rights in Sound Recordings and Ephemeral Recordings – Docket No. 2000-9 (CARP DTRA 1 & 2), U. S. Copyright Office, Library of Congress, 2001 (hearing) – hearing to set royalty rates for digital transmission of sound recordings

- PBM Products, Inc. v. Mead Johnson & Company, 2001 – U.S. District Court for the Eastern District of Virginia (Case No. 3:01CV199) (deposition) – Lanham Act case

- Bell South v. Supra Telecommunications, 2001 – U.S. District Court for the Southern District of Florida (Civil Action No. 004205-CIV) (deposition and trial) – Lanham Act case

- Gibson v. Nissan Motor Company, et al., 2002 – U.S. District Court for the District of Colorado (Civil Action No. 00-M-1819) (deposition) – products liability case

- FTC v. Stephen Patrick Garvey, et al., 2002 – U.S. District Court for the Central District of California (Civil Action No. 00-09358) (trial) – deceptive advertising case

- FTC v. Speedway Motorsports, Inc. and Oil-Chem Research Corp., 2002 – U.S. District Court for the Middle District of California (Civil Action No. 1:00CV00126) (deposition) – deceptive advertising case

- Victoria Stuart v. Consumers Paint Factory, et al., 2002 – Superior Court of the State of California in and for the County of San Luis Obispo (Civil Action No. CV 980999) (deposition and trial) – Proposition 65 case (warnings)

- Maui Pineapple Company v. Del Monte Fresh Produce, et al., 2002 – United States District Court Northern District of California (San Francisco Division) (Case No. C 01-1449 CRB) (deposition) – Lanham Act case

- Michael DiPirro v. Macy's West, Inc. and J.C. Penney Company, Inc., 2002 – Superior Court of the State of California in and for the County of San Francisco (Case Nos. 407150 and 407058) (deposition and trial) – Proposition 65 case (warnings)

- FTC v. Mercury Marketing, et al., 2003 – U.S. District Court for the Eastern District of Pennsylvania (Civil Action No. 00-CV-3281) (deposition and trial) – deceptive advertising case

- Monsanto Company v. Oakhurst Dairy, Inc., 2003 – U.S. District Court for the Eastern Division of Massachusetts (Civil Action No. 03-11273 RCL) (deposition) – Lanham Act case

- McNeil-PPC, Inc. and Johnson & Johnson Hemisferica S.A. v. Merisant Company and Merisant Puerto Rico, Inc., 2004 – U.S. District Court for the District of Puerto Rico (Civil Action No. 04-1090 JAG) (trial) – Lanham Act case

- FTC v. Telebrands, et al., 2004 – Federal Trade Commission proceeding (Docket No. 9313) (deposition and trial) – deceptive advertising case

- Robert P. Heffner, et al. v. Blue Cross Blue Shield of Alabama, 2004 – U.S. District Court for the Middle District of Alabama, Northern Division (deposition) – class action suit

- The Steak n Shake Company v. Burger King Corporation, 2004 – U.S. District Court for the Eastern District of Missouri (Case No. 4:04CV00525TCM) (trial) – Lanham Act case

- Kathleen McCormack, et al. v. Wyeth, et al., 2004 – Superior Court of the District of Columbia (Civil No. 02-CA-6082) (deposition) – products liability case

- Pilot Corporation of America v. Fisher-Price, Inc. and Mattel, Inc., 2004 – U.S. District Court for the District of Connecticut (Civil Case No. 3:04CV977 JBA) (trial) – Lanham Act case

- FTC v. Basic Research, LLC, et al., 2004 – Federal Trade Commission proceeding (Docket No. 9318) (deposition) – deceptive advertising case

- Lucent Technologies, Inc. v. Extreme Networks, Inc. and Foundary Networks, Inc., 2005 – U.S. District Court for the District of Delaware (C.A. No. 03-508) (deposition and trial) – patent case

