# EXHIBIT B TO

# MAZIS MOTION IN LIMINE



LEO J. SHAPIRO & ASSOCIATES LLC.

## DECLARATION OF PHILIP JOHNSON

I, Philip Johnson, declare as follows:

1.     I am Chief Executive Officer of Leo J. Shapiro and Associates, Inc., a Chicago-based market research and consulting firm that conducts surveys.

2.     I have been with this firm since 1971.  Over the past 37 years, I have designed and supervised hundreds of surveys measuring consumer behavior, opinion, and beliefs concerning brands and products, employing a wide range of research techniques.  I have given lectures before the American Bar Association (ABA), the Practicing Law Institute (PLI), the American Intellectual Property Law Association (AIPLA), and the International Trademark Association (INTA) on the use of survey research in litigation.  I am a member of the American Marketing Association (AMA), the American Association for Public Opinion Research (AAPOR), and the International Trademark Association (INTA).  I have a B.S. degree in Psychology from Loyola University and an M.B.A. degree from the University of Chicago.  A description of my background and a list of cases where I have offered survey evidence during the past four years are attached to the Appendix of this Declaration.

3.      Victoria's Secret Stores Brand Management, Inc. ("Victoria's Secret") is involved in a
dispute with Sexy Hair Concepts, LLC ("Sexy Hair Concepts"). Sexy Hair Concepts
markets a line of hair care products using the name "SEXY." This dispute concerns
Victoria Secret's use of the name "SO SEXY" on a line of hair care products. In support
of its case, Victoria's Secret has introduced two surveys in this matter. One survey,
designed and conducted by Dr. Gerald Ford ("Ford Survey"), was purportedly designed
to measure the likelihood of confusion in this case. The other survey, designed by Dr.
Michael Mazis ("Mazis Survey"), was supposed to measure secondary meaning of the
use of "SEXY" on hair care products.

4.      I have been asked by Roberta Jacobs-Meadway, counsel for Sexy Hair Concepts, to
review and comment on both of these surveys. Counsel has also supplied me with both
parties' trial briefs before the TTAB as well as the TTAB decision in this matter. I have
reviewed these materials and reached a number of conclusions and observations
regarding the opinions expressed by Ford and Mazis and their respective survey results. I
may have additional observations and opinions if additional materials are made available
to me.

**The Ford Survey**

5.      The study designed by Dr. Gerald Ford and offered as evidence in this case uses an
inappropriate methodology, draws from the wrong survey universe, and employs an
improper survey stimulus for testing the likelihood of confusion. Further, contrary to

generally accepted techniques in surveys like this, the Ford Survey did not incorporate a control group or control question in order to measure the level of error or noise in his survey.

*Inappropriate Methodology*

6.   Dr. Ford relied on a survey approach which is often described, by himself and others, as an "Eveready" design. Such a survey design depends on two critical factors to produce relevant results - first that the parties involved produce different products using a similar or identical mark. Dr. Thomas McCarthy points this out in his treatise.[1] Dr. Itamar Simonson also notes the concern that when the name is virtually the same it is less likely to reveal confusion unless the products differ.[2] This is not the case in this dispute. As the TTAB notes in its decision in this dispute, the parties produce identical products and have virtually identical marks.

7.   The second critical factor that would dictate the use of the Eveready survey methodology is that the senior user be a well known or famous mark, or at least known enough that you can have a high degree of confidence that the survey participants would have encountered it before. That is not the case in this dispute. The senior user's mark is a registered mark which has been used in salons around the country, but certainly is not a famous mark or household word. In its brief, Sexy Hair Concepts describes its mark as being inherently distinctive for the goods it sells at the places it sells them to the customers who frequent

[1] McCarthy on Trademarks and Unfair Competition, Volume 5, 32:174.
[2] Simonson, "The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test," 83 Trademark Reporter, 364 (1993).

3

such places. This does not comport with a situation in which an "Eveready" survey

protocol is appropriate.


*Wrong Universe*

8.     In any research survey, it is critically important to identify and interview the appropriate

survey universe - or market for the product or service at issue. The Ford Survey

interviewed males and females 18 years and older, who within the next six months are

likely to purchase one or more hair care products, regardless of where they buy them or at

what price point. In my opinion, this is an overly broad survey universe.


9.     In surveys designed to measure the likelihood of forward confusion, the appropriate

survey universe is comprised of potential purchasers of the junior user's goods or

services. Dr. Thomas McCarthy outlines this in his treatise.[3] In this case, Victoria's

Secret is the junior user. In its trial brief and in Baker's deposition testimony, Victoria's

Secret reports that it sells its line of hair care products to women.

