# EXHIBIT A TO

# FORD MOTION IN LIMINE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VICTORIA'S SECRET STORES BRAND MANAGEMENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> SEXY HAIR CONCEPTS, LLC, <br><br> Defendant. | Case No. 07cv-5804 (GEL) <br><br> DECLARATION AND RULE 26 REPORT OF DR. GERALD L. FORD |

I, Dr. Gerald L. Ford, hereby declare as follows:

INTRODUCTION

1.  I am a partner in the marketing research and consulting firm of Ford Bubala & Associates, located in Huntington Beach, California, where I have been engaged in commercial marketing research and consulting for the past thirty-three years. I am also an emeritus faculty member of the School of Business Administration, California State University, Long Beach, where I held a full-time teaching position for twenty-five years, prior to my retirement in 1994. My professional experience is further summarized below in paragraphs 26 through 36

2.  In the instant matter, at the request of Colucci & Umans, counsel for Plaintiff Victoria's Secret Stores Brand Management, Inc. ("Victoria's Secret"), I designed and caused to be conducted a survey to address the issue of likelihood of confusion. Specifically, this survey was designed to measure the degree, if any, to which the SO SEXY brand of hair care products sold by Plaintiff, Victoria's Secret, is likely to cause

confusion with respect to the source, authorization or approval of, or business affiliation or connection of the SO SEXY brand with Defendant Sexy Hair Concepts or its brands.

3. This survey was designed to conform to the survey design preference of the Patent and Trademark Office Trademark Trial and Appeal Board.[1]

4. The survey results do not evidence that an appreciable number of the defined universe of males and females likely to purchase certain hair care products are likely to be confused as to the source, authorization or approval of, or business affiliation or connection of the SO SEXY brand with Defendant Sexy Hair Concepts or its brands.

5. It is my opinion that the results of the survey conducted in this matter clearly support a finding of no likelihood of confusion. Specifically, the survey results evidence that the defined universe of male and female potential purchasers of certain hair care products are not likely to be confused or deceived by the belief that Plaintiff's SO SEXY hair care products are put out by Defendant Sexy Hair Concepts, are put out with the authorization or approval of Defendant Sexy Hair Concepts, or that the company that puts out SO SEXY hair care products has a business affiliation or business connection with Defendant Sexy Hair Concepts.

---

[1] See Miles Laboratories Inc. v. Naturally Vitamin Supplements Inc., 1 USPQ2d 1445 (TTAB 1987); Carl Karcher Enterprises, Inc. v. Stars Restaurants Corp., 35 USPQ2d 1125 (TTAB 1995); and OMS Investments, Inc. v. Central Garden & Pet Company, 2006 TTAB LEXIS 274 (TTAB 2006).

SURVEY BACKGROUND

6. Attached hereto, as Exhibit A, Volumes I and II, are the results of the survey which addressed the issue of likelihood of confusion, if any, with respect to the source, authorization/approval of, or business affiliation/connection of Plaintiff's SO SEXY brand. Exhibit A, Volume I, provides a synopsis of the survey methodology, a copy of the survey exhibit, the survey screener and questionnaire, response frequencies for the survey questions, and a listing of respondents' verbatim responses to the survey. Exhibit A, Volume II, contains a sequential listing of the survey responses and copies of the Supervisor and Interviewer Instructions, which provide additional details of the survey protocols, and other survey-related background materials.

7. The sample selection, questions, questionnaire design, and interviewing procedures employed in this survey were designed in accordance with the generally accepted standards and procedures in the field of surveys and were designed to meet the criteria for survey trustworthiness detailed in the Federal Judicial Center's Manual for Complex Litigation, Fourth.[2]

---

[2] For the proffered poll or survey, "...Relevant factors include whether: the population was properly chosen and defined; the sample chosen was representative of that population; the data gathered were accurately reported; and the data were analyzed in accordance with accepted statistical principles...In addition, in assessing the validity of a survey, the judge should take into account the following factors: whether the questions asked were clear and not leading; whether the survey was conducted by qualified persons following proper interview procedures; and whether the process was conducted so as to ensure objectivity..." See Federal Judicial Center, Manual for Complex Litigation, Fourth, Section 11.493, @ 102-104 (2004).

8. I was responsible for the design of the survey, the survey's questionnaire, and the instructions given to the survey's supervisors and interviewers, as well as for the procedures to be followed in conducting the interviews. Interviewing, data gathering, and response recordation were carried out, under the direction of Ford Bubala & Associates, by interviewers employed by independent interviewing organizations. Supervisors working on this survey were personally trained by Ford Bubala & Associates with respect to the design, procedures, and related protocols for the survey; and daily shipments of completed interviews from each professional interviewing service were reviewed by Ford Bubala & Associates to confirm that the questionnaires were being properly executed. In addition, approximately seventy-two percent (71.90%) of the survey interviews were validated, in person, by the survey supervisors personally meeting the survey respondents and confirming their qualification and participation in the survey. Ford Bubala & Associates conducted validations of approximately twenty-one percent (20.92%) of the interviews by recontacting, by telephone, survey respondents to confirm their qualification and participation in the survey. Net nonduplicated validations totaled approximately eighty percent (80.07%) of all survey interviews.[3] None of the interviews failed to validate.

