# EXHIBIT B TO

# FORD MOTION IN LIMINE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VICTORIA'S SECRET STORES
BRAND MANAGEMENT, INC.,

      Plaintiff,

      v.

SEXY HAIR CONCEPTS, LLC,

      Defendant.

Case No. 07-CIV-5804 (GEL)

SUPPLEMENTAL DECLARATION AND
RULE 26 REPORT OF
DR. GERALD L. FORD

I, Dr. Gerald L. Ford, hereby declare as follows:

### INTRODUCTION

1.    I am a partner in the marketing research and consulting firm of Ford Bubala & Associates, located in Huntington Beach, California, where I have been engaged in commercial marketing research and consulting for the past thirty-three years. I am also an emeritus faculty member of the School of Business Administration, California State University, Long Beach, where I held a full-time teaching position for twenty-five years, prior to my retirement in 1994. My professional experience is further summarized below in paragraphs 29 through 39.

2.    In the instant matter, at the request of Colucci & Umans, counsel for Plaintiff Victoria's Secret Stores Brand Management, Inc. ("Victoria's Secret"), I designed and caused to be conducted a second survey to address the issue of likelihood of confusion. Specifically, this survey was designed to measure the degree, if any, to which the SO SEXY brand of hair care products sold by Plaintiff, Victoria's Secret, is likely to cause

confusion with respect to the source, authorization or approval of, or business affiliation or connection of the SO SEXY brand with Defendant Sexy Hair Concepts or its brands.

3.    This second survey was designed to conform to the survey design generally accepted by U.S. Federal Courts. Among other things, this likelihood of confusion survey exposed potential purchasers to the alleged infringing product bearing the alleged infringing mark in the manner in which potential purchasers would encounter the junior user's product in the marketplace.[1]

4.    The second survey results do not evidence that an appreciable number of the defined universe of females likely to purchase certain hair care products that are sold by Victoria's Secret under the SO SEXY brand or mark are likely to be confused as to the source, authorization or approval of, or business affiliation or connection of the SO SEXY brand with Defendant

---

[1]    See J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, Vol. 6 §32:175 @ 32-341-342, Rel. #42, 5/2007 (The Standard Format - One often-used two-part format for eliciting responses as to both source confusion and confusion as to sponsorship, affiliation and connection is the following.  The respondent is shown the accused product or advertisement and is asked:  "What company do you think makes this product?" Responses naming the senior user evidence actual confusion as to source.  Respondents who did not name the senior user are then asked a second question:  "Do you think this product was approved, licensed or sponsored by another company or not?"  If the answer is yes, respondent is asked:  "What company do you think this product is approved, licensed or sponsored by?" Responses naming the senior user evidence actual confusion as to sponsorship, affiliation or connection, which is actionable. Both questions should be followed by the important question: "Why do you say that?"  Often, an examination of the respondents' verbatim responses to the "why" question are the most illuminating and probative part of a survey, for they provide a window into consumer thought processes in a way that mere statistical data cannot.  [footnotes omitted])

Sexy Hair Concepts or its brands.

5.    It is my opinion that the results of the second survey conducted in this matter clearly support a finding of no likelihood of confusion.  Specifically, the second survey results evidence that the defined universe of female potential purchasers of certain hair care products are not likely to be confused or deceived by the belief that Plaintiff's SO SEXY hair care products are put out by Defendant Sexy Hair Concepts, are put out with the authorization or approval of Defendant Sexy Hair Concepts, or that the company that puts out SO SEXY hair care products has a business affiliation or business connection with Defendant Sexy Hair Concepts.

<u>SECOND SURVEY BACKGROUND</u>

6.    Attached hereto, as Exhibit A, Volumes I and II, are the results of the second survey which addressed the issue of likelihood of confusion, if any, with respect to the source, authorization/approval of, or business affiliation/connection of Plaintiff's SO SEXY brand.  Exhibit A, Volume I, provides a synopsis of the survey methodology, photographs of the survey exhibits, the survey screeners and questionnaires, response frequencies for the survey questions, and a listing of respondents' verbatim responses to the survey.  Exhibit A, Volume II, contains a sequential listing of the survey responses and copies of the Supervisor and Interviewer Instructions, which provide additional details of the survey protocols, and other survey-related background materials.

