# EXHIBIT 2 TO

# STATEMENT OF FACTS

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

---------------------------------x
SEXY HAIR CONCEPTS, LLC,          :

        Opposer,              :
                                                  Opposition No.
   v.                                :         125,739
                                                  (SO SEXY)

V SECRET CATALOGUE, INC,          :

        Applicant.            :
---------------------------------x

### APPLICANT'S FIRST NOTICE OF RELIANCE ON PORTIONS OF MICHAEL O'ROURKE'S DISCOVERY DEPOSITION AND EXHIBITS

        Pursuant to T.B.M.P §704.09 and 37 C.F.R. § § 2.120 (j) (1) and 2.120 (j) (3) (i), applicant hereby gives notice that it intends to rely on the following evidence:

        1.    Portions of the transcript of the deposition taken by applicant pursuant to Rule 30 (b) (6) of the Federal Rules of Civil Procedure of opposer's founder, President and CEO, Michael O'Rourke, on February 5, 2003, and their relevance are set forth as follows:

        a.    line 10 of p. 21 through line 10 of p. 24 are relevant as they contradict opposer's allegation that since late 2002 it adopted a specific type of format for the packaging of its Sexy Hair products. Copies of these pages together with Applicant's Dep. Exhs. 42 and 43* are attached herewith as Applicant's Exh. KK**.

        b.    line 7 through line 14 of p. 42 is relevant as it relates to the reason opposer alleges confusion is likely between applicant's mark SO SEXY and its Sexy Hair marks. A copy of this page is attached herewith as Applicant's Exh. LL.

        c.    line 10 of p. 44 through line 25 of p. 46 are relevant as they

---

\*    References hereinafter to "Applicant's Dep. Exhs. ____" are to applicant's exhibits marked during applicant's discovery deposition of Mr. O'Rourke.

\*\*   References hereinafter to "Applicant's Exh. ____" are to applicant's exhibits submitted herewith during applicant's testimony period following the last exhibit number (JJ) of the testimonial deposition of applicant's witnesses, Kathi Van Zandt, Sherry H. Baker and William R. Bechstein.

relate to Mr. O'Rourke's understanding of opposer's claim of a "family" of trademarks in the word "sexy". Copies of these pages are attached herewith as Applicant's Exh. MM.

    d.    line 9 of p. 49 through line 10 of p. 62 and line 3 of p. 80 through line 10 of p. 99 are relevant as they relate to descriptive uses of the word "sexy" and/or "sexy hair" by unrelated third-parties and opposer's admission that this type of use is objectionable, and admits there is probably no use of the word "sexy hair" by any third-party which would not create a problem for opposer. It further supports Applicant's First Affirmative Defense claimed in its answer that no one company engaged in the marketing of personal care products, including hair care products, is entitled to the exclusive right to register and/or use the word "sexy" as part of its mark or name. Copies of these pages together with Applicant's Dep. Exhs. 23, 24, 25, 33, 34, 45, 48, 49, 50, 51, 52, and 53 referred to therein are attached herewith as Applicant's Exh. NN.

    e.    line 1 of p. 63 through line 24 of p. 71 are relevant as opposer's admission of the descriptive nature of its Sexy Hair marks, as they relate to its goods. Copies of these pages together with Applicant's Dep. Exhs. 9, 10, 11, 12, 14, 17, 18, and 46 referred to therein are attached herewith as Applicant's Exh. OO.

    f.    line 25 of p. 71 through line 2 of p. 73 are relevant as opposer's admission that according to Mr. O'Rourke no one, including applicant, can even promote the "perception" that their hair care products make one look sexy. Copies of these pages are attached herewith as Applicant's Exh. PP.

    g.    line 3 of p. 73 through line 25 of p.76 and line 7 of p. 78 through line 20 of p. 79 are relevant as opposer admits, after reviewing applicant's intended use of SO SEXY, that it objects not only to applicant's mark SO SEXY, but also to applicant's descriptive use of the words "sexy hair." Copies of these pages together with Applicant's Dep. Exh. 47 referred to therein are attached herewith as Applicant's Exh. QQ.

    h.    line 2 of p. 100 through line 9 of p. 114 and line 17 of p.118 through line 6 of p. 145 are relevant as they are published articles produced by opposer in which Mr. O'Rourke is quoted as using the words "sexy" and/or "sexy hair" descriptively and admits in certain instances that "sexy" and/or "sexy hair" is descriptive. Copies of these pages together with Applicant's Dep. Exhs. 35, 38, 42, 54, 55, 56, 57, 58, and 59 referred to therein are attached herewith as Applicant's Exh. RR.

    i.    line 10 of p. 114 through line 15 of p. 118 are relevant as they demonstrate instances of unrelated third-party uses of the words "sexy" and/or "sexy hair" which were produced by opposer and which were not objected

to by opposer. Copies of these pages together with Applicant's Dep. Exhs. 36 and 37 referred to therein are attached herewith as Applicant's Exh. SS.

Dated: New York, New York
February 10, 2005

COLUCCI & UMANS

By: *Frank J. Colucci*
Frank J. Colucci
Attorneys for Applicant
218 East 50th Street
New York, New York 10022
(212) 935-5700

## CERTIFICATE OF SERVICE

It is hereby certified that a copy of the foregoing "Applicant's Notice of Reliance on Portions of Michael O'Rourke's Discovery Deposition" and Applicant's Exhibits KK-SS filed with the United States Trademark Trial and Appeal Board have also been forwarded via Express Mail, postage prepaid, to Opposer's Attorney, Roberta Jacobs-Meadway of Ballard Spar Andrews & Ingersoll, LLP at 1735 Market Street, 51st Floor, Philadelphia, Pennsylvania 19103-7599 this 10th day of February, 2005.

*David M. Dahan*
DAVID M. DAHAN

FEBRUARY 10, 2005

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

---

SEXY HAIR CONCEPTS, LLC,

    Opposer,

v.

V SECRET CATALOGUE, INC.,

    Applicant.

---

Opposition No.