- S&M NuTek v. T.F.H. Publications, 2005 – U.S. District Court for the Western District of Missouri Western Division (Case No. 03-1033-CV-W-NKL) (deposition) – Lanham Act case

- Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc., 2005 – U.S. District Court for the District of Kansas (Case No. 04-2419-JWL) (deposition) – Lanham Act case

- Ruth King, et al. v. McNeil Nutritionals LLC and McNeill PPC-INC, 2005 – Supreme Court of the State of New York, County of New York (Index No. 6001168/05) (deposition) – class action suit

- Celgene Corporation v. Centocor, Inc., 2005 – U.S. District Court for the Eastern District of Pennsylvania (Case No. 03-CV-05978) (deposition) – Lanham Act case

- Commonwealth of Pennsylvania v. Peoples Benefit Services, Inc., 2006 – U.S. Commonwealth Court of Pennsylvania (Case No. 557 M.D. 2005) (trial) – consumer protection case

- Prempro Products Liability Litigation (Wyeth), 2006 – E.D. Arkansas (Case No. 4:03-CV-1507-WRW) (deposition) – products liability case

- Bass Pro Trademarks, LLC v. Sportsman's Warehouse, Inc., 2006 – Cancellation Proceeding No. 92045000 (deposition)

- State of Vermont v. R.J. Reynolds Tobacco Company, 2006 – Superior Court State of Vermont, Chittenden, SS (Docket No. S1087-05 CnC) (deposition)

- Merisant Company v. McNeil Nutritionals LLC and McNeil PPC-INC., 2006-2007 – United States District Court for the District of Pennsylvania (Case No. CIV 04CV5504) (deposition and trial)

- Vital Pharmaceuticals, Inc. v. American Body Building Products, LLC, 2006-2007 – United States District Court for the Southern District of Florida, Miami Division (Case No. 06-60633- CIV-Middlebrooks/Johnson) (deposition and trial)

- CNG Financial Corporation v. Google, Inc., 2007 – United States District Court for the Southern District of Ohio, Western Division (Case No. 1:06CV040 - Beckwith) (deposition)

- Lucas Oil Products, Inc. v. OAO Lukoil, et al., 2007 – United States District Court for the Southern District of New York, (Case No. 06-CV-4650 - Berman) (deposition)

- DIRECTV Inc. v. Comcast of Illinois, III, Inc. et al., 2007 – United States District Court for the Northern District of Illinois, Eastern Division (Case No. 07C-2568 - Grady) (trial)

- Luster Products, Inc. v. Intimate Beauty Corporation and V Secret Catalogue, Inc., 2007 – United States District Court for the Northern District of Illinois, Eastern Division (Case No. 05C-4527 - Grady) (deposition)

# Exhibit C



515 Airport Executive Park    T: 845 426.1200
Nanuet, New York 10954    F: 845 426.1218
www.targetresearchgroup.com

Name Recognition Survey
Study # 08006
January, 2008

## SUPERVISOR INSTRUCTIONS

### OVERVIEW
This study is to be conducted in an enclosed facility.

The purpose of this study is to interview males and females 18 years of age or older who have purchased shampoo, conditioner or hair conditioning creme, hair gel, mousse, hair lotion or hair spray, hair color, hair tint or hair rinse over the past 6 months or expect to in the next 6 months.

Each respondent will be exposed to a card with some words on it and then asked some questions about it.

### MATERIALS
- Screeners (White)
- Main Questionnaires (Lilac, Orange)
- Practice Interviews (Pink)
- Supervisors Instructions
- Interviewer Instructions
- Master Quota Sheets (Lilac, Orange)
- Answer Card Q1b (One with a Lilac dot, one with an Orange dot)
- Name Card
- Security Agreement
- Respondent Number Worksheet
- Study/Shipping Schedule
- Shipping Instructions
- Validation Forms
- Audio Tape (Supplied by TRG)—**to tape the Briefing**
- Daily Report Form - **to be emailed**

### Quota/Assignment
You are to complete a total of **38/39** interviews as detailed on your Master Quota sheets.

### Master Quota Sheets
You have been provided with 2 Master Quota sheets –(Lilac, Orange) which define your quotas by age and gender.  Be sure to follow your quotas exactly as defined on the Master Quota Sheets.