> *"In or about 2001, Victoria's Secret Beauty decided to begin a line of hair care products, which was a natural extension of its existing beauty products business, intended to make Victoria's Secret Beauty a 'full beauty destination' for its customers, who are women. (App. NOR, Baker Test., pp. 13:22-14:4)"[4]*

> *"It also bears noting that Victoria's Secret Beauty sells its beauty products exclusively to women."[5]*

> *"Women and girls purchase VS's SO SEXY hair care products, including women and girls who go to salons (Baker Test. Dep. 35-36)."[6]*

---

[3] McCarthy on Trademarks and Unfair Competition, Volume 5, 32:248.
[4] Applicant V. Secret Catalogue's Main Brief, Pg. 8.
[5] Applicant V. Secret Catalogue's Main Brief, Pg. 36.
[6] Opposer's Trial Brief, Pg. 19

4

10.    Likewise, Sexy Hair Concepts also sells its line of hair care products primarily to women.

> *"Sexy Hair's SEXY hair care products are sold primarily through salons to women and girls (Stiller Test. Dep. 29-30)."*[7]

11.    Further, Victoria's Secret's current distribution of hair care products is through its specialty stores, while Sexy Hair Concepts distributes its hair care products to salons and salon distributors.  Yet, Dr. Ford did not focus his survey on women, or those who purchase hair care products through such specialty channels, or even based on a mid-level price point.  In fact, there is no way to tell where the participants in his survey typically purchase their hair care products or how much they normally spend on hair care products.

12.    The fact that virtually everyone who was screened to participate in his survey qualified to be interviewed (92%) confirms that the Ford Survey simply includes the general population, with no concern for whether or not they would ever encounter either party's products.  In short, the Ford Survey did not target the relevant universe of respondents.

*Improper Survey Stimulus*

13.    Dr. Ford did not test the "SO SEXY" mark by identifying a product genre and then exposing his respondents to the mark as used in commerce, nor as shown on the registration application, nor even in simple block letters.  Instead, he showed an exhibit with the words "SO SEXY" and a list of thirteen different hair care products including: hair conditioner, hair dyes, hair glitter, hair highlighter, hair mascara, hair pomade, hair

---

[7] Opposer's Trial Brief, Pg. 19.

5

rinses, hair removing creams, hair shampoo, hair spray, hair straightener, hair styling gel, and hair styling mousse.

14.     A reduced size of the exhibit used in the Ford Survey appears below:



15.     The senior user markets products in no more than seven of the categories in this exhibit. Based on a current review of its website, it is also my understanding that Victoria's Secret has produced no more than nine of these products.  The breadth of the hair care product line shown on the survey stimulus is suggestive of a mass market consumer package goods company rather than a specialty product manufacturer, which would tend to preclude participants from identifying them with the senior user.  Further, the use of a stimulus which contains the words "SO SEXY" followed by thirteen products - which reflects neither the plaintiff's nor the defendant's actual product line - can only confuse

6

respondents and cause ambiguity as to what the survey questions are referring to when they say "this name" and "the products."

16.    Overall, the Ford Survey is neither properly designed nor executed such that any valid conclusions can be drawn from it concerning this dispute.

**The Mazis Survey**

17.    The Mazis Survey is misplaced from its inception. Dr. Mazis purports to measure whether the word "SEXY" has acquired secondary meaning when applied to hair care products. However, Sexy Hair Concepts holds a trademark registration for the words "SEXY HAIR" in hair care products and is not claiming that it has acquired secondary meaning. Therefore, Dr. Mazis' survey is not relevant in this matter. Further, the Mazis study suffers from many other significant defects. Namely, it was not conducted with the appropriate universe, used a misleading stimulus, and incorporated leading and confusing questions.

*Wrong Universe*

18.    The Mazis Survey included any males or females ages 18 years and older, who had purchased in the prior six months OR might purchase in the coming six months any brand of shampoo, conditioner, hair conditioning crème, hair gel, mousse, hair lotion, hair spray, hair color, hair tint, or hair rinse. This universe comports with neither the customers of Sexy Hair Concepts, nor those of Victoria's Secret and more simply might be described as "anyone in the shopping mall where he conducted his survey." Certainly

7

if one were to attempt to measure secondary meaning for a word mark (despite the

mark's registration) one would certainly want to locate individuals who could have

potentially been exposed to it. However, Dr. Mazis chose not to.