9. The survey conducted in this matter was administered under a double-blind protocol. Specifically, not only were the respondents not informed as to the purpose or

---

[3] This level of validation exceeds industry standards of 10% to 15%.

- 4 -

sponsor of the survey, but similarly, both the survey's supervisors and interviewers were not informed as to the purpose or sponsor of the survey.

SURVEY STRUCTURE

10. The likelihood of confusion survey conducted in this matter was designed to employ a scientific experimental survey design consisting of two survey cells: (1) a test or experimental survey cell designed to measure confusion, if any, with respect to the source, authorization/approval of, or business affiliation/connection with Defendant; and, (2) a control cell designed to measure the extent of mismeasurement of trademark confusion in the test cell survey results. Based upon the test cell survey results, the control cell was not executed.

11. In addition, the likelihood of confusion survey conducted in this matter employed the use of the question "Why do you say that?" to assess the basis for the beliefs expressed in response to the survey's source, authorization/approval of, and business affiliation/connection questions.

12. In total, three hundred six (306) interviews were conducted in the test cell in this survey.

13. The survey exhibit (i.e., survey stimulus), for the test cell, was a card that contained the words SO SEXY in plain block letters and below that a list of hair care products, namely, hair conditioner, hair dyes, hair glitter, hair highlighter, hair mascara, hair pomade, hair rinses, hair removing creams, hair shampoo, hair spray, hair straightener, hair styling gel and hair styling mousse. See Exhibit A, Volume I, page 6. The presentation of Plaintiff's brand and the defined

goods were designed to reflect the "face" of Plaintiff's trademark application and to conform to the survey stimulus preference of the Patent and Trademark Office Trademark Trial and Appeal Board.[4]

14. This survey employed a shopping center intercept methodology. Respondents in the survey were interviewed by interviewers employed by professional interviewing services at shopping centers in metropolitan markets in nine (9) states (i.e., Arizona, California, Georgia, Illinois, Massachusetts, Minnesota, New York, Tennessee, and Texas), located in each of the nine (9) U.S. Census Divisions.

15. The universe was defined as males and females, eighteen years of age or older, who within the next six months were likely to purchase one or more certain hair care products.[5]

16. The respondent selection procedure employed in this survey was based upon screening for qualified respondents in proportion to the age distribution of the male and female population 18 years of age or older in the United States until the established quota for each cell was filled. This method provided a respondent base that is believed to be generally

---

[4] Supra note 1.

[5] Additionally, the likelihood of confusion survey universe was also restricted as follows: (1) to respondents who did not, nor did anyone else in their home, work for an advertising agency or marketing research firm, or a retail store or company that makes, sells, or distributes any hair care products; (2) to respondents who, during the preceding three months, had not participated in any marketing research surveys, including online surveys, other than a political poll; and (3) to respondents who, during the preceding month, had not heard anything about the subject of any of the interviews being conducted at the mall.

representative of the age distribution of adult males and females in the United States likely to purchase, within the next six months, one or more of the hair care products previously identified.

## SURVEY PROCEDURES AND QUESTIONS

17. Initially, a potential survey respondent was stopped by an interviewer in the public area of a shopping mall and screened (i.e., asked questions) to determine if the potential respondent met the criteria to be included in the survey universe (i.e., during the next six months was likely to purchase one or more of certain hair care products, etc.). See Exhibit A, Volume I, pages 7-9.

18. If a potential respondent fulfilled the screening criteria, or survey universe definition, he/she was then invited to return with the interviewer to the professional interviewing service facility located within the shopping mall to complete the interview. See Exhibit A, pages 10-14. The interviewer then escorted the survey respondent into a private interviewing area. In the private interviewing area, the respondent was told:

> In a moment, I am going to show you the survey exhibit; then I will ask you a couple of questions.
>
> Please understand that we are only interested in your opinions; and if you don't have an opinion or don't know the answer to a question, that is an acceptable answer.

The interviewer then handed the respondent the test cell exhibit, and the respondent was then told:

> Please look at the products and name on this survey exhibit.

and

- 7 -

>    Please take as much time as you like, and let me
> know when you are ready to continue.

When the respondent indicated that he/she was ready to continue, he/she was asked:

> 6.0   Who, or what company, do you believe puts out
>       the products on this card with this name?[6]

For respondents who indicated a belief as to the source of products with that name, the interviewer asked the basis for that belief with the question:

> 6.1   Why do you say that?[7]

Respondents were then asked:

> 7.0   What other brand name or names, if any, do you
>       believe are used by the company that puts out the
>       products on this card with this name?