7.    The sample selection, questions, questionnaire design, and interviewing procedures employed in this survey were

- 3 -

designed in accordance with the generally accepted standards and procedures in the field of surveys and were designed to meet the criteria for survey trustworthiness detailed in the Federal Judicial Center's <u>Manual for Complex Litigation, Fourth</u>.[2]

     8.   I was responsible for the design of the survey, the survey's questionnaires, and the instructions given to the survey's supervisors and interviewers, as well as for the procedures to be followed in conducting the interviews. Interviewing, data gathering, and response recordation were carried out, under the direction of Ford Bubala & Associates, by interviewers employed by independent interviewing organizations. Supervisors working on this survey were personally trained by Ford Bubala & Associates with respect to the design, procedures, and related protocols for the survey; and daily shipments of completed interviews from each professional interviewing service were reviewed by Ford Bubala & Associates to confirm that the questionnaires were being properly executed. In addition, approximately seventy-one percent (70.51%) of the survey interviews were validated, in person, by the survey supervisors personally meeting the survey respondents and confirming their qualification and participation in the survey. Ford Bubala &

---

[2]    For the proffered poll or survey, "...Relevant factors include whether: the population was properly chosen and defined; the sample chosen was representative of that population; the data gathered were accurately reported; and the data were analyzed in accordance with accepted statistical principles...In addition, in assessing the validity of a survey, the judge should take into account the following factors: whether the questions asked were clear and not leading; whether the survey was conducted by qualified persons following proper interview procedures; and whether the process was conducted so as to ensure objectivity..." See Federal Judicial Center, <u>Manual for Complex Litigation, Fourth</u>, Section 11.493, @ 102-104 (2004).

Associates conducted validations of approximately twenty-two
percent (21.69%) of the interviews by recontacting, by telephone,
survey respondents to confirm their qualification and
participation in the survey.  Net nonduplicated validations
totaled approximately seventy-six percent (75.93%) of all survey
interviews.[3]  None of the interviews failed to validate.

      9.   The survey conducted in this matter was
administered under a double-blind protocol.  Specifically, not
only were the respondents not informed as to the purpose or
sponsor of the survey, but similarly, both the survey's
supervisors and interviewers were not informed as to the purpose
or sponsor of the survey.

<u>SURVEY STRUCTURE</u>

      10.  The likelihood of confusion survey conducted in
this matter was designed to employ a scientific experimental
survey design consisting of two survey cells:  (1) a test or
experimental survey cell designed to measure confusion, if any,
with respect to the source, authorization/approval of, or
business affiliation/connection with Defendant; and, (2) a
control cell designed to measure the extent of mismeasurement of
trademark confusion in the test cell survey results.

      11.  In the test cell, survey respondents were shown a
photograph, taken at a Victoria's Secret store, of a display of
hair care products bearing the SO SEXY mark and then were handed
a bottle of SO SEXY shampoo and were asked to look at the product
as they would if they saw it in a store and were considering

---

[3]   This level of validation exceeds industry standards of
10% to 15%.

purchasing the product.  Respondents were then asked questions regarding their state of mind with respect to the source, authorization/approval of, or business affiliation/connection of the SO SEXY shampoo.  See Exhibit A, Volume I, pages 6-15.

12.  In the control cell, survey respondents were shown the same photograph of a display of hair care products but the name on the products was digitally changed from SO SEXY to O! SO and then respondents were handed the same bottle of shampoo as in the test cell but with labels on the front and back of the bottle on which the SO SEXY mark was replaced with the O! SO mark. Other than the modified mark, all other words and statements on the control cell bottle remained the same as on the test cell bottle.  Respondents in the control cell were asked the same questions as respondents in the test cell regarding their state of mind with respect to the source, authorization/approval of, or business affiliation/connection of the O! SO shampoo.  See Exhibit A, Volume I, pages 124-133.