125,739

## APPLICANT'S EXHIBIT RR

Page 97

Page 98

Page 99

Page 100

(2) Q BY MR. COLUCCI: Exhibit 35, it's my
(3) understanding, is an excerpt from a magazine called
(4) Cosmetic Personal Care. And it appeared in the
(5) March/April 2000 edition of that magazine. Have you seen
(6) this article before?
(7) A It's very possible. I do read some of them,
(8) but it all goes to our PR company.
(9) Q Could you look at it.
(10) A I did.
(11) Q Did you notice in the article that there were a
(12) number of quotations or quotes attributable to you?
(13) A Yes.
(14) Q Do you recall being interviewed for any article
(15) by CPC?
(16) A I don't recall it at all. I have so many.
(17) Q If you look in the first column of the
(18) article –
(19) A Yes.
(20) Q – and about the third full paragraph down,
(21) under the heading "Tailored Products," beginning with,
(22) "Short Sexy Hair, as its name implies, is composed of
(23) products geared for short hairstyles." Do you see that?
(24) A Absolutely.
(25) Q Now, if you look into that paragraph, there's a

Page 101

(1) quote. And it says, "Short Sexy Hair is a brand that
(2) communicates its purpose from all aspects. From the
(3) compact packaging design, to the short descriptive names
(4) of the products, everything about it says Short and
(5) Sexy,' says Michael O'Rourke, CEO, Ecoly International,
(6) Inc., Chatsworth California." Do you recall --
(7)  A  Do you have a question?
(8)  Q  Do you recall making that statement?
(9)  A  I don't recall it.
(10) Q  Is it an accurate statement?
(11) A  About short hair, yes.
(12) Q  The statement, the complete statement, is it
(13) accurate?
(14) A  Well, define "the statement." I'm talking about
(15) short hair and the packaging of short hair, all relating
(16) to short hair.
(17) Q  What I'm relating to is the quotation. Is the
(18) quotation accurate or not?
(19) A  I can't remember whether that is an accurate
(20) statement that I made. The statement, I believe, is
(21) saying that the packaging, the product, all relates to
(22) short hair; and that the brand process behind it is
(23) "sexy." That's what it's saying.
(24) Q  Let me --
(25) A  And that's most probably what I said to them.

Page 102

(1)  Q  Let me break it down for you.
(2)  A  All right.
(3)  Q  There's two parts to it. Did you say this to
(4) the reporter?
(5)  A  I can't remember. I can't remember that.
(6)  Q  And that's one thing.
(7)  A  Okay.
(8)  MS. JACOBS-MEADWAY:  Mr. Colucci, please, let him
(9) finish his answer --
(10) MR. COLUCCI:  I'm sorry. I'm sorry.
(11) MS. JACOBS-MEADWAY:  -- or the record will not be
(12) accurate. The two of you are still jumping on each
(13) other's sentences, and it's not going to be good for the
(14) record.
(15) Please let him finish, then ask the question.
(16) MR. COLUCCI:  I apologize. I didn't mean to
(17) interrupt you. Go ahead.
(18) Q  Instead, let me go back. The first part is: Is
(19) this -- did you make this statement as quoted?
(20) A  I can't remember having done that.
(21) Q  The second part is: Is it an accurate
(22) statement?
(23) A  I believe it's written as they hear -- as they
(24) want to hear it.
(25) Q  Well, is it accurate or is it not accurate?

Page 103

(1)  A  As far as the packaging being short and the
(2) concept being short, yes. And the brand name being Sexy,
(3) yes. And that's what I would say exactly.
(4)  Q  So it's not accurate?
(5)  A  I'm telling you exactly what I read from that.
(6)  Q  The way it's quoted, is it accurate?
(7)  A  That the packaging is short, yes, that part is
(8) accurate. And the part of Sexy is accurate because
(9) that's the brand name. I don't know why we're having
(10) conflict on this.
(11) Q  I don't know either. Is there something that is
(12) inaccurate about it?
(13) A  I need to read it again.
(14) Can I have a look at that.
(15) It is what it is. And I don't remember this
(16) interview at all. And it is what it is.
(17) Q  What about the statement that is made
(18) previously? Now, it's not a quote from you, but it says,
(19) "Short Sexy Hair, as its name implies, is comprised of
(20) products geared for short hairstyles." And then the same
(21) statement is made under a picture, which appears to be
(22) your products, below on that article.
(23) Do you consider that to be an accurate
(24) statement?
(25) A  Short -- that the product's made for short hair?

Page 104

(1) Yes.
(2)  Q  The statement that's made in the article,
(3) exactly as written, do you agree with that statement?
(4)  A  I agree with the part of it being for short hair
(5) and sexy as emotion. That's the part I agree with. How
(6) the statement is written, I don't know.
(7)  Q  What is there about the statement that you don't
(8) agree with?
(9)  A  The way they have written it. It's short hair,
(10) definitely products for short hair. And then the
(11) consumer can perceive from that the emotion of what they
(12) want to get out of it. That's how it should be written.
(13) Q  So you don't think -- it's not accurate the way
(14) it's written?
(15) A  I don't think so.
(16) Q  Then in the second column, again -- this is the
(17) third full column -- full paragraph in the second column
(18) where there is another quote. Can you look at it, sir.
(19) A  Is it on this one?
(20) Q  Yes. It's on the same article, and it's on the
(21) second column.
(22) A  Right.
(23) Q  It's the third paragraph. It begins, "O'Rourke
(24) notes that the Sexy Hair concepts were developed under
(25) psychographics rather than demographic guidelines." Do

### Page 105

(1) you see that?
(2) A  Yeah. I don't remember this at all.
(3) Q  You don't remember making that statement?
(4) A  Not at all.
(5) Q  There's a quote that says, "The products were
(6) created to evoke emotion. Consumers using the product
(7) range from age 16 to 60." Then I don't know where the
(8) end of the quote is there; there doesn't seem to be one.
(9) Then there's another quote which says, "Which is
(10) proof positive that age has nothing to do with feeling
(11) Sexy,' he says," meaning you say.
(12) Do you remember that?
(13) A  I believe what I would have said was that --
(14) Q  No, no. I'm not asking you that, sir.
(15) A  Well --
(16) Q  I'm asking you --
(17) A  Well, this is what it connotates to.
(18) MS. JACOBS-MEADWAY:  Just answer the question.
(19) Q  BY MR. COLUCCI: I wasn't asking you what it
(20) connotates --
(21) A  The question is what?
(22) Q  The question is: Did you make those statements?
(23) That's number one.
(24) A  I can't remember.
(25) Q  Are the statements accurate?