## RESPONDENT QUALIFICATIONS

Eligible respondents are males and females 18+ who:

1. Are in an age/gender group needed to fill quota (QA1/A2)
2. Do not work in the mall where the interviewing is taking place (QB)
3. Must have purchased shampoo, conditioner or hair conditioning creme, hair gel, mousse, hair lotion, hair spray, or hair color, hair tint or hair rinse over the past 6 months (QC) **OR** expect to in the next 6 months (QD)
4. Do not nor have a household member who works in an advertising agency, a public relations firm, a marketing research firm, a manufacturer, distributor or retailer of hair care products. (QE)
5. In the past 3 months have not participated in a market research survey other than a political poll (QF).
6. Have their glasses or contacts with them that they use when they read (QG/H).
7. Are willing to participate (QI).

---

**DO NOT INTERVIEW ANYONE WITH A HEARING, LANGUAGE OR SIGHT DISABILITY.**

---

## SECURITY INSTRUCTIONS

All materials related to this study are the property of Target Research Group and our client.
You are responsible for all materials being used on this study; all materials are to be kept out of sight of anyone not directly involved in the study.

**No one representing Target Research Group or our client is to be admitted to the facility or have access to the materials without your first calling Target Research Group to confirm. Further, no one is to be permitted access to the facility or materials without showing satisfactory identification.**

## MAIN QUESTIONNAIRES / NAME CARD / ANSWER CARD Q1b

You have received a supply of 2 different color main questionnaires, **Lilac and Orange**. The difference between the 2 main questionnaires is the Answer Card to use at Q1b.

## ANSWER CARD Q1b

You have 2 different "Answer Card Q1b". One has a Lilac dot and one has an Orange dot.

> **Answer Card Q1b" with a Lilac dot-** use at Q1b when administering the **LILAC** questionnaire ONLY.

> **Answer Card Q1b" with an Orange dot-** use at Q1b when administering the **ORANGE** questionnaire ONLY.

## Name Card

There is one Name Card to show ALL respondents at Q1a of the main questionnaire. You will use the same Name Card for both the Orange and the Lilac questionnaire.

**Prior to Interviewing:**

- o You must conduct the interview in a room with a door. The respondent should not be able to hear any sounds or have visual interference from another interviewing station. He/she must **not** be able to see any products other than the one that is being called for in the questionnaire.
- o Escort the respondent into the interviewing room
- o If respondent indicated that he/she wears glasses or contact lenses, be sure that he/she is wearing them.

## QUALITY CONTROL PROCEDURES

**ANY WORK RECEIVED BY OUR OFFICE WHICH HAS NOT BEEN SUBJECT TO THE FOLLOWING PROCEDURES WILL BE SUBJECT TO A PAYMENT ADJUSTMENT.**

Strict quality control is a primary Supervisor responsibility. Target Research Group requires that the following controls be followed:

1. No one is to be in the interviewing room with the respondent, except a small child if necessary.
2. Anyone accompanying the respondent must wait for the respondent in the waiting room.
3. Interviewing should not be conducted with anyone who has a hearing, visual or English language problem.

## ASSIGNING OF INTERVIEWERS

> **Each interviewer working on this study should not complete <u>less than 6 interviews</u> nor <u>more than 11.</u>**

You will need **experienced interviewers** who are good at recording open-ended responses. You may <u>not</u> use an inexperienced or "new" interviewer.

## WRITING IMPLEMENTS

<u>**Screener MUST be completed in pencil.**</u> This is required so that you may erase and re-use a screener if a respondent does not qualify.
<u>**Main Questionnaire MUST be completed only in blue or black ball-point pen.**</u> For the purpose of this study, Main Questionnaires **not** recorded in blue or black pen will be considered invalid and will not be included in the project or paid for. On the main questionnaire, cross out if necessary.