*Improper Survey Stimulus and Leading Questions*

19.     Dr. Mazis also failed to test the word he set out to test, namely "SEXY." Instead of

showing them the word at issue, Dr. Mazis gave respondents a card that said "SEXY hair

care products" on it. Such a survey stimulus suggests a descriptive use of the word

"SEXY," likely leading respondents to think of the word "SEXY" as an adjective in this

context. A reduced size of the exhibit used in the Mazis survey appears below:



20.     The Mazis Survey then asks each respondent:

> *"Do you associate the word SEXY with hair care products from one company,
> more than one company, no company, you don't know or you have no opinion?"*

21.     This is a very confusing and leading question. First, as mentioned above, participants have already been primed to think of "SEXY" in a descriptive manner. Second, it is not clear exactly what the question is asking. Do they associate "SEXY" with hair care products? Do they think one or more than one company makes sexy hair care products (in a descriptive sense)? Or, as Mazis concludes, does one or more than one company use the word SEXY on their hair care products? There are multiple interpretations of this question, making the results impossible to interpret. In fact, participants divided roughly evenly between the five possible answers, suggesting that they were guessing or simply did not know how to answer the question. Nearly two-thirds of the respondents were unable to answer the question one way or the other and report that such products come from no company (25%), don't know (22%) or no opinion (18%). Further, among those who did answer, more respondents reported that such products come from "one company" (19%) than report that they come from "more than one company" (16%).

22.     Finally, the Mazis Survey did not include any control group or control question to measure the level of error, noise, or bias in his survey design. Therefore, there is no way to determine the extent to which the results are due to the bias from the descriptive usage employed on the survey stimulus card, his confusing question, or noise or guessing.

23.     Taken as a whole, the Mazis Survey is not a valid or reliable measure of secondary meaning, and in fact, the survey tells us nothing about consumer perception of the word "SEXY" as it relates to hair care products.

9

Pursuant to 28 U.S.C., Section 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on February 15, 2008 at Chicago, Illinois.

Philip Johnson

10

**<u>APPENDIX</u>**



LEO J. SHAPIRO & ASSOCIATES LLC.

# PHILIP JOHNSON

## CURRICULUM VITAE

Philip Johnson is the Chief Executive Officer of Leo J. Shapiro and Associates, a Chicago-based market research and behavioral consulting company.  Mr. Johnson has been with this firm since 1971 and has held a number of positions.  In recent years, he has concentrated his efforts in the areas of study design and the development of innovative research techniques.

Over the past years, Mr. Johnson has designed and supervised hundreds of surveys measuring consumer behavior and opinion, employing a wide range of research techniques.  His area of expertise is in the use of survey research as a tool in litigation, including jury selection and trademark disputes.

Mr. Johnson has offered testimony regarding survey evidence on over fifty occasions in both Federal and State courts.  In addition, he has offered survey research in matters before the Federal Trade Commission, The Food and Drug Administration, the Patent and Trademark Office, and the Trademark Trial and Appeal Board.  Mr. Johnson has designed, conducted, and reported survey evidence on behalf of both plaintiffs and defendants in various cases.  The topics covered in these litigation related surveys include matters related to likelihood of confusion, secondary meaning, genericness, dilution, false advertising, change of venue, and unfair competition.

2

Part of Mr. Johnson's training has been through working with Dr. Leo J. Shapiro, the Founder of the company; the late Dr. Philip M. Hauser, a former Director of the U. S. Census Bureau; and the late Dr. Hans Zeisel, who made significant contributions in the application of social science to the solution of legal questions.

Mr. Johnson has given lectures before the American Bar Association (ABA) and the Practising Law Institute (PLI) on the use of survey research in litigation. He is a member of the American Marketing Association (AMA), the American Association for Public Opinion Research (AAPOR), and the International Trademark Association (INTA).

Mr. Johnson has a B.S. degree in Psychology from Loyola University and an M.B.A. degree from the University of Chicago.



LEO J. SHAPIRO & ASSOCIATES LLC.

**RECENT CASES WHERE PHILIP JOHNSON**
**TESTIFIED OR OFFERED SURVEY EVIDENCE...**

AUGUST 2007              SAINT-GOBAIN CORPORATION VS. 3M COMPANY
                         United States Patent and Trademark Office
                         Trademark Trial and Appeal Board
                               Secondary Meaning

APRIL 2007               NIKE, INC. VS. NIKEPAL INTERNATIONAL, INC.
                         United States District Court for the
                         Eastern District of California
                               Likelihood of Initial Interest Confusion and Dilution

FEBRUARY 2007            JOHNSON & JOHNSON VISION CARE, INC. VS. CIBA VISION
                         CORPORATION
                         United States District Court for the
                         Southern District of New York
                               False Advertising