For each response at question 7.0, respondents were asked:

> 7.1   Why do you say that   __INSERT RESPONSE TO Q7.0__   is
>       another brand name used by the company that puts
>       out these products with this name?

Next, respondents were told:

> 8.0   Now, I am going to ask you a question that has
>       three choices. After I am done, if you want me to
>       read the question again, just ask me.

and then asked:

---

[6]    The first principal survey questions (i.e., question series 6.0 and 7.0) were designed to address the issue of likelihood of confusion as to source or origin and were patterned after similar accepted questions. See <u>Union Carbide Corp. v. Ever-Ready, Inc.</u>, 531 F.2d 366 (7th Cir. 1976), <u>cert. denied</u>, 429 U.S. 830, 50 L. Ed. 2d 94, 97 S. Ct. 91 (1976); <u>E. & J. Gallo Winery v. Gallo Cattle Co.</u>, 12 USPQ2d 1657, 1674 (E.D. Cal. 1989), <u>aff'd</u>, 967 F.2d (9th Cir. 1992); and J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u>, Vol. 6 §32:174 @ 32-339, Rel. #42, 5/2007.

[7]    Respondents who did not indicate a belief as to who put out products with the SO SEXY name were not asked question 6.1.

- 8 -

> Do you believe that the products on this card with this name...
>
> - one, <u>are</u> being put out with the authorization or approval of any other company or companies;
> - two, are <u>not</u> being put out with the authorization or approval of any other company or companies;[8][9] or
> - three, don't know or have no opinion?

Respondents who indicated the belief that the products were put out with the authorization or approval of any other company or companies were asked:

> 8.1  With what other company or companies?[10]

If the respondent provided a company's name or companies' names, he/she was asked the basis for the belief with the question:

> 8.2  Why do you say that?

If a respondent did not provide a company's name or companies names in response to question 8.1, he/she was asked:

> 8.3  Even though you don't know the name or names, what, if anything, can you tell me about the company or companies that you believe gave their authorization or approval for the products on this card with this name?

---

[8]  To guard against any order bias, the first two alternatives in this list were rotated (i.e., approximately one-half of the respondents were read the list with the first alternative being "...<u>are</u> being put out with the authorization or approval..." and approximately one-half of the respondents were read the list with the first alternative being "...are <u>not</u> being put out with the authorization or approval...").

[9]  The principal survey question designed to address likelihood of confusion as to authorization/approval was also patterned after similar accepted questions.  J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u>, Vol. 6 §32:175 @ 32-341, Rel.#42, 5/2007.

[10]  Respondents who did not identify a company or companies in response to this question were not asked question 8.2 but, instead, were asked question 8.3.

- 9 -

Respondents were asked this same series of questions with regard to business affiliation or business connection. Specifically, respondents were told:

> 9.0 Now, I am going to ask you another question that has three choices. Again, after I am done, if you want me to read the question again, just ask me.

Subsequently, respondents were asked:

> Do you believe that the company that puts out the products on this card with this name...
>
> - one, <u>has</u> a business affiliation or business connection with any other company or companies;
> - two, does <u>not</u> have a business affiliation or business connection with any other company or companies;[11] or
> - three, don't know or have no opinion?

Respondents who indicated the belief that the company that puts out the products had a business affiliation/connection with another company were asked:

> 9.1 With what other company or companies?[12]

If the respondent provided a company's name or companies' names,

---

[11] Again, to guard against any order bias, the first two alternatives in this list were rotated (i.e., approximately one-half of the respondents were read the list with the first alternative being "...<u>has</u> a business affiliation or business connection..." and approximately one-half of the respondents were read the list with the first alternative being "...does <u>not</u> have a business affiliation or business connection...").
    As an additional guard against order bias, approximately one-half of the respondents were queried in question 8.0 regarding authorization/approval, and approximately one-half of the respondents were queried in question 8.0 regarding business affiliation/connection. Similarly, approximately one-half of the respondents were queried in question 9.0 regarding authorization/approval, and approximately one-half of the respondents were queried in question 9.0 regarding business affiliation/connection.

[12] Respondent who did not identify a company or companies in response to this question were not asked question 9.2 but, instead, were asked question 9.3.

- 10 -

he/she was asked the basis for the belief with the question:

    9.2  Why do you say that?

If a respondent did not provide a company's name or companies names in response to question 9.1, he/she was asked:

    9.3  Even though you don't know the name or names, what, if anything, can you tell me about the company or companies that you believe have a business affiliation or business connection with the company that puts out the products on this card with this name?

## SURVEY RESULTS

19.  The results of the three hundred six (306) likelihood of confusion survey interviews conducted in the instant matter evidence, on a nonduplicated basis, that only approximately two percent (2.29%) of the survey respondents reported that they believed that SO SEXY hair care products were being put out by Defendant, that SO SEXY was another name used by Defendant, that SO SEXY was put out with the authorization/approval of Defendant, or that whoever put out SO SEXY had a business affiliation/connection with Defendant.