13.  The control survey cell provides a measure of the extent of non-trademark related confusion that exists in the test cell survey results which is not reflective of a likelihood of confusion due to the mark SO SEXY.  Specifically, the control survey cell functions as a baseline and provides a measure of the degree to which respondents are likely to answer Sexy Hair Concepts not as a result of the mark SO SEXY but because of other factors, such as the survey's questions, the survey's procedures, the market share or brand popularity of Sexy Hair Concepts' products, or some other potential influence on a respondent's answer.

- 6 -

14.   In addition, the likelihood of confusion survey conducted in this matter employed the use of the question "Why do you say that?" to assess the basis for the beliefs expressed in response to the survey's source, authorization/approval of, and business affiliation/connection questions.

15.   In total, five hundred ninety (590) interviews were conducted in this survey:  three hundred six (306) in the test cell and two hundred eighty-four (284) in the control cell.[4]

16.   This survey employed a shopping center intercept methodology.  Respondents in the survey were interviewed by interviewers employed by professional interviewing services at shopping centers in metropolitan markets in nine (9) states (i.e., Arizona, California, Georgia, Illinois, Massachusetts, Minnesota, New York, Tennessee, and Texas), located in each of the nine (9) U.S. Census Divisions.

17.   The universe was defined as females, eighteen years of age or older, who within the next six months were likely

---

[4]   306 interviews were scheduled to be conducted in the control cell but due to a tornado in Tennessee that damaged the shopping center, the shopping center was evacuated and closed. Only 12 of the scheduled 34 control cell interviews were completed at this location.

to purchase one or more certain hair care products sold by Victoria's Secret under the SO SEXY brand or mark.[5],[6]

18.  The respondent selection procedure employed in this survey was based upon screening for qualified respondents in proportion to the age distribution of the female population 18 years of age or older in the United States until the established quota for each cell was filled.  This method provided a respondent base that is believed to be generally representative of the age distribution of adult females in the United States likely to purchase, within the next six months, one or more of the hair care products previously identified.

<u>SURVEY PROCEDURES AND QUESTIONS</u>

19.  Initially, a potential survey respondent was stopped by an interviewer in the public area of a shopping mall and screened (i.e., asked questions) to determine if the potential respondent met the criteria to be included in the survey universe (i.e., during the next six months was likely to purchase one or more of certain hair care products, etc.).  See Exhibit A, Volume I, pages 8-10 and 126-128.

---

[5]  These products included the following:  shampoo; conditioner; hair spray, styling gel, mousse, pomade, or style cream; straightening balm; curl-enhancing spray; or shine serum.

[6]  Additionally, the likelihood of confusion survey universe was also restricted as follows:  (1) to respondents who did not, nor did anyone else in their home, work for an advertising agency or marketing research firm, or a retail store or company that makes, sells, or distributes any hair care products; (2) to respondents who, during the preceding three months, had not participated in any marketing research surveys, including online surveys, other than a political poll; and (3) to respondents who, during the preceding month, had not heard anything about the subject of any of the interviews being conducted at the mall.

20. If a potential respondent fulfilled the screening criteria, or survey universe definition, she was then invited to return with the interviewer to the professional interviewing service facility located within the shopping mall to complete the interview. See Exhibit A, pages 11-15 and 129-133. The interviewer then escorted the survey respondent into a private interviewing area. In the private interviewing area, the respondent was told:

> In a moment, I am going to show you a picture of a retail display; and after that, I am going to show you a product from that display. Then I will ask you a couple of questions.

> Please understand that we are only interested in your opinions; and if you don't have an opinion or don't know the answer to a question, that is an acceptable answer.

The interviewer then handed the respondent a photograph of a retail display, and the respondent was then told:

> Would you please look at this picture as you would if you saw this display in a store.

and

> Please take as much time as you like, and let me know when you are ready to continue.

When the respondent indicated that she was ready to continue, the interviewer got the picture back from the respondent and put it out of sight. The respondent was then handed a bottle of shampoo and was told:

> This is a product from the display like the one you saw in the picture. Please look at this product as you would if you saw it in a store and were considering purchasing this product.