### Page 106

(1) MS. JACOBS-MEADWAY:  I am going to object to the
(2) form of the question. It's vague. Accurate in terms of
(3) is this an accurate quote or something else?
(4) MR. COLUCCI:  No. I told you. I broke it down two
(5) ways.
(6) Q  Were you -- did you make this statement,
(7) meaning --
(8) A  I don't recall. So if it's accurate --
(9) Q  You don't recall that?
(10) A  No.
(11) Q  So then, is it accurate? Do you agree with
(12) this --
(13) A  I don't recall --
(14) Q  Do you agree with these statements? Where the
(15) quotes are attributable to you, do you agree with what
(16) they say?
(17) A  I think part I agree with, which is, "The
(18) products were created to evoke emotions." Yes, I will
(19) agree with that part.
(20) Q  And that's all you would agree with?
(21) A  And I do agree that the consumers range from 16
(22) to 62, or whatever. That's it.
(23) Q  You don't agree with the last statement, "Which
(24) is proof positive that age has nothing to do with feeling
(25) Sexy"?

### Page 107

(1) A  I feel that's an emotion that people can feel
(2) from any range to any range, from any age to any age.
(3) They can feel -- that's --
(4) Q  So was that an --
(5) A  That's an emotion anybody can feel, yes.
(6) Q  So you agree with that statement?
(7) A  That anybody can feel it? Yes.
(8) MR. COLUCCI:  Next number, please.
(9) THE REPORTER:  54.
(10) MR. COLUCCI:  54. This is a document that has a
(11) Bates stamp number 1258. It was produced by your
(12) company. And it's entitled "Michael O'Rourke Interview."
(13) I'm not sure with whom. Let's mark it.
(14)    (Applicant's Exhibit 54 was marked
(15) for identification by the court
(16) reporter and is attached hereto.)
(17) MR. COLUCCI:  Do you need a copy of that?
(18) MS. JACOBS-MEADWAY:  Yes.
(19) THE WITNESS:  Does it have a date?
(20) MR. COLUCCI:  I don't have -- in answer to your
(21) question, I don't have a date on it. This is the way it
(22) was furnished to me. It may be part of another document.
(23) I don't know.
(24) Q  Have you looked at it?
(25) A  I'm looking at it, yes.

### Page 108

(1) Q  Oh, sure. Let me know when you are finished.
(2) A  All right.
(3) Q  Look at the middle column, the last full
(4) paragraph in the middle column, beginning about two
(5) thirds of the way down, beginning "In this case." Do you
(6) see that? "In this case, the consumer is looking for
(7) products and hairstyles that say sexy and make her feel
(8) sensual." Do you see that?
(9) MS. JACOBS-MEADWAY:  Halfway down the quote.
(10) A  I'm looking where it starts, "In this case."
(11) MS. JACOBS-MEADWAY:  You are picking up in the
(12) middle of the paragraph.
(13) THE WITNESS:  Okay. Yes. I have got it.
(14) Q  BY MR. COLUCCI: First of all, do you recall
(15) giving this interview?
(16) A  No. I don't.
(17) Q  You don't. You have no idea to whom it was
(18) given?
(19) A  No. I have no idea.
(20) Q  And nothing about it refreshes your
(21) recollection?
(22) A  Obviously there are things in here from, you
(23) know, where I come from -- I'm from Africa. And one of
(24) those thing obviously we have gone through many, many,
(25) many, many times.

Page 109

(1) Q So you do give many interviews; correct?
(2) A Yes, I do.
(3) Q All right. Well then, have you found the place
(4) that I was referring to?
(5) A Yes, I saw it. It was – let me find it again.
(6) "In this case."
(7) Q Can you read that down to the bottom – to
(8) yourself.
(9) A I see that. I see what you also – okay. Let
(10) me leave it, because you –
(11) MS. JACOBS-MEADWAY: Answer the question.
(12) THE WITNESS: It doesn't matter. Okay.
(13) Okay.
(14) Q BY MR. COLUCCI: And there's nothing quoted in
(15) this paragraph, but it seems to be based upon an
(16) interview with you. So let me ask you –
(17) MS. JACOBS-MEADWAY: I'm going to object to the form
(18) of the question. There are quote marks up above.
(19) MR. COLUCCI: Where?
(20) MS. JACOBS-MEADWAY: "Michael told us, 'Sexy Hair
(21) Concepts collection are hot and at this point –'"
(22) MR. COLUCCI: Oh, okay. Sorry. Sorry. Thank you.
(23) I missed that.
(24) Q Maybe you should go back further and start with
(25) that section, which is, "Michael told us." That's one,

Page 110

(1) two, three, four, five, six lines up.
(2) MS. JACOBS-MEADWAY: Whether it's anchored or not,
(3) that's what it says, and there's a quote so –
(4) MR. COLUCCI: Okay.
(5) THE WITNESS: Okay.
(6) Q BY MR. COLUCCI: All right?
(7) A Yes.
(8) Q Okay. So this is a long, long paragraph.
(9) The first, then, is: Did you make this
(10) statement to whoever interviewed you back when?
(11) A I would believe it's possible, parts of it. How
(12) they have written it, you know, is their interpretation.
(13) Q Let's take it sentence by sentence.
(14) Is it correct that "Sexy Hair Concepts
(15) collection are hot and at this point, driving our whole
(16) product line"?
(17) A I believe so.
(18) Q Is it correct that, "The products were conceived
(19) when I –" meaning you "– realized that with women
(20) assuming more roles than ever, emotions were of key
(21) importance"?
(22) A Without a doubt.
(23) Q "They want products that evoke emotion"; is that
(24) accurate?
(25) A That's inaccurate. That's inaccurate.

Page 111

(1) Q Why is it inaccurate?
(2) A The product does the hair.
(3) Q I'm sorry. What?
(4) A The product does the hair. The brand evokes
(5) emotion. Two separate thinkings.
(6) Q Take the next sentence. "In this case the
(7) consumer is looking for products and hairstyles that say
(8) sexy and make her feel sensual, and there is a big
(9) difference between sexy and sensual. It's as different
(10) as night and day."
(11) Is that an accurate statement?
(12) A That is what each individual would feel in an
(13) interpretation of my brand name.
(14) Q Well, do you agree with this statement I just
(15) read to you?
(16) A From what point of view?
(17) Q To what it says. Do you agree with what it
(18) says?
(19) A If it's referring to the emotion coming from the
(20) brand name, yes, not from the product.
(21) Q You don't remember saying this to the
(22) interviewer?
(23) A If I said it, it would always be the product
(24) does the hair; the brand name evokes the emotion. And
(25) then they pick it up from there.