Supervisors must have read and examined all materials to be completely prepared for the job. The supervisor must conduct the briefing and be present for all days of interviewing on the study. A field kit of all paper materials must be supplied for each interviewer at the briefing.

## BRIEFING

All interviewers must attend a personal briefing. **The supervisor must record the briefing on audio tape and return it to us with your shipment of Screener/Questionnaires.** All audio taped briefings must be checked to ensure that briefing is audible. An inaudible briefing tape is of no use.

During the briefing, read through the Interviewer Instructions along with the study materials. <u>All interviewers must do at least one Practice Interview.</u> All Practice Interviews must be reviewed by the supervisor – and any problems cleared up – before actual interviewing begins.

Then, each interviewer is to **sign their copy.** Each interviewer's signed Instructions are to be stapled to his/her practice interview and returned with the <u>first</u> <u>shipment</u>.

If possible, one briefing should be conducted, even if several interviewing shifts are involved. If more than one briefing is required, the field supervisor must:

- Conduct the second briefing
- Record the second briefing

REMEMBER, all personnel involved in the study must attend a briefing.

**At your briefing**, stress the following points and be sure the interviewers at the briefing are following them:

1. Proper handling of Name Card and when to show it to the respondent
2. Using the correct Answer Card Q1b with the appropriate color questionnaire
3. When to probe
4. Following skip patterns
5. Recording answers verbatim

**Proper question and recording procedures:**
- o Read questions slowly and exactly as written
- o Give respondent enough time to answer
- o Ask respondent to repeat or go slower if you are not getting their entire answer
- o Capture answers verbatim, do not summarize or paraphrase.
- o Write legibly
- o Use pen on main questionnaire (no erasing; cross out if necessary)
- o Probing only when indicated on the questionnaire
- o Completing the Certification Page

Interviewers are to record the responses verbatim. Interviewers are to record ONLY the answers to the question. This means absolutely <u>NO</u> paraphrasing. They must write legibly. Do not record "thoughts or comments" that may be said aloud by the respondent.

**This questionnaire has several open-ended questions. Recording answers verbatim and probing where indicated are very important and should be monitored carefully.**

Without proper recording of the responses verbatim, this questionnaire becomes worthless. <u>A supervisor **MUST** check the interviews as they are being done.</u> If you see that a certain interviewer is not recording the answers verbatim or whose writing is not legible, re-brief and replace.

All work should be edited as soon as the interview is completed in order to spot errors and quickly bring them to an interviewer's attention.

## RESPONDENT/INTERVIEWER CERTIFICATION BOXES

Both the respondent and the interviewer must sign in the appropriate Certification box on the last page of the questionnaire. If the respondent refuses to sign, his/her initials are acceptable. The interviewer must also PRINT the name of the respondent in the box provided so that it can be easily matched with the appropriate screener.

## EDITING

All work should be edited soon after completion in order to spot errors and quickly bring them to an interviewer's attention.  In editing check for:

- o Completeness of information on the front of each screener of each completed questionnaire
- o Gender and age as indicated on the screener
- o Verbatim capture of responses
- o Proper skip patterns
- o Legible handwriting
- o NO erasures on the Main Questionnaire
- o If an interviewer appears not to be following instructions exactly, please alert them to that as soon as possible and take remedial action if needed.

## RESPONDENT NUMBERS

In this shipment is a respondent number worksheet.  This form is for your use only and does not need to be returned to TRG.  The numbers listed on this form are unique to your location and are the only respondent numbers you may use.  No one respondent number can be assigned to more than one respondent.