NOVEMBER 2006            HASBRO, INC. VS. MGA ENTERTAINMENT, INC.
                         United States District Court for the
                         District of Rhode Island
                               Secondary Meaning

OCTOBER 2006             CLASSIC FOODS INTERNATIONAL CORPORATION VS. KETTLE
                         FOODS, INC.
                         United States District Court for the
                         Central District of California (Southern Division)
                               Likelihood of Confusion

JUNE 2006                GROCERY OUTLET INC. VS. ALBERTSON'S, INC., AMERICAN
                         STORES COMPANY, L.L.C., AND LUCKY STORES, INC.
                         United States District Court for the
                         Northern District of California (San Francisco Division)
                               Likelihood of Confusion and Fame

JUNE 2006                DE BEERS LV TRADEMARK LTD. AND DE BEERS LV LTD. VS.
                         DEBEERS DIAMOND SYNDICATE INC. AND MARVIN
                         ROSENBLATT
                         United States District Court for the
                         Southern District of New York
                               Awareness

2

| | |
|---|---|
| APRIL 2006 | 24 HOUR FITNESS USA, INC. VS. 24/7 TRIBECA FITNESS, L.L.C., 24/7 GYM, L.L.C., ET AL.<br>United States District Court for the<br>Southern District of New York<br>    Likelihood of Confusion |
| APRIL 2006 | JUICY COUTURE, INC. AND L.C. LICENSING, INC. VS. LANCÔME PARFUMS ET BEAUTE & CIE AND LUXURY PRODUCTS, L.L.C.<br>United States District Court for the<br>Southern District of New York<br>    Likelihood of Confusion |
| JANUARY 2006 | WHIRLPOOL PROPERTIES, INC., ET AL., VS. LG ELECTRONICS U.S.A., INC., ET AL.<br>United States District Court for the<br>Western District of Michigan (Southern Division)<br>    Likelihood of Confusion |
| OCTOBER 2005 | PRL USA HOLDINGS, INC. VS. UNITED STATES POLO ASSOCIATION, ET AL.<br>United States District Court for the<br>Southern District of New York<br>    Likelihood of Confusion |
| SEPTEMBER 2005 | HILL'S PET NUTRITION, INC. VS. NUTRO PRODUCTS, INC. AND JOHN DOES #1-20<br>United States District Court for the<br>Central District of California (Western Division)<br>    False Advertising |
| SEPTEMBER 2005 | PERFUMEBAY.COM, INC. VS. EBAY, INC.<br>United States District Court for the<br>Central District of California (Western Division)<br>    Likelihood of Dilution and Initial Interest Confusion |
| JUNE 2005 | METROPOLITAN LIFE INSURANCE CORPORATION VS. METBANK<br>United States District Court for the<br>Southern District of New York<br>    Likelihood of Confusion |
| MARCH 2005 | PACIFIC MARKET INTERNATIONAL VS. THERMOS L.L.C.<br>United States District Court for the<br>Western District of Washington (Seattle Division)<br>    Likelihood of Confusion |
| MARCH 2005 | JADA TOYS, INC. VS. MATTEL, INC.<br>United States District Court for the<br>Central District of California<br>    Likelihood of Confusion |

3

| | |
|---|---|
| AUGUST 2004 | VERIZON DIRECTORIES CORP. VS. YELLOW BOOK USA, INC.<br>United States District Court for the<br>Eastern District of New York<br>    False Advertising |
| APRIL 2004 | DAVID'S BRIDAL, INC. VS. MITCH YEH ET AL.<br>United States District Court for the<br>Southern District of Texas (Houston Division)<br>    Likelihood of Confusion |
| FEBRUARY 2004 | MERISANT VS. JOHNSON AND JOHNSON/MCNEIL<br>LABORATORIES<br>United States District Court for the<br>District of Puerto Rico<br>    Likelihood of Confusion |
| OCTOBER 2003 | THE MAY DEPARTMENT STORES COMPANY VS.<br>VICTORIA'S SECRET STORES, INC. & MARK WEIKEL<br>In the Circuit Court of the County of St. Louis<br>State of Missouri<br>    A Study of Cross Shopping |
| JULY 2003 | STAR INDUSTRIES, INC. VS. BACARDI & COMPANY LIMITED,<br>BACARDI U.S.A., INC. AND ANHEUSER-BUSCH, INCORPORATED<br>United States District Court for the<br>Southern District of New York<br>    Likelihood of Confusion |
| FEBRUARY 2003 | GATEWAY, INC. VS. COMPANION PRODUCTS, INC.<br>United States District Court for the<br>District of South Dakota (Southern Division)<br>    Likelihood of Confusion |