When the respondent indicated that she was ready to continue, she was asked:

6.0  Who, or what company, do you believe puts out this product with this name?[7]

For respondents who indicated a belief as to the source of a product with that name, the interviewer asked the basis for that belief with the question:

6.1  Why do you say that?[8]

Respondents were then asked:

7.0  What other brand name or names, if any, do you believe are used by the company that puts out this product with this name?

For each response at question 7.0, respondents were asked:

7.1  Why do you say that __INSERT RESPONSE TO Q7.0__ is another brand name used by the company that puts out this product with this name?

Next, respondents were told:

8.0  Now, I am going to ask you a question that has three choices. After I am done, if you want me to read the question again, just ask me.

---

[7]    The first two principal survey questions (i.e., question series 6.0 and 7.0) were designed to address the issue of likelihood of confusion as to source or origin and were patterned after similar accepted questions. See Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366 (7th Cir. 1976), cert. denied, 429 U.S. 830, 50 L. Ed. 2d 94, 97 S. Ct. 91 (1976); E. & J. Gallo Winery v. Gallo Cattle Co., 12 USPQ2d 1657, 1674 (E.D. Cal. 1989), aff'd, 967 F.2d (9th Cir. 1992); and J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, Vol. 6 §32:174 @ 32-339, Rel. #42, 5/2007.

[8]    Respondents who did not indicate a belief as to who put out the product were not asked question 6.1.

and then asked:

>Do you believe that this product with this name...
>
>- one, <u>is</u> being put out with the authorization or approval of any other company or companies;
>- two, is <u>not</u> being put out with the authorization or approval of any other company or companies;[9] [10] or
>- three, don't know or have no opinion?

Respondents who indicated the belief that the product was put out with the authorization or approval of any other company or companies were asked:

>8.1   With what other company or companies?[11]

If the respondent provided a company's name or companies' names, she was asked the basis for the belief with the question:

>8.2   Why do you say that?

If a respondent did not provide a company's name or companies names in response to question 8.1, she was asked:

>8.3   Even though you don't know the name or names, what, if anything, can you tell me about the company or companies that you believe gave their authorization or approval for this product with this name?

---

[9]    To guard against any order bias, the first two alternatives in this list were rotated (i.e., approximately one-half of the respondents were read the list with the first alternative being "...<u>is</u> being put out with the authorization or approval..." and approximately one-half of the respondents were read the list with the first alternative being "...is <u>not</u> being put out with the authorization or approval...").

[10]    The principal survey question designed to address likelihood of confusion as to authorization/approval was also patterned after similar accepted questions.  J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u>, Vol. 6 §32:175 @ 32-341, Rel.#42, 5/2007.

[11]    Respondents who did not identify a company or companies in response to this question were not asked question 8.2 but, instead, were asked question 8.3.

- 11 -

Respondents were asked this same series of questions with regard

to business affiliation or business connection.  Specifically,

respondents were told:

> 9.0 Now, I am going to ask you another question that
> has three choices.  Again, after I am done, if you
> want me to read the question again, just ask me.

Subsequently, respondents were asked:

> Do you believe that the company that puts out this
> product with this name...
>
> * one, <u>has</u> a business affiliation or business
>   connection with any other company or
>   companies;
> * two, does <u>not</u> have a business affiliation or
>   business connection with any other company or
>   companies;[12] or
> * three, don't know or have no opinion?

Respondents who indicated the belief that the company that puts

out the product had a business affiliation/connection with

another company were asked:

> 9.1 With what other company or companies?[13]

If the respondent provided a company's name or companies' names,

---

[12]     Again, to guard against any order bias, the first two
alternatives in this list were rotated (i.e., approximately one-
half of the respondents were read the list with the first
alternative being "...<u>has</u> a business affiliation or business
connection..." and approximately one-half of the respondents were
read the list with the first alternative being "...does <u>not</u> have
a business affiliation or business connection...").
     As an additional guard against order bias,
approximately one-half of the respondents were queried in
question 8.0 regarding authorization/approval, and approximately
one-half of the respondents were queried in question 8.0
regarding business affiliation/connection.  Similarly,
approximately one-half of the respondents were queried in
question 9.0 regarding authorization/approval, and approximately
one-half of the respondents were queried in question 9.0
regarding business affiliation/connection.