Page 112

(1) Q The next sentence, "Healthy hair is very sexy."
(2) Do you recall saying that?
(3) A What I probably would have said, that if your
(4) hair is shiny and healthy, people could interpret that to
(5) be sexy.
(6) Q So you didn't say, "Healthy hair is very sexy"?
(7) You don't recall that saying that?
(8) A I don't recall saying that.
(9) Q Is it accurate to say that healthy hair is very
(10) sexy or not?
(11) A I think that would be a perception from whoever
(12) says it.
(13) Q The next statement, "Sexiness transcends all
(14) aspects of the consumer's life, so I see endless
(15) opportunities for growth." Do you recall making that
(16) statement?
(17) A Read it again.
(18) Q Yes. You can follow me along if you want.
(19) "Sexiness transcends all aspects of the consumer's life,
(20) so I see endless opportunities for growth."
(21) A I don't recall saying that.
(22) Q Is it an accurate statement? Do you agree?
(23) A I don't recall it at all.
(24) Q Do you agree with it?
(25) A I think the brand name Sexy has unlimited

Page 113

(1) potential.
(2) Q    Do you agree with the statement in this that we
(3) just read? Do you agree with it?
(4) A    No. I agree with what I just said. That's
(5) probably what I did say.
(6) Q    The next sentence is, "Our newest launch, Short
(7) Sexy Hair, looks like it will have more power than its
(8) successors." Do you recall saying that?
(9) A    At that time, I might have thought that.
(10) Q    And then the next sentence, the last sentence,
(11) "In today's society, a woman with short sexy hair is as
(12) comfortable in the boardroom as she is in the bedroom."
(13) Do you recall making that statement?
(14) A    I believe my statement would be that she is a
(15) confident lady.
(16) Q    You don't recall making this particular
(17) statement?
(18) A    I don't recall that. That could be the
(19) interpretation of what I said.
(20) Q    And you don't agree with the statement or you do
(21) agree with the statement?
(22) A    It's very possible. I don't – I think it's
(23) possible. I don't know.
(24) Q    And you don't remember reading this review –
(25) interview, I'm sorry?

Page 114

(1) A    I know parts of it. I have interviewed so many
(2) times, and it's interpreted by the interviewers in the
(3) way they see it.
(4) Q    Do you ever write to any of the interviewers if
(5) you –
(6) A    No.
(7) Q    – think they have got something wrong?
(8) A    I don't do that. I don't do that. I don't do
(9) that. There would be hundreds of them.

Page 115

Page 116

Page 117

Page 118

(17) MR. COLUCCI: What's the next number?
(18) THE REPORTER: The next number is 55.
(19) MR. COLUCCI: 55, okay. Let's mark this as Exhibit
(20) 55.
(21) (Applicant's Exhibit 55 was marked
(22) for identification by the court
(23) reporter and is attached hereto.)
(24) Q BY MR. COLUCCI: We've marked for
(25) identification as Exhibit 55 a document that was

Page 119
(1) furnished to us by Sexy Hair, Bates stamped No. 1327.
(2) And it's entitled at the top of it, "Manquest,"
(3) M-a-n-q-u-e-s-t. So I don't know where it came from.
(4) But are you familiar with this article?
(5) A I have no idea what it is.
(6) Q All right. It's entitled "Hair Sells." And I
(7) take it that's a picture of you to the left?
(8) A I believe so.
(9) Q Direct your attention to the third paragraph,
(10) the first -- the third full paragraph, to the left of the
(11) picture, beginning, "The success of Big Sexy Hair answers
(12) the question, 'does sex still sell?'"
(13) Do you see that?
(14) A I can barely see it. Yes.
(15) Q I don't have a good copy. I don't know if this
(16) is better. You can use this if you want to. I could
(17) read it into the record if you would like.
(18) Is that a better -- is that a clearer copy?
(19) A Yes. Thank you. This one will be okay. I
(20) just --
(21) Q All right?
(22) A Okay.
(23) Q Do you remember making any of these statements
(24) that are contained in this third paragraph?
(25) A I don't remember it at all.

Page 120
(1) Q Do you agree with those statements? We can take
(2) them one by one.
(3) A I'm looking at it in the whole. And it's -- the
(4) basics of it is that it's triggered through emotions.
(5) That's where it all ends up.
(6) Q Let me -- look at the fifth line, where it says:
(7) "O'Rourke says the marketing behind the
(8) line has worked so well because for one, the
(9) message is simple. Instead of using technical
(10) words to describe what the product will do to
(11) hair, it offers a descriptive image: big and
(12) sexy."
(13) Do you see that?
(14) A Okay.
(15) Q Do you agree with that?
(16) A Sorry. Read it again.
(17) Q Sure. Okay. (Reading:)
(18) "O'Rourke says the marketing behind the
(19) line has worked so well because for one, the
(20) message is simple. Instead of using technical
(21) words to describe what the product will do to
(22) hair, it offers a descriptive image: big and
(23) sexy."
(24) A Okay.
(25) Q Do you want me to go on?

Page 121

(1) A No, that's fine.
(2) Q Do you agree with that?
(3) A I agree with the point that the "big" is the
(4) product that gives you volume, and the "sexy" creates the
(5) emotion. I think that makes sense to me.
(6) Q I know. I'm asking you whether you agree with
(7) the statement.
(8) A That's what I read -- what they're saying.
(9) Q I read it differently. I read it to say what
(10) it says. Do you agree with what it says?
(11) A They have quoted what I -- what I have said in
(12) there, that there's emotions that create from "sexy" the
(13) brand, and the product "big" gives you hair volume.
(14) That's what I tell them. And that's what they
(15) have written.
(16) Q So your statement is you did not make that
(17) statement as quoted?
(18) A I don't recall that.
(19) Q And your second part of it is, you don't agree
(20) with it either -- correct? -- as written?
(21) A I don't.
(22) Q It goes on to say, "The choice of these words
(23) then convey an emotion. 'We use words like big and sexy
(24) to depict the epitome of hair. Emotions trigger senses,
(25) which trigger buying."