## VALIDATION SHEETS

- o List only ONE interviewer's work on a validation sheet.
- o Fill out all required respondent information, interviewer name, city and the quota groups
- o Be sure about indicating correct area code for every respondent.
- o Write listings in black or blue ink ONLY.
- o You are not to phone validate, since we will be validating 100% of every interviewer's work.
- o You must however, monitor each interviewer's work for eligibility and completeness.
- o SEND VALIDATION SHEETS WITH EVERY SHIPMENT
- o Do not list respondents on the validation sheet that are not included in the shipment.
- o A new validation sheet must be completed for each shipment.
- o VALIDATION FORMS MAY NOT BE CUMULATIVE

## DAILY REPORTING

The Completed Interviews daily report must be emailed to field@targetresearchgroup.com not later than 8:30 AM ET Daily.  You may find it necessary to email the    report the night before or at the end of your shift. At whatever time you need to cut off the figures to ensure the report is in my office by the designated time is fine.  Make sure that you are recording the interviews and terminations accurately on the daily report, it is imperative that this information is recorded correctly.

## SCHEDULE

In this shipment is a study schedule.  The schedule will outline for you the study dates AND the dates of shipments. Make sure all personnel are familiar with this schedule.

## STUDY SHIPPING

In this shipment are very specific instructions for preparing the screener/questionnaire for shipment.  Make sure you review the instructions thoroughly and prepare the shipment in accordance with the instructions.

<u>**STUDY MANAGEMENT**</u>
If there are any questions or problems please contact TRG immediately.

**Phone: (845) 426-1200        field@targetresearchgroup.com**

515 Airport Executive Park     T: 845 426.1200
Nanuet, New York  10954     F: 845 426.1218

www.targetresearchgroup.com



Name Recognition Survey
Study # 08006
January, 2008

**SUPERVISOR BRIEFING VERIFICATION FORM**

**Supervisor Name (Please Print):** _____

**Supervisor Signature:** _____

**Date of Briefing:** _____

**Company:** _____

**City:** _____

515 Airport Executive Park   T: 845 426.1200
Nanuet, New York 10954   F: 845 426.1218
www.targetresearchgroup.com

**TARGET RESEARCH GROUP**

Name Recognition Survey
Study # 08006
January, 2008

## INTERVIEWER'S INSTRUCTIONS

### OVERVIEW
This study is to be conducted in an enclosed facility.

The purpose of this study is to interview males and females 18 years of age òr older who have purchased shampoo, conditioner or hair conditioning creme, hair gel, mousse, hair lotion or hair spray, hair color, hair tint or hair rinse over the past 6 months or expect to in the next 6 months.

Each respondent will be exposed to a card with some words on it and then asked questions about it.

### MATERIALS
- Screeners (White)
- Main Questionnaires (Lilac, Orange)
- Interviewer Instructions
- Answer Card Q1b (One with a Lilac dot, one with an Orange dot)
- Name Card

### Quota/Assignment
Your quota will be assigned by your supervisor.

## RESPONDENT QUALIFICATIONS
Eligible respondents are males and females 18+ who:
1. Are in an age/gender group needed to fill quota (QA1/A2)
2. Do not work in the mall where the interviewing is taking place (QB)
3. Must have purchased shampoo, conditioner or hair conditioning creme,hair gel, mousse, hair lotion or hair spray, hair color, hair tint or hair rinse over the past 6 months (QC) **OR** expect to in the next 6 months (QD)
4. Do not nor have a household member who works in an advertising agency, a public relations firm, a marketing research firm, a manufacturer, distributor or retailer of hair care products. (QE)
5. In the past 3 months have not participated in a market research survey other than a political poll (QF).
6. Have their glasses or contacts with them that they use when they read (QG/H).
7. Are willing to participate (QI).

**DO NOT INTERVIEW ANYONE WITH A HEARING, LANGUAGE OR SIGHT DISABILITY.**

## SECURITY INSTRUCTIONS

All materials related to this study are the property of Target Research Group and our client. You are responsible for all materials being used on this study; all materials are to be kept out of sight of anyone not directly involved in the study.

**No one representing Target Research Group or our client is to be admitted to the facility or have access to the materials without your first calling Target Research Group to confirm. Further, no one is to be permitted access to the facility or materials without showing satisfactory identification.**

## BRIEFING

All interviewers must attend a personal briefing.  During the briefing, you will read through the Interviewer Instructions along with the study materials.  <u>All interviewers must do at least one Practice Interview.</u>

Then, each interviewer is to **<u>sign their copy.</u>**  Each interviewer's signed Instructions are to be stapled to his/her practice interview and returned with the <u>first</u> <u>shipment</u>.