[13]     Respondent who did not identify a company or companies
in response to this question were not asked question 9.2 but,
instead, were asked question 9.3.

she was asked the basis for the belief with the question:

    9.2  Why do you say that?

If a respondent did not provide a company's name or companies

names in response to question 9.1, she was asked:

    9.3  Even though you don't know the name or names,
        what, if anything, can you tell me about the
        company or companies that you believe have a
        business affiliation or business connection with
        the company that puts out this product with this
        name?

Finally, the shampoo bottle was removed from sight and

respondents were asked:

    11.0 Within the past six months, have you had your hair
        done at a salon?

and

    11.1 Within the next six months, are you likely to have
        your hair done at a salon?

## SURVEY RESULTS

### Test Cell Survey Results

21. In the test cell, following a review of the Victoria's Secret SO SEXY shampoo product, two (2) respondents or approximately one percent (0.65%) of the survey responses were classified as Sexy Hair Concepts responses even though these respondents did not specifically mention Sexy Hair Concepts or any of its brands. See Exhibit A, Volume I, Table 1, page 16.

TABLE 1[14]
TEST CELL
SO SEXY

Q6.0  Who, or what company, do you believe puts out this product with this name?

Q6.1  Why do you say that?

| Response Categories | Response Distribution | |
| --- | --- | --- |
| | Number | Percent (n=306) |
| 1. Sexy Hair Concepts | 2 | 0.65 |
| 2. So Sexy/Victoria's Secret | 231 | 75.49 |
| 3. Other | 31 | 10.13 |
| 4. Don't know | 42 | 13.73 |
| Total | 306 | 100.00 |

[14]  The table numbers in this declaration correspond to the table numbers in Exhibit A, Volume I, and therefore may not be sequential.

- 14 -

22. In response to the next question (i.e., "What other brand name or names, if any, do you believe are used by the company that puts out this product with this name?"), none of the survey responses were classified as Sexy Hair Concepts responses. See Exhibit A, Volume I, Table 2, page 40.

TABLE 2
TEST CELL
SO SEXY

Q7.0  What other brand name or names, if any, do you believe are used by the company that puts out this product with this name?

Q7.1  Why do you say that <u>INSERT RESPONSE</u> is another brand name used by the company that puts out this products with this name?

| Response Categories | Response Distribution | | | |
|---|---|---|---|---|
| | Number | Percent (n=306) | Unduplicated Number | Percent (n=306) |
| 1. Sexy Hair Concepts | -- | --- | -- | --- |
| 2. So Sexy/Victoria's Secret | 36 | 11.76 | | |
| 3. Other | 39 | 12.75 | | |
| 4. Don't know/None | 241 | 78.76 | | |

- 15 -

23.    No additional survey responses were categorized as Sexy Hair Concepts responses with regard to the belief that the Victoria's Secret SO SEXY shampoo was put out with the authorization/approval of Sexy Hair Concepts and one (1) respondent or approximately one-third of one percent (0.33%) of the survey responses was categorized as a Sexy Hair Concepts response with regard to the belief that the company that puts out the Victoria's Secret SO SEXY shampoo had a business affiliation/connection with Sexy Hair Concepts even though this respondent did not specifically mention Sexy Hair Concepts or any of it brands.  See Exhibit A, Volume I, Tables 3 and 4, pages 62 and 88.

TABLE 3
TEST CELL
SO SEXY

Q8.0   Do you believe that this product with this name...
      one, are being put out with the authorization or approval of
      any other company or companies;
      two, are not being put out with the authorization or approval
      of any other company or companies; or
      three, don't know or have no opinion?
Q8.1   With what other company or companies?
Q8.2   Why do you say that?
Q8.3   Even though you don't know the name or names, what, if anything,
      can you tell me about the company or companies that you believe
      gave their authorization or approval for this product with this
      name?