Page 122

(1) Do you recall saying that?
(2) A There are certain parts of it, I certainly do.
(3) Where it says "emotions trigger senses," I agree with
(4) that.
(5) Q You don't agree with the rest of it?
(6) A If it's a result of buying, I would agree that
(7) could happen.
(8) Q "The choice of these words then convey an
(9) emotion." Do you agree with that?
(10) A Beg your pardon?
(11) Q Do you agree with the statement "The choice of
(12) these words then convey an emotion," referring back to
(13) "big and sexy"?
(14) A No. I think the word "sexy" would create the
(15) emotion.
(16) MR. COLUCCI: What's the next number?
(17) THE REPORTER: 56.
(18) MR. COLUCCI: I'd like to mark as Exhibit 56 a
(19) document, two-page document, bearing Bates stamps 1337
(20) and 1338.
(21) (Applicant's Exhibit 56 was marked
(22) for identification by the court
(23) reporter and is attached hereto.)
(24) THE WITNESS: Thank you.
(25) Q BY MR. COLUCCI: Have you seen this document

Page 123

(1) before -- these documents?
(2) A It's amazing. It's amazing what they put
(3) together. Anyway -- it's possible that I have. There's
(4) so many of them that are similar.
(5) Q I'm sorry. Have you seen this before or not?
(6) A I am trying to recall when this was done.
(7) The question?
(8) Q So is this something that your company put out?
(9) A I am wondering whether our company put it out or
(10) whether it was a writer, by somebody.
(11) Q Do you approve any of the promotions --
(12) promotional materials that your company puts out?
(13) A It would be approved by Marketing.
(14) Q But do you approve any?
(15) A No. There's so much of it.
(16) Q "It's All So Sexy," is that a quote from you?
(17) A No.
(18) Q What about on page -- the second page, on --
(19) where it says "Short, Sexy and to the point"? Do you
(20) agree with that statement that's referring to the Short
(21) Sexy Hair products? "Short, Sexy and to the point"?
(22) A I don't really understand that. I don't
(23) understand what they're saying.
(24) Q Aren't they, in fact, just using the word "sexy"
(25) there descriptively. "Short, Sexy and to the point"?

Page 124

(1) A They must be using the word "short" and the
(2) brand name "Sexy" together. I do not what it relates,
(3) "to the point."
(4) Are we done with this?
(5) MR. COLUCCI: Yes. Sorry.
(6) All right. I'm going to show you Exhibit 38.
(7) (Applicant's Exhibit 38, being previously
(8) marked for identification in the deposition
(9) of Mark Stiller, is attached hereto.)
(10) Q BY MR. COLUCCI: The second page of Exhibit 38,
(11) the bottom, has your picture; is that correct?
(12) A Yes.
(13) Q Then there's a quotation, "There's nothing
(14) sexier than strong, healthy hair." Do you see that? And
(15) it's attributable to you.
(16) Do you see it?
(17) A I see it. I see it.
(18) Q Did you make that? Is that your quotation? Is
(19) that your quote?
(20) A I don't remember saying that.
(21) Q If you just page through the rest of the
(22) exhibit, it appears frequently. It appears on the next
(23) page, which is Bates stamp 1349. It appears on 1352
(24) again, and at the bottom of 1353.
(25) You are sure that you never made that quotation?

Page 125

(1) You never said that?
(2) A I don't recall it. I don't recall saying that.
(3) I don't recall saying that. And again, we are going
(4) through -- there's hundreds of these. And I will say
(5) something, and then it's written in the context of
(6) whatever.
(7) Q These are -- these are promotional pieces --
(8) A Yes.
(9) Q -- put out by your company; is that correct?
(10) A That's correct.
(11) Q Let me ask you this: Is it an accurate
(12) statement? Do you agree with the statement that there's
(13) nothing sexier than strong, healthy hair?
(14) A I believe, again, that's what whoever looks at
(15) the brand name might perceive.
(16) MR. COLUCCI: Let me show you what has been
(17) previously marked as Exhibit 42.
(18) (Applicant's Exhibit 42, being previously
(19) marked for identification in the deposition
(20) of Mark Stiller, is attached hereto.)
(21) Q BY MR. COLUCCI: Are you familiar with this
(22) document?
(23) A I'll need to have a look at it.
(24) Q Sure.
(25) Who is M. Craig & Associates?

Page 126

(1) A Our PR company.
(2) Q Have you seen this document before?
(3) A Not this particular one. I don't recall.
(4) Excuse me.
(5) Q Did there come a time when you did formally
(6) announce that the company will be named Sexy Hair
(7) Concepts?
(8) Do you recall that?
(9) A I believe so.
(10) Q And the second paragraph on that document,
(11) again, appears to be a quote from you. It says:
(12) "'Sexy hair is exactly what we are about
(13) and I believed it was time to 'own' it. Our
(14) products continue to impact the beauty industry
(15) and our customer keeps coming back for more,'
(16) says O'Rourke."
(17) Did you make that statement?
(18) A I don't remember this at all. So, you know,
(19) it's a while ago. I don't remember exactly if I made a
(20) statement like that.
(21) Q Do you agree --
(22) A I'm sure we made statements.
(23) Q Do you agree with the statement?
(24) A This is the fourth paragraph? Is that correct?
(25) Q No. The second paragraph. Well, I mean, this

Page 127

(1) one says "Sexy hair is . . . ." It's the second
(2) paragraph.
(3) A I believe I was referring to the emotional
(4) branding as a great niche in the market.
(5) Q I wasn't really exactly asking you that. I was
(6) asking you whether you agree with this quotation here.
(7) Whether you made it or not, do you agree with it?
(8) A I don't remember making it. What it reads to me
(9) is what I just said.
(10) Q The fourth paragraph, then. Please look at the
(11) fourth paragraph and read it to yourself.
(12) This is -- the fourth paragraph contains a
(13) purported quote from Donna Federici, Vice President of
(14) Marketing for Sexy Hair; correct?
(15) A What about it?
(16) Q I mean, that's what it says, that that's her
(17) quotation, not yours?
(18) A If that's what they say.
(19) Q That's what it says.
(20) A (No audible response).
(21) Q Do you agree with that statement:
(22) "The word Sexy is a powerful marketing
(23) tool. Being subjective in nature, it allows
(24) the consumer to drum up connotations on a very
(25) personal level. Beauty and women's magazines