REMEMBER, all personnel involved in the study must attend a briefing.

**<u>At your briefing</u>**, the following points will be stressed:

1. Proper handling of Name Card and when to show it to the respondent
2. Using the correct Answer Card Q1b with the appropriate color questionnaire
3. When to probe
4. Following skip patterns
5. Recording answers verbatim

## MAIN QUESTIONNAIRES / NAME CARD / ANSWER CARD Q1b

You have received a supply of 2 different color main questionnaires **Lilac and Orange**. The difference between the 2 main questionnaires is the Answer Card to use at Q1b.

## ANSWER CARD Q1b

You have 2 different "Answer Card Q1b". One has a Lilac dot and one has an Orange dot.

➢ **<u>Answer Card Q1b" with a Lilac dot-</u>** use at Q1b when administering the **LILAC** questionnaire ONLY.

➢ **<u>Answer Card Q1b" with an Orange dot-</u>** use at Q1b when administering the **ORANGE** questionnaire ONLY.

## Name Card

There is one Name Card to show ALL respondents at Q1a of the main questionnaire. You will use the same Name Card for both the Orange and the Lilac questionnaire.

## MAIN QUESTIONNAIRE IN DETAIL

The procedure for administering each questionnaire is identical, however, the Answer Card Q1b to use is based on the **LILAC** main questionnaire:

Before you begin the interview, be sure you have the Answer Card Q1b with the Lilac dot and the Name Card.

Q.1a:  Read Q1a then show <u>Name</u> Card to respondent.

Q.1b:  Hand <u>Answer</u> Card with the Lilac dot to respondent and read Q1b.  Record one answer.  If "Don't know" or "No opinion", skip to Q5.  If "No company", skip to Q4.  If "More than one company" skip to Q3.  If "One company", ask Q2.

Q.2:    (Ask Q.2 ONLY if "one company" is answered in Q.1b)  Record verbatim.  Probe once with "Any other reason?"

Q.2a:  Record verbatim

Q.2b:  Read question, inserting company name from Q.2.  Record verbatim.  Probe once with "Any other reason?"  Record verbatim.  **(AFTER ADMINISTERING Q.2b SKIP TO Q.5)**

Q.3:    (Ask Q.3 only if "more than one company" is circled in Q.1b)  Read question and record verbatim.  Probe once with "Any other reason?"

Q.3a:  Read question and record each company mentioned on a separate line in the Q3a "Companies Mentioned" column.  Probe once with "Any others?"

Q.3b:  Ask Q3b separately for each company listed in Q3a inserting the company name each time the question is asked.  Record responses verbatim under "Q3b Reasons Mentioned" next to the corresponding company name. Probe once with "Any other reasons?" **(AFTER ADMINISTERING Q3b, SKIP TO Q5)**

Q4:    (Ask Q.4 ONLY if "No company" is circled in Q.1b) Read question and record verbatim.  Probe once with "Any other reason?"

**Q.5: Thank respondent and complete CERTIFICATION PAGE.**

## RESPONDENT/INTERVIEWER CERTIFICATION BOXES
<u>Both</u> the respondent and the interviewer must sign in the appropriate Certification box on the last page of the questionnaire. If the respondent refuses to sign, his/her initials are acceptable. The interviewer must also PRINT the name of the respondent in the box provided



515 Airport Executive Park    T: 845 426.1200
Nanuet, New York  10954    F: 845 426.1218
www.targetresearchgroup.com

Name Recognition Survey
Study # 08006
January, 2008

## INTERVIEWER BRIEFING VERIFICATION FORM

**Interviewer Name (Please Print):** _____

**Supervisor Signature:** _____

**Date of Briefing:** _____

**Company:** _____

**City:** _____