| | Response Distribution | | | |
| Response Categories | Number | Percent (n=306) | Unduplicated Number | Percent (n=306) |
|---|---|---|---|---|
| 1. Put out with authorization or approval | | | | |
| • Sexy Hair Concepts | -- | --- | -- | --- |
| • So Sexy/Victoria's Secret | 21 | 6.86 | | |
| • Other | 22 | 7.19 | | |
| • Don't know | 40 | 13.07 | | |
| Subtotal | 83 | 27.12 | | |
| 2. Not put out with approval | 55 | 17.97 | | |
| 3. Don't know/No opinion | 168 | 54.90 | | |
| Total | 306 | 100.00 | | |

- 17 -

TABLE 4
TEST CELL
SO SEXY

Q9.0   Do you believe that the company that puts out this product with
       this name...
           one, has a business affiliation or business connection with
           any other company or companies;
           two, does not have a business affiliation or business
           connection with any other company or companies; or
           three, don't know or have no opinion?
Q9.1   With what other company or companies?
Q9.2   Why do you say that?
Q9.3   Even though you don't know the name or names, what, if anything,
       can you tell me about the company or companies that you believe
       have a business affiliation or business connection with the
       company that puts out this product with this name?

| Response Categories | Response Distribution | | Unduplicated | |
| --- | --- | --- | --- | --- |
| | Number | Percent (n=306) | Number | Percent (n=306) |
| 1. Has business affiliation or connection | | | | |
| • Sexy Hair Concepts | 1 | 0.33 | 1 | 0.33 |
| • So Sexy/Victoria's Secret | 19 | 6.21 | | |
| • Other | 37 | 12.09 | | |
| • Don't know | 34 | 11.11 | | |
| Subtotal | 91 | 29.74 | | |
| 2. Does not have business affiliation or connection | 70 | 22.88 | | |
| 3. Don't know/No opinion | 145 | 47.39 | | |
| Total | 306 | 100.00 | | |

<u>Control Cell Survey Results</u>

     24.   In the control cell, following a review of the
O! SO shampoo product, none of the survey responses were
classified as Sexy Hair Concepts responses.   See Exhibit A,
Volume I, Table 11, page 134.

TABLE 11
CONTROL CELL
O! SO

Q6.0  Who, or what company, do you believe puts out this product
     with this name?
Q6.1  Why do you say that?

| Response Categories | Response Distribution | |
| --- | --- | --- |
| | Number | Percent (n=284) |
| 1. Sexy Hair Concepts | -- | --- |
| 2. O! SO/Victoria's Secret | 209 | 73.59 |
| 3. Other | 17 | 5.99 |
| 4. Don't know | 58 | 20.42 |
| Total | 284 | 100.00 |

25. In response to the next question (i.e., "What other brand name or names, if any, do you believe are used by the company that puts out this product with this name?"), one (1) respondent or approximately one-third of one percent (0.35%) of the survey responses was classified as a Sexy Hair Concepts response even though this respondent did not specifically mention Sexy Hair Concepts or any of its brands. See Exhibit A, Volume I, Table 12, page 156.

---

TABLE 12
CONTROL CELL
O! SO

Q7.0  What other brand name or names, if any, do you believe are used by the company that puts out this product with this name?

Q7.1  Why do you say that INSERT RESPONSE is another brand name used by the company that puts out this product with this name?

---

| | Response Distribution | | | |
|---|---|---|---|---|
| | | | Unduplicated | |
| Response Categories | Number | Percent (n=284) | Number | Percent (n=284) |
| 1. Sexy Hair Concepts | 1 | 0.35 | 1 | 0.35 |
| 2. O! SO/Victoria's Secret | 50 | 17.61 | | |
| 3. Other | 28 | 9.86 | | |
| 4. Don't know/None | 226 | 79.58 | | |

26.  No additional survey responses were categorized as Sexy Hair Concepts responses with regard to the belief that the O! SO shampoo was put out with the authorization/approval of Sexy Hair Concepts and no additional survey responses were categorized as Sexy Hair Concepts responses with regard to the belief that the company that puts out the O! SO shampoo had a business affiliation/connection with Sexy Hair Concepts.  See Exhibit A, Volume I, Tables 13 and 14, pages 176 and 200.