Page 128

(1) invariably use it on almost every cover to
(2) entice the reader in some aspect or another"?
(3) A I do not agree with it all. I don't agree with
(4) it all at all.
(5) Q Is there anything you do agree with?
(6) A I believe it does evoke emotions on a very
(7) personal level, without a doubt.
(8) Q Do you believe that the word "sexy" is a
(9) powerful marketing tool?
(10) A As a brand name, yes.
(11) Q No. It says, "The word Sexy is a powerful
(12) marketing tool." Do you see that?
(13) A I just work with "Sexy Hair." And they relate
(14) to it -- one is the brand and the other is what it does.
(15) Q So you wouldn't agree that the word "sexy" is a
(16) powerful marketing tool?
(17) A Totally depends on the context.
(18) Q And what about her statement that "Beauty and
(19) women's magazines invariably use it on almost every cover
(20) to entice the reader in some aspect or another"?
(21) A That's very possible. Diet. Everything else.
(22) MR. COLUCCI: Let's mark the next one. What is it,
(23) fifty-what?
(24) THE REPORTER: 57.
(25) MR. COLUCCI: Okay. Let's mark as Exhibit 57 a

### Page 129

(1) two-page document bearing Bates stamp Nos. 1477 and 1478.
(2) The cover document is entitled "Love Sexy." And then in
(3) the second page there's a section that says, "The Sexy
(4) Hair Concepts Range."
(5) Oh, excuse me. You know what? There's another
(6) page to this. It should have a document 1476 showing
(7) that it comes from the Hairdressers Journal –
(8) Hairdressers International Journal, January 11-17 2002.
(9) Let's put that on top of the exhibit.
(10)    THE WITNESS:    Are these together?
(11)    MR. COLUCCI:    Yes. I think they came – that's –
(12) I think that's the way they're supposed to be. I'm not
(13) positive.
(14)    THE WITNESS:    Okay.
(15)    MR. COLUCCI:    But I believe that's the way they were
(16) stapled for me. And I think that this is an article
(17) called "Love Sexy" that appeared in this Hairdressers
(18) International Journal on that date. And the third page
(19) talks about the Sexy Hair Concepts Range.
(20)    THE WITNESS:    Okay.
(21)    (Applicant's Exhibit 57 was marked
(22) for identification by the court
(23) reporter and is attached hereto.)
(24)    Q    BY MR. COLUCCI: Are you familiar with this
(25) article?

### Page 130

(1)    A    I'm sorry. Did you say the third – this third
(2) page?
(3)    Q    I think that's the way it should be.
(4)    A    Yes.
(5)    Q    Now, this is an article reported by Emma
(6) Gillespie, G-i-l-l-e-s-p-i-e. And if you turn to the
(7) second page of that document, which is Bates stamped 1477
(8) on the bottom –
(9)    A    Yes.
(10)    Q    I am going to ask you something about the first
(11) article – the first column of that article.
(12) Do you recall having seen this article?
(13)    A    It almost seems like a European magazine to me.
(14) I don't recall this at all.
(15)    Q    Yeah, I think it probably is. It says
(16) "International Journal."
(17)    A    I don't recall it at all.
(18)    Q    You don't recall ever seeing it or reading it?
(19)    A    No. I'm just reading down here, "Ian Gerrard."
(20) That's British. British distributor.
(21)    Q    Do you sell your products in the UK?
(22)    A    In 28 countries.
(23)    Q    These are the same products that you sell in the
(24) United States?
(25)    A    Yes.

### Page 131

(1)    Q    The reporter states – or somebody states – in
(2) the third paragraph on the second page, "The logic
(3) behind the name Sexy Hair Concepts is that everyone wants
(4) to be sexy, so why not call the products that."
(5) Do you see that?
(6)    A    Uh-huh.
(7)    Q    Did you make that statement?
(8)    A    No.
(9)    Q    Do you agree with that statement?
(10)    A    No.
(11)    Q    Apparently the quote goes on to say:
(12) "The products also still need to be good,
(13) because people won't buy them if they don't
(14) work,' says Ian Gerrard –" G-e-r-r-a-r-d "–
(15) director of the Natural Nail Company, which
(16) distributes the American range."
(17) Are you familiar with the Natural Nail Company?
(18)    A    They're out of Britain.
(19)    Q    And they distribute your Sexy Hair line?
(20)    A    Yes.
(21)    Q    And do you know Mr. Ian Gerrard?
(22)    A    I know who he is.
(23)    Q    So do you agree with his statement, "The logic
(24) behind the name Sexy Hair Concepts is that everyone wants
(25) to be sexy, so –"

### Page 132

(1)    A    No.
(2)    Q    Did you ever speak to Mr. Gerrard about his
(3) quotation in this article?
(4)    A    No.
(5)    MR. COLUCCI:    Mark this as 58.
(6)    (Applicant's Exhibit 58 was marked
(7) for identification by the court
(8) reporter and is attached hereto.)
(9)    MR. COLUCCI:    Let me show you what we have marked
(10) as Exhibit 58 for identification. This is a document
(11) bearing Bates stamp No. 1374. It's entitled "Who Sez –"
(12) s-e-z "– straight isn't Sexy?"
(13)    Q    Have you seen this document before?
(14)    A    No.
(15)    Q    I believe it's a document that was produced by
(16) your company, meaning that it was something that your
(17) company put together as opposed to someone else. Or it
(18) may have been your public relations company.
(19)    A    At the bottom it says our PR company, Lindy
(20) Berman.
(21)    Q    Yes.
(22) This article seems to be primarily about your
(23) product Straight Sexy Hair; is that correct?
(24)    A    I haven't read it.
(25)    Q    In the second full paragraph, the second to the

Page 133

(1) last sentence, it says, "According to O'Rourke 'From
(2) shampoo, to conditioner, to Straight Aero -" a-e-r-o "-
(3) to Smooth-Out, Formulas by Ecoly provides the tools to
(4) make it STRAIGHT -" all caps "- and SEXY - the rest is
(5) up to you.'"
(6)    Do you recall making that statement?
(7)    A    I don't recall that at all.
(8)    Q    Do you agree with that statement?
(9)    A    I would believe the product does make it
(10) straight. And I believe that the brand name could evoke
(11) the senses.
(12)    Q    Well, you said - it says, "provides the tools
(13) to make it STRAIGHT -" which you agree with "- and
(14) SEXY."
(15)    Do you agree with that latter part, "and SEXY"?
(16)    A    That's a perception.
(17)    MR. COLUCCI:    Let's watch some television. Get the
(18) popcorn out.
(19)    What I am going to place into the machine now is
(20) a tape, another tape, which we will provide a duplicate
(21) of for the Board.
(22)    This is entitled "Sexy Hair Concept Power
(23) Tools." And it was furnished to us by the attorneys for
(24) Sexy Hair.
(25)    ///