TABLE 13
CONTROL CELL
O! SO

Q8.0  Do you believe that this product with this name...
      one, <u>are</u> being put out with the authorization or approval of any other company or companies;
      two, are <u>not</u> being put out with the authorization or approval of any other company or companies; or
      three, don't know or have no opinion?
Q8.1  With what other company or companies?
Q8.2  Why do you say that?
Q8.3  Even though you don't know the name or names, what, if anything, can you tell me about the company or companies that you believe gave their authorization or approval for this product with this name?

| Response Categories | Response Distribution | | | |
| --- | --- | --- | --- | --- |
| | Number | Percent (n=284) | Unduplicated Number | Percent (n=284) |
| 1. Put out with authorization or approval | | | | |
| • Sexy Hair Concepts | -- | --- | -- | --- |
| • O! SO/Victoria's Secret | 27 | 9.51 | | |
| • Other | 13 | 4.58 | | |
| • Don't know | 32 | 11.27 | | |
| Subtotal | 72 | 25.35 | | |
| 2. Not put out with approval | 47 | 16.55 | | |
| 3. Don't know/No opinion | 165 | 58.10 | | |
| Total | 284 | 100.00 | | |

TABLE 14
CONTROL CELL
O! SO

Q9.0  Do you believe that the company that puts out this product with
      this name...
           one, has a business affiliation or business connection with
           any other company or companies;
           two, does not have a business affiliation or business
           connection with any other company or companies; or
           three, don't know or have no opinion?
Q9.1  With what other company or companies?
Q9.2  Why do you say that?
Q9.3  Even though you don't know the name or names, what, if anything,
      can you tell me about the company or companies that you believe
      have a business affiliation or business connection with the
      company that puts out this product with this name?

| Response Categories | Response Distribution | | Unduplicated | |
|---|---|---|---|---|
| | Number | Percent (n=284) | Number | Percent (n=284) |
| 1. Has business affiliation or connection | | | | |
| • Sexy Hair Concepts | -- | --- | -- | --- |
| • O! SO/Victoria's Secret | 21 | 7.39 | | |
| • Other | 39 | 13.73 | | |
| • Don't know | 36 | 12.68 | | |
| Subtotal | 96 | 33.80 | | |
| 2. Does not have business affiliation or connection | 44 | 15.49 | | |
| 3. Don't know/No opinion | 144 | 50.70 | | |
| Total | 284 | 100.00 | | |

## SUMMARY OF SURVEY RESULTS

27.   The results of the likelihood of the second

confusion survey evidence, on a net basis after adjusting the

survey data for non-trademark related confusion based upon the

- 22 -

control cell,[15] that less than one percent (0.63%) of the survey respondents are likely to be confused relative to the belief that the Victoria's Secret SO SEXY brand shampoo was either put out by Defendant, was put out with the authorization/approval of Defendant, or that the company that puts out the SO SEXY brand shampoo has a business affiliation/connection with Defendant. See Exhibit A, Volume I, Table 21, page 235.

TABLE 21
CONTROL CELL
ALL RESPONDENTS
Composite Response Analysis
Net Unduplicated Responses

| Response Categories | Response Distribution | |
| --- | --- | --- |
| | Test Cell Percent (n=306) | Control Cell Percent (n=284) |
| 1. Sexy Hair Concepts | 0.98 | 0.35 |

CONCLUSION

28. It is my considered opinion, based upon my education, background, and professional experience, and based upon my review and analysis of results of the second survey conducted in this matter, that the results clearly support a finding of no likelihood of confusion. Specifically, the second survey results evidence that the defined universe of female potential purchasers of certain hair care products are not likely

---

[15] The adjustment for non-trademark related confusion is accomplished by reducing the percent of responses classified as Sexy Hair Concepts in the test cell by the percent of responses classified as Sexy Hair Concepts in the control cell. In this case 0.98% of the responses in the test cell were classified as Sexy Hair Concepts responses and 0.35% of the responses in the control cell were classified as Sexy Hair Concepts responses. Thus, the likelihood of confusion level would be calculated as 0.98% – 0.35% = 0.63%.