Page 134

(1)    (Applicant's Exhibit 59 was marked
(2) for identification by the court
(3) reporter but was not attached.)
(4)    (Videotape is played.)
(5)    Q    BY MR. COLUCCI: I just want to ask a question,
(6) a few questions.
(7)    The tape that I just marked is entitled "Power
(8) Tools."
(9)    Are you familiar with that tape?
(10)    A    I would have to see it to see which one it is.
(11)    Q    All right. Tell me when to stop.
(12) I don't want to go all the way through it and
(13) then have to go back over it.
(14)    A    I think it depends on what you're going to ask
(15) me.
(16)    Q    No, no. I'm saying, do you recognize – do you
(17) have to see the whole thing to recognize whether it's –
(18)    A    I need to see more of it, because I've done a
(19) lot of them like this.
(20)    MR. COLUCCI:    Just tell me when to stop.
(21)    (Videotape is played.)
(22)    Q    BY MR. COLUCCI: That's Douglas Little;
(23) correct?
(24)    A    Yes.
(25)    Q    And this is Mr. Abrams?

Page 135

(1)    A    Correct. I am trying to remember, because we've
(2) got a few with all of us in it, and I'm trying to see
(3) which one it is.
(4)    MR. COLUCCI:    Let me go back. Hold on a second.
(5)    (Videotape is replayed.)
(6)    Q    BY MR. COLUCCI: Do you agree with that
(7) statement?
(8)    A    I think he is combining the product, which he
(9) said earlier, "specific products for each thing," with
(10) the emotional branding, which is the client can then
(11) perceive what she wants out of it.
(12)    MR. COLUCCI:    Well, let's find out what he actually
(13) says, and then we can –
(14)    (Videotape is replayed.)
(15)    Q    BY MR. COLUCCI: Do you agree with that
(16) statement, or do you want to hear it again? Do you want
(17) to hear it again?
(18)    A    I agree with what he is saying in the sense that
(19) he is – as he has broken it down earlier – you've got
(20) to take the whole thing in context.
(21) He said that each product was for an individual
(22) reason. And in Big Sexy Hair, what he is saying is if
(23) you emotionally want to be involved with feeling sexy,
(24) you can. That's what he is saying.
(25)    Q    All right. Well, you are interpreting what he

Page 136

(1) is saying.
(2)    A    That's exactly it. That's what –
(3)    Q    But I want to find out –
(4)    MS. JACOBS-MEADWAY:    One at a time, people.
(5)    Q    BY MR. COLUCCI: I want to find out exactly, do
(6) you agree with the statement that he's made? Hold on a
(7) second. Let me get it.
(8)    (Videotape is replayed.)
(9)    Q    BY MR. COLUCCI: Do you agree with that
(10) statement?
(11)    A    I believe that it's different for everyone. I
(12) think it's different for everyone. And everyone gets an
(13) emotion out of it.
(14)    Q    Mr. O'Rourke, you are not answering my question.
(15)    MS. JACOBS-MEADWAY:    Mr. Colucci, would you please
(16) let him finish his answer. You are jumping in on him –
(17)    MR. COLUCCI:    He is not answering my question.
(18)    MS. JACOBS-MEADWAY:    I think he's answered the
(19) question twice.
(20)    MR. COLUCCI:    I don't think he's answered it at all.
(21)    MS. JACOBS-MEADWAY:    Irrespective of whether you
(22) think he's answered it or not –
(23)    MR. COLUCCI:    Let's go back.
(24)    MS. JACOBS-MEADWAY:    – he's answered it twice. And
(25) if you jump in on top of what he's saying, we won't have

Page 137

(1) a decent record.
(2) So let him finish before you go back.
(3)     MR. COLUCCI: Let me go back.
(4)     (Videotape is replayed.)
(5)     MR. COLUCCI: Okay. I'm going to ask you to take it
(6) down. We're going to stop it and have you take it
(7) down.
(8)     THE REPORTER: Okay. Now, who is saying this?
(9)     MR. COLUCCI: Okay. Now, we are talking about on
(10) the screen, Mr. Little. And the screen has just popped
(11) up and says, "Big Sexy Hair." And now, we're going to
(12) take down what Mr. Little actually does say.
(13) (Transcription from videotape as follows:
(14)     (MR. LITTLE: "A product line is
(15) specifically geared to do that, give you big
(16) sexy hair. And it's about fun products
(17) that –")
(18)     Q    BY MR. COLUCCI: Do you want to repeat it?
(19)     MS. JACOBS-MEADWAY: I'm going to object to stopping
(20) it in the middle of the sentence.
(21)     MR. COLUCCI: No, it's only just about one statement
(22) he made.
(23) Can you read that statement that he made?
(24)     THE REPORTER: Sure.
(25)     MS. JACOBS-MEADWAY: Just let me note the objection

Page 138

(1) for the record that I'm objecting to the form of the
(2) question and the interruption of the statement.
(3) And you can answer the question.
(4)     (The record was read as follows:
(5) "A product line is specifically geared to
(6) do that, give you big sexy hair. And it's
(7) about fun products that –")
(8)     Q    BY MR. COLUCCI: I want to ask you about the
(9) statement. He says it's a product designed to do exactly
(10) that, Big Sexy Hair.
(11)     A    I believe that everybody creates – this creates
(12) an emotion for everybody, and everybody perceives it
(13) differently.
(14) That's what I'm reading from that.
(15)     Q    Do you agree with the statement or not?
(16)     A    When I hear the statement, I'm hearing that it's
(17) saying you get big hair with the product, and you get an
(18) emotion with the sexy part of it. That's what I'm
(19) hearing out of it.
(20)     Q    The statement doesn't say that. It said what we
(21) quoted it saying. Do you agree with that –
(22)     A    I've told you that they – he is now saying –
(23) excuse me for talking over you – that – and I have said
(24) it triggers emotions, a different emotion in each person.
(25) And that's what I'm hearing here.