- 23 -

to be confused or deceived by the belief that Plaintiff's SO SEXY hair care products are put out by Defendant Sexy Hair Concepts, are put out with the authorization or approval of Defendant Sexy Hair Concepts, or that the company that puts out SO SEXY hair care products has a business affiliation or business connection with Defendant Sexy Hair Concepts.

<u>QUALIFICATIONS</u>

29.  I hold a Bachelor's Degree in Advertising (B.A.) from San Jose State University, a Master's Degree in Business Administration (M.B.A.) from the University of Southern California, and a Doctoral Degree in Business Administration (D.B.A.) from the University of Southern California.

30.  During my twenty-five year academic appointment, my teaching responsibilities included both graduate and undergraduate level courses in a variety of subject areas. My teaching responsibilities included courses in marketing (e.g., marketing, marketing management, advertising, promotion, consumer behavior, and marketing research) and management (e.g., principles of management; business policy and strategy; business policies, operations, and organizations; and integrated analysis).

31.  I am a member of the American Marketing Association (AMA), the American Academy of Advertising (AAA), the American Association of Public Opinion Research (AAPOR), the Council of American Survey Research Organizations (CASRO), and the International Trademark Association (INTA).

32.  As a partner with Ford Bubala & Associates, I have been retained by a variety of firms engaged in the consumer

product, industrial product, and service sectors of the economy
to provide marketing consulting and research services.
Approximately one-half of Ford Bubala & Associates' consultancies
in which I have participated have involved the design and
execution of marketing research surveys.

33.  As previously noted, during the past thirty-three
years, I have been retained in a number of litigation-related
consultancies involving intellectual property matters, including
matters before federal and state courts, the Trademark Trial and
Appeal Board of the U.S. Patent and Trademark Office, and the
International Trade Commission.  I have designed and executed
surveys relating to intellectual property matters, including
false advertising, trademark, patent, and other related matters.
I am familiar with the accepted principles of survey research, as
well as the tests for trustworthiness of properly conducted
surveys or polls.[16]

34.  During the past twenty-eight years, I have
addressed a variety of groups on the subject of surveys or polls
and their use in the measurement of the state of mind of
consumers, with respect to Lanham Act matters.  Specifically, I
have spoken at meetings of the American Bar Association, the
American Intellectual Property Law Association, the American
Marketing Association, the International Trademark Association,
the Marketing Research Association, the Intellectual Property Law
Institute of Canada, and the Practising Law Institute.

35.  I have also written on the subject of the design
and execution of litigation-related surveys in intellectual

---

[16]    Supra note 2.

- 25 -

property matters.  Attached hereto as Exhibit B is a list of
papers I have written since 1987.

36.  Since 1998 I have served as a member of the
Editorial Board of The Trademark Reporter, the scholarly legal
journal on the subject of trademarks, published by the
International Trademark Association.

37.  I have been qualified and accepted as an expert in
marketing and marketing research in more than fifty (50) trials
before federal and state courts and administrative government
agencies.

38.  Attached hereto as Exhibit C is a list of cases in
which I have provided trial and/or deposition testimony since
1992.

39.  Attached hereto as Exhibit D is a copy of my
professional history, describing my qualifications and
professional background.

## MATERIAL CONSIDERED

40.  Material considered, in the instant matter,
include:  the Complaint; the Answer; the Trademark Trial and
Appeal Board opinion in Sexy Hair Concepts, LLC. v. Victoria's
Secret Stores Brand Management, Inc.; Sexy Hair Concepts' Trial
Brief before the Trademark Trial and Appeal Board; Victoria's
Secret's Trial Brief before the Trademark Trial and Appeal Board;
and Sexy Hair Concepts' Reply Brief before the Trademark Trial
and Appeal Board.

## COMPENSATION

41.  Ford Bubala & Associates' fees for this engagement
consist of billable time and expenses.  Standard time is billed

- 26 -

at the rate of $450.00 per hour for the services of a Partner and $200.00 per hour for the services of a Research Associate. Deposition and trial time are billed at the rate of $600.00 per hour plus expenses.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 14th day of February, 2008, in Huntington Beach, California.

_____
Dr. Gerald L. Ford