Page 139

(1)     (Videotape is played.)
(2)     Q    BY MR. COLUCCI: Do you hear him say that it
(3) makes it sexier?
(4)     A    I heard him say that. And I know exactly. He
(5) is evoking the emotion.
(6)     Q    Do you agree with that statement that it makes
(7) the hair look sexier?
(8)     A    No.
(9)     Q    No, you don't. Okay.
(10)     (Videotape is played.)
(11)     Q    BY MR. COLUCCI: Did you hear him saying
(12) bigger; it makes the hair look bigger, in that statement?
(13)     A    I beg your pardon?
(14)     Q    Did you hear him say it makes the hair look
(15) bigger?
(16)     A    I didn't. Just right now?
(17)     Q    Yes.
(18)     A    I think he said it a few times.
(19)     Q    He said "bigger"?
(20)     A    That it makes the hair bigger?
(21)     Q    Right.
(22)     A    I heard that.
(23)     Q    Do you agree with that?
(24)     A    I agree that the product gives it volume, yes.
(25)     Q    Do you agree that it makes the hair look bigger?

Page 140

(1)     A    And again, when I look at the word "bigger," it
(2) depends on how you look at "bigger." Her hair is bigger
(3) in a short sense to me.
(4)     Q    I want to ask you a very simple question. He
(5) said – he used the word "bigger." Do you agree with the
(6) use of the word "bigger" by him?
(7)     A    I would make – yes. It makes the hair have
(8) more volume. That's exactly what I'm seeing.
(9)     (Videotape is playing.)
(10)     THE WITNESS: That's exactly what I said.
(11)     Q    BY MR. COLUCCI: You agree with that?
(12)     A    His interpretation, if you read it earlier,
(13) said, "It gives volume." And he's saying it in another
(14) way to me.
(15)     Q    He said "bigger" again. Did you see that?
(16)     A    (Witness nods in the affirmative).
(17)     Q    This is Mr. Abrams talking; right?
(18)     A    (Witness nods in the affirmative).
(19)     Q    Do you agree with that so far?
(20)     A    (Witness nods in the affirmative).
(21)     Q    Are these two fellows, Little –
(22)     (Videotape is stopped.)
(23)     Q    BY MR. COLUCCI: Little and Abrams, are
(24) they hair stylists? Hairdressers?
(25)     A    They're hairdressers.

Page 141
(1) Q And how long have they been with you,
(2) approximately?
(3) A At different times, David Abrams works for
(4) another company. He works for a hair -- for another
(5) salon, and comes in and works with us on different
(6) promotions.
(7) Q He is not a full-time employee?
(8) A No, he's not a full-time employee.
(9) Q Is he an independent contractor? I mean --
(10) A You could say that. We bring him in on
(11) different educational projects.
(12) Q But Little is full time with your company?
(13) A Little is full time.
(14) (Videotape is played.)
(15) Q BY MR. COLUCCI: Do you agree with that
(16) statement?
(17) A I agree that he's quoting on the product,
(18) what it does.
(19) Q Doesn't he refer to Sexy Hair?
(20) A He knows that emotional brand, the brand is
(21) emotional. And he is referring to the product each time,
(22) not the word "sexy." He's referring to the product.
(23) That's why he is talking about "Curly" at this
(24) time. If you notice, in each one, they talk about
(25) "Straight," "Curly," and "Big."

Page 142
(1) Q Let's hear it again.
(2) A Yeah.
(3) (Videotape is played.)
(4) MR. COLUCCI: I think I missed it.
(5) (Videotape is replayed.)
(6) MR. COLUCCI: I -- I missed it again.
(7) (Videotape is replayed.)
(8) Q BY MR. COLUCCI: Do you hear that? Did you hear
(9) him use "sexy hair" in a descriptive sense?
(10) A Again, I believe that it's what you perceive it
(11) is is what it is. And it's not one special thing to
(12) anybody. It's just a brand name. And that's what he's
(13) trying to say.
(14) (Videotape is played.)
(15) Q BY MR. COLUCCI: Do you, Mr. O'Rourke, develop
(16) your own formulations, or does somebody do that for you?
(17) A I'm a hairdresser.
(18) Q Yes.
(19) A So I'm very involved in the feel of the product,
(20) and what I want is an end result.
(21) Q So do you actually work in developing the
(22) formulations or do you --
(23) A What would happen --
(24) Q -- have somebody do that for you?
(25) A They do it. But it comes back to me, and I will

Page 143
(1) feel it for weight and slip and so on.
(2) Q I mean, do you have people in the laboratory
(3) that are designing these formulas?
(4) A Yes. Not ours, in whoever the filler is going
(5) to be. And we look for the best filler for the type of
(6) product we're making.
(7) Q Meaning the company that makes your particular
(8) products, do they make the same products for other
(9) companies without your brand?
(10) A I would believe so.
(11) MR. COLUCCI: All right. Thank you.
(12) (Videotape is played.)
(13) MR. COLUCCI: Off the record.
(14) (Discussion off the record had.)
(15) Q BY MR. COLUCCI: Do you recognize that
(16) promotional film?
(17) A Yes.
(18) Q Okay. Is that something that is currently being
(19) used by your company?
(20) A I think it was. I don't know if it is anymore.
(21) Q Is there a newer version?
(22) A May be one coming. I don't know.
(23) Q If there is a newer one, then I would like to
(24) see it.
(25) A Yeah, I --

Page 144
(1) MS. JACOBS-MEADWAY: We'll take it under advisement.
(2) MR. COLUCCI: All right.
(3) The show is over. Thank you very much. I have
(4) no further questions. Thank you for coming. Nice to
(5) meet you.
(6) THE WITNESS: Thank you.
(7) MR. COLUCCI: You will be getting a copy of the
(8) transcript of this deposition in a few weeks.
(9) I am going to ask you to read it and sign it.
(10) And if there are any corrections, they you will be
(11) instructed by your counsel as to how to do that. And
(12) then get it back to us.
(13) Thank you very much.
(14) THE WITNESS: You're very welcome.
(15) MS. JACOBS-MEADWAY: You know what I have to ask --
(16) THE REPORTER: Wait, wait. Let me get your copy
(17) order. Do you want a copy?
(18) MS. JACOBS-MEADWAY: Yes.
(19) THE REPORTER: So do I send it to Mr. O'Rourke? Do
(20) I send the copy he's going to sign, the booklet, to --
(21) MR. COLUCCI: The way we do it back where we come
(22) from, or where I come from, is that you send the original
(23) to me plus my copy, and you send her her copy. And then
(24) I will send her the original and ask her to get it signed
(25) by her client. She then contacts the client, gets it

(1) signed, returns it to me.
(2) Is that the way we do it?
(3)   MS. JACOBS-MEADWAY:   That's fine.
(4)   MR. COLUCCI:   Okay. Good.
(5)   (Whereupon proceedings
(6) concluded at 3:45 p.m.)
(7)
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)