# EXHIBIT F TO

# FORD MOTION IN LIMINE




VOL 12, NO. 2

SUMMER 1987

OFFICIAL PUBLICATION OF THE STATE BAR OF CALIFORNIA INTELLECTUAL PROPERTY SECTION

# REPRINT

## Inside

PROTECTING LITERARY TITLES:
Discusses pros and cons of various
avenues of protection .............. 1

TRADEMARK SURVEYS:
Discusses survey methodology
with numerous case citations, and
suggests future developments in
survey techniques and uses......... 2

TECHNOLOGY LICENSING
IN THE SEMICONDUCTOR
INDUSTRY: Gives a business
perspective as to why and how
licensing is used in this area ........ 3

Case Comments .................. 4

Section News and Upcoming
Events ......................... 17

VS - Ford 0001

©1987 California Intellectual Property Section, California State Bar. The Statements and opinions here are those of editors and contributors and not necessarily those of the State Bar of California, the Intellectual Property Section, or any government body.

# Trademark Surveys: Universe, Questions, and Future Approaches



© 1987, Dr. Gerald L. Ford
Ford Bubala & Associates

### Is a Survey Needed?

During the past twenty-five years, the role and significance of survey research in litigation related matters has undergone a dramatic change. Twenty-five years ago surveys were seldom offered into evidence and, if offered, were seldom admitted. Today, surveys are both offered and admitted with increasing frequency. Evidence of this nature is being provided for actions ranging from anti-trust cases (e.g., relevant market definition) to actions involving federal regulatory agencies (e.g., advertising claims) to trademark related actions (e.g., likelihood of confusion in the marketplace).

In early cases, when efforts were made to introduce surveys into evidence, admissibility objections of hearsay were regularly raised and sustained. In the majority of cases today, hearsay is not generally an obstacle. In *Wuv's International, Inc. v. Love's Enterprises, Inc.*[1] the court lists the following theories for admitting surveys into evidence:

> 1) surveys are not hearsay because they are not offered to prove the truth of the matters asserted, Rule 801(c), F.R.Evid.; 2) surveys fall within the present state of mind exception, or the catch-all exceptions to the hearsay rule, Rules 803(1), (3), (24) and 804(b)(5), F.R.Evid.; 3) the facts or data upon which the survey or its results are based need not be admissible in order for an expert to base opinion testimony upon them, so long as such information is of a type reasonably relied upon by experts in the particular field, Rule 703, F.R.Evid.; and 4) evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result is admissible for purposes of authentication, Rule 901(9), F.R.Evid.[2]

In addition, the court's perspective has also turned away from admissibility issues as they relate to trustworthiness, reliability and accuracy, with consideration of these factors now going to the weight of the survey (i.e., its evidentiary value), not to the admissibility of the survey.[3]

This changed perspective has been accompanied by a voluminous growth in the number of surveys offered into evidence. Recently, the use of surveys in trademark cases has become so commonplace that it has led a growing number of commentators to suggest that the acceptance of surveys has now reached the point where they may be an assumed required component in trademark actions. Interestingly, some courts have gone as far as to deny relief because of a plaintiff's failure to introduce a survey.[4]

Despite this increasing use of surveys in trademark actions, it must certainly be recognized that they are neither the only course nor can they be engaged in without risk. Some factors to bear in mind relative to the use of a survey include:

- surveys are generally both expensive and time consuming;
- once introduced, a survey many times becomes a focal issue in a case, and may divert attention away from other strong evidence;
- no matter how carefully the research is designed and executed, there are almost certainly going to be one or more flaws, and no matter how minor, these flaws will become magnified and emphasized in the courtroom; and
- finally, there is always the chance that the survey results will conflict with the views of the court and the court will then find some deficit in the process which "causes" the court to ignore the survey results.

Whether or not to take a survey is a critical question a litigator must increasingly answer. Part of the answer to the question of survey use lies in the response to such questions as "how willing am I to take a chance on the survey results?", or "how well does a survey fit the particular facts of the case?" Obviously, not every trademark case cried out for a survey. However, there are fewer and fewer situations where one can avoid their use.

*Continued on page 12*

**Intellectual Property Section**

**Alan M. Krubiner**
Chair
Palo Alto

**Laurence H. Pretty**
Vice-Chair
Los Angeles

**Jeffrey G. Sheldon**
Secretary/Treasurer
Pasadena

**Lowell Anderson**
Editor
Knobbe, Martens, Olson & Bear
610 Newport Center Drive,
Suite 1600
Newport Beach, CA 92660

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered and is made available with the understanding that the publisher is not engaged in rendering legal or other professional service. If legal advice or other expert assistance is required, the services of a competent professional person should be sought.

VS - Ford 0002

# Trademark Surveys: Universe, Questions and Future Approaches

*Continued from page 2*

### General Required Procedures

While it is recognized that surveys directed at proving or disproving genericness will be fundamentally different from surveys directed at likelihood of confusion or secondary meaning issues, the overall tests of the trustworthiness of a survey effort were initially spelled out in 1960. It is with continuing modification and exception that the courts have generally recognized the following principles of the trustworthiness of a survey:

1) a proper universe must be examined and a representative sample chosen;
2) the persons conducting the survey must be experts;
3) the data must be properly gathered and accurately reported;
4) the sample design, the questionnaires and the manner of interviewing must meet the standards of objective surveying and statistical techniques;
5) the survey must be conducted independently of the attorneys involved in the litigation;
6) the interviewers of sample designers must be trained and unaware of the purposes of the survey or the litigation; and
7) the survey respondents must be similarly unaware.[5]

Likened to the list of "Polaroid" or "AMF" factors for likelihood of confusion, not all of the preceding factors have been given equal weight, nor has the interpretation of this list been viewed literally. For example, some have argued that "standards of objective surveying and statistical technique"[6] equate to random and thus projectionable surveys; and yet the courts have become increasingly willing to accept surveys which are not statistically projectionable. Additionally, Professor McCarthy notes actual deletions in this generalized list of principles of trustworthiness.[7]

### Designating the Survey's "Universe"

Although all of the preceding factors deserve comment, the specification of a proper universe (that segment of the population whose characteristics are relevant to the proposition in question) may, more than any other factor, affect the probative weight given to a survey.[8] Regardless of the care taken in the design and execution of the research, from specification of the sampling process through analysis of the data, it is the designation of the universe that can be viewed as the foundation of the appropriateness of a survey as a market study.

Two issues with respect to universe selection deserve comment: width and depth. On occasion, the universe can be defined as the population at large, for such products as lamp bulbs[9] or replica sports garments;[10] but, frequently, a "population at large" definition is simply too broad and does not provide results that effectively address the state of mind of consumers or potential consumers of specific products or services. Consequently, results based upon such a broad universe definition may be neither relevant nor useful in a trademark proceeding. For example, in *General Motors Co. v. Cadillac Marine & Boat Co.*,[11] the court held that the universe of the general public was too broad to represent the ordinary boat purchaser. In *WGBH Educational Foundation, Inc. v. Penthouse International, Ltd.*,[12] the District Court criticized the survey because the universe sampled was too broad, and consequently minimized the evidentiary weight of the results.

Conversely, too narrow of a universe definition can also lead to diminished weight given to survey results. In *American Basketball Assn. v. AMF Voit, Inc.*,[13] the court held that a universe whose definition was males 12 to 23 years of age who had played basketball within the preceding 12 months was too narrow to be given substantial weight relative to the perceptions of potential purchasers of basketballs.

A review of cases providing acceptable breadth (width of the sampling window) and depth (the focus on sampling specific population members) in the definition of an appropriate survey universe suggests that a thin line separates the acceptable from the unacceptable. In contrast to the *Cadillac Boat* case,[14] a universe of all airplane owners was considered sufficiently narrow, regardless of whether they worked on their airplane themselves, to test a trademark used on airplane parts.[15] Similarly, where the universe definition of males 12 to 23, who had played basketball within the last year, was deemed too narrow in the *American Basketball* case,[16] a universe of male and female children ages 8 to 18 was considered proper for secondary meaning and likelihood of confusion regarding the trademark of a sole pattern of youth oriented sneakers.[17]

From a survey research point of view, a proper universe definition is a fine needle to thread. Currently, one popular view is that, when feasible, a sample universe should be broadly enough defined so as to include subuniverses. This type of universe definition provides for a situation in which the data can be evaluated in gradients from general to specific universe populations. This multifaceted universe approach was successfully utilized in the previously discussed *National Football League* case.[18] In that case, the broad universe definition included the

**Intellectual Property Section Executive Committee**

| | | |
|---|---|---|
| Alan M. Krubiner<br>Chair<br>Palo Alto | Thomas R. Berthold<br>San Jose | Kate H. Murashige<br>Menlo Park |
| Laurence H. Pretty<br>Vice-Chair<br>Los Angeles | M. Michael Carpenter<br>Los Angeles | Manuel Quiogue<br>Newport Beach |
| Jeffrey G. Sheldon<br>Secretary/Treasurer<br>Pasadena | Brooks Gifford, Jr.<br>Tustin | Stephen M. Westbrook<br>Oakland |
| | Anne Hiaring<br>San Francisco | Gregory B. Wood<br>Los Angeles |
| Joel Ackerman<br>Richmond | Joan Kupersmith Larkin<br>Los Angeles | Lowell Anderson<br>Newport Beach |
| Donald L. Bartels<br>San Francisco | Lawrence A. Maxham<br>San Diego | Section Administrator<br>Robyn Murphy<br>State Bar, San Francisco |

VS - Ford 0003

general population from 13 to 65, with subuniverses being "prior purchasers," "team fans," and "fans plus." The results of that survey effort provided levels of confusion as to the source of sponsorship from the population at large as well as from specific customer segments.

Prior to initiation of a survey effort, assistance in the process of identifying an appropriate universe can be found via the answer to a cadre of questions regarding customers and markets as well as the review of published industry data, and proprietary market research records of the litigants. Exemplary of information helpful in the definition and defense of a particular chosen universe, as well as the defense of the representativeness of the results, are answers (for both plaintiff's and defendant's markets/goods) to such questions as: who buys the product or service (males, females, children, or adults); the role and importance of participants in the process (influencers, deciders, purchasers, users); demographics of market participants (age, income, marital status, family size); psychology of market purchasers (activities, interests, life styles); where and how the product is serviced, purchased, or consumed (type of store, or a type of purchase process such as phone, catalog, or door to door); and other socioeconomic characteristics associated with the customers of the product or service (membership in special groups or associations, types of employment, or attendance at special events). Obviously, these examples, while not exhaustive, are intended to exemplify the process of identifying the relevant market to be sampled and the demographic profiles of relevant consumers.

What the above data and cases ultimately suggest is that once the decision has been made to use a survey, one of the initial, and perhaps most critical questions to address is who are "the right people" to survey? To survey other than appropriately defined consumers or potential consumers weakens, if not possibly destroys, the foundation of the survey and its value. As will be seen in the next section, the concern with who is the relevant universe must also be considered with regard to the legal issue(s) being investigated.

## The Survey Questions

Case histories abound with examples of surveys which have been criticized for employing defective questions. Biased,[19] leading,[20] suggestive of an answer,[21] the encouraging of guessing,[22] or ambiguous[23] questions are often cited as reasons which dissuade judges from giving survey results probative weight. In some cases selfserving bias is easily identifiable; in others, shortcomings are the product of the complex task of asking relevant legal questions in a manner communicable to the general public.

Compounding the difficulty of selecting appropriate and defensible questions is the mix of court rulings for the same question or procedures. Even within the same Circuit the same question formats have been found both leading and non-leading.[24] This situation has encouraged some to suggest that a solution to this dilemma might be to submit the questions and methodology to the court for

---

*Whether or not to take a survey is a critical question a litigator must increasingly answer.*

---

approval prior to executing the survey. This procedure of submitting survey questions, along with the results of a preliminary survey for a ruling *in limine* on the question of admissibility has been praised as "commendable" by the Seventh Circuit.[25] Unfortunately, such pre-screening offers no indication as to the weight the court will afford the survey and it simultaneously concedes significant control over the methodology and questions to opposing counsel and the court.

The skill of the court in assisting the process of writing survey questions is readily seen in the *Monopoly* cases.[26] The prudence of stipulating survey questions and methodology with the court and opposing counsel is another matter. If your opponent is clever, the product of this process may actually increase question and/or methodology bias and leave you with results you cannot object to or challenge.

A second alternative approach to solving this dilemma might be a more aggressive effort at ensuring that a survey's questions and protocol rigidly conform to the process most traditionally accepted by the courts in determining such issues as genericness, secondary meaning, or likelihood of confusion. The problem is that this alternative tends to be impractical. Generally, each case provides a unique set of facts which precedent setting questions typically do not exactly match (e.g. product characteristics, buying behavior, and marketing methods). Obviously, to ignore precedent setting questions and procedures would be foolish. Perspective should be gained via precedent and then used to challenge the marketing research to improve the quality of questions or methodology of surveys used in litigation.

Regardless of approach, the successful design of both survey questions and protocols rests soundly on a clear and thorough understanding between the researcher and the attorney commissioning the study of the exact "state of mind" or "states" which are at issue in the case. A conceptual error here can be irreversible.

For example, when investigating a case involving alleged false advertising, one issue for investigation may be the belief consumers have about whether a particular claim was made by the advertisement, while a very different issue is an investigation of whether or not consumers believe that the advertisement is an accurate description of the performance of the product. With regard to likelihood of confusion, should the investigation focus on, for example, confusion with regard to the name of a brand, or confusion with regard to the sponsorship of a product? For a secondary meaning issue the focus of the investigation can vary from the name, to the design, to the shape.

While appropriate conceptualization of the relevant "state of mind" is not a panacea for the proper design of questions, it goes without saying that this step is critical in the search for the "right question."

### Future Approaches

The very nature of the title of this paper assumes the appropriateness of surveys in trademark litigation. For years, attorneys and many researchers in this area have focused on survey research and ignored other, and possibly more powerful, tools and techniques of the marketing research discipline. This situation appears to be changing. The exclusive dominance of surveys in false advertising and trademark cases may soon be supplemented with other appropriate marketing research techniques which have previously been unused.

One well accepted methodology in consumer behavior research, which is beginning to move into the courtroom, is experimental or quasi-experimental design. These processes generally provide

*Continued on page 14*

13

# Trademark Surveys: Universe, Questions and Future Approaches

*Continued from page 13*

for exposing one treatment group to one version of an advertisement, label or package, and another treatment group to another.

One example of a quasi-experiment is reported in *Squirt Company v. Seven-Up Company.*[27] In this methodology, shoppers were given a cents off coupon for a product. After shopping, each coupon-redeeming shopper was asked to identify the brand he or she purchased and then show the actual product to the interviewer. Unfortunately, the courts treated this methodology as a survey of likelihood of confusion, as opposed to actual confusion. The methodology fared no better in the Court of Appeals, where, in affirming the trial court's findings, it noted that "Not only was the methodology of the study novel but also the admission of survey-type interviews as evidence of actual confusion was without legal precedent!"[28] Boal, in an article in *The Trademark Reporter,*[29] reports successful use of the retail store coupon test in *RJR Foods, Inc. v. White Rock Corp.*[30] With this technique a fifteen to twenty percent confusion was held to constitute reliable evidence of likelihood of confusion.

The principle benefit in this approach is that it is a realistic means to provide evidence of actual marketplace confusion. But, the downsides of lack of projectionability and the current lack of willingness of the courts to understand and accept the value of experimental models must be recognized.

In addition to experimental or quasi-experimental methods, other marketing research tools are now also finding their place in litigation research. Specifically, some "trade dress" cases are employing a marketing research protocol utilizing a tachistoscope. This is a marketing tool for assessing a product's shelf visibility and distinctiveness. In *Kroger Co. v. Johnson & Johnson,*[31] consumers were asked to view picture slides of a shelf of products containing the junior users product, as well as other national brands of pain relievers, for approximately five seconds. Participants were then asked to identify the products they saw. Approximately one quarter of the participants indicated that they had seen Tylenol when in fact it was not present in the picture. Respondents were then shown the junior user's product and asked who they believed made or manufactured that product.

In the future we may see the use and application of techniques other than the preceding, including: observational rather than self-reported data, video tapes of focus groups or other "qualitative" data, and not inconceivably other physiological measures (e.g., pupilometers, voice analyzers, psychogalvanometers, or other such physical indicia).

A final change that is anticipated to occur is that attorneys will begin to use marketing research techniques very early in the litigation calendar and on a growing number of occasions even prior to the filing of an action. In this respect marketing research may serve several needs. For example, such research (e.g., a focus group or a small scale survey) may be useful in evaluating if the client really has a problem. Or, in the same vein, research at this early stage may assist in defining how a problem is occurring in the marketplace, in deciding whether or not to proceed, in defining the most productive approaches to providing probative evidence, or in identifying areas where settlement issues may be resolved. As a result, it is anticipated that attorneys will increasingly acknowledge that if either the assistance of a marketing research expert or execution of a survey are contemplated, consultation with the expert at the initial phase of a case will oftentimes be of significant benefit to the ultimate value of either the expert's assistance or the judicial relevance of the survey.

In conclusion, while it is recognized that the use of surveys in the judicial process is beginning to come of age, the complexities and subtleties of the use of surveys must be appreciated and understood if a survey is to be of value in the litigation of a particular case or in the evolution of the law.

## Footnotes

1. *Wuv's International, Inc. v. Love's Enterprises, Inc.,* 208 U.S.P.Q. 736 (D. Colo. 1980).
2. *Id.* at 753.
3. *Piper Aircraft Corp. v. Wang-Aero, Inc.* 741 F.2d 925 (7th Cir. 1984). *See also Prudential Insurance Co. v. Gibraltar Financial Corp. of California,* 694 F.2d 1150 (9th Cir. 1982).
4. *Information Clearing House, Inc. v. Find Magazine,* 492 F. Supp. 147, 160 (S.D.N.Y. 1980). *See Metro Kane Imports, Ltd. v. Rowoco, Inc.,* 618 F. Supp. 273, 276 (S.D.N.Y. 1985) (survey to show secondary meaning on product appearance "highly desirable, if not essential, evidentiary data"). *See* Robin and Barnaby, "Trademark Surveys—Heads You Lose, Tails They Win," 73 *Trademark Reporter,* 436 (1983).
5. Handbook of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 351, 429 (1960). These factors, issued by the Judicial Conference Board of the United States, delineate the meticulous care required to eliminate biases in the methodology of survey execution which could affect the data. *See American Footwear Corp. v. General Footwear Co., Ltd.,* 609 F.2d 655, 661 (2nd Cir. 1979), *cert. denied.* 445 U.S. 951 (1980); *Wuv's International, Inc. v. Love's Enterprises, Inc.,* 208 U.S.P.Q. 736 (D. Colo. 1980).
6. Handbook of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 351, 429 (1960).
7. 2 J. Thomas McCarthy, *Trademarks and Unfair Competition,* §32:50, at 777 n.6. "The language in the 1960 version of the Judicial Conference Handbook requiring that the interviews 'were conducted independently of the attorneys in the case,' was deleted by the 1981 version. *Compare*: Judicial Conf. of the U.S., Handbook of Recommended Procedures for the Trial of Protracted Cases, 75 (1960, West ed) with Federal Judicial Center, Manual for Complex Litigation, 116 (5th ed, 1981)."
8. *Amstar Corp. v. Domino's Pizza, Inc.* 615 F.2d 252 (5th Cir.), *cert denied,* 449 U.S. 899 (1980), where it was found that single, male college age persons comprised almost the entire potential market for defendent's products, the perceptions of middle aged females provide no relevant information.
9. *Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366, 385-88 (7th Cir.), *cert denied,* 429 U.S. 830 (1976), where the populace at large was relevant because the issues involved the purchase of lamp bulbs, etc. and the potential purchasers would be the entire populace.
10. *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.,* 532 F. Supp. 651 (W.D. Wash. 1982), where the views of the public at large were relevant to secondary meaning and likelihood of confusion of sponsorship of NFL football jersey replicas.
11. *General Motors Corp. v. Cadillac Marine & Boat Co.,* 226 F. Supp. 716 (W.D. Mich. 1964).
12. *WGBH Educational Foundation, Inc. v. Penthouse International, Ltd.,* 453 F. Supp. 1347, 1351 (S.D.N.Y. 1978), *affd without op.,* 598 F.2d 610 (2nd Cir. 1979).
13. *American Basketball Ass'n. v. AMF Voit, Inc.,* 358 F. Supp. 981 (S.D.N.Y. 1973), *affd without op.,* 487 F.2d 1393 (2nd Cir. 1973), *cert denied,* 416 U.S. 986 (1974).
14. *General Motors Corp. v. Cadillac Marine & Boat Co.,* 226 F. Supp. 716 (W.D. Mich. 1964).
15. *Piper Aircraft Corp. v. Wag-Aero, Inc.,* 741 F.2d 925 (7th Cir. 1984).
16. 358 F. Supp. 981 (S.D.N.Y. 1973).
17. Re *Sneakers with Fabric Uppers & Rubber Soles,* 223 U.S.P.Q. 536 (ITC 1983).
18. 532 F. Supp. 651 (W.D. Wash. 1982). *See* text accompanying note 10, *supra.*
19. *Esquire Sportswear Mfg. Co. v. Genesco, Inc.,* 141 U.S.P.Q. 400 (T.T.A.B. 1964). In *Esquire,* the manufacturer of men's slacks

14

under the name "SLEEX" was contesting the use of the same name by a manufacturer of women's bras. The survey instrument sent to retailers included a letter from the company outlining its legal problems and requesting the customers' help in substantiating the secondary meaning and goodwill of its name, followed by the question "Do you think, as a merchandiser, that your male customers would refuse to purchase slacks bearing the trademark "SLEEX" if they knew that girdles for women were being sold under the same trademark?"

20. *Wuv's International, Inc. v. Love's Enterprises, Inc.*, 208 U.S.P.Q. 736, 755 (D. Colo. 1980). In *Wuv's*, the following question was found leading, "Do you believe that this restaurant is connected or related to any other?"; not leading, "What company or person do you believe owns or operates this restaurant?" *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984). *Universal* found the following question was leading, "To the best of your knowledge, was the Donkey Kong game made with the approval or under the authority of the people who produce the King Kong movies?"; not leading, "As far as you know, who makes Donkey Kong?" *McGraw-Edison Co. v. Walt Disney Productions*, 225 U.S.P.Q. 512, 517 (N.D. Ill. 1985). In *McGraw-Edison*, the court contrasted the following approaches: "The survey showed 494 consumers pictures of a TRON fuse package and a picture of a TRON product licensed from Disney and asked if the two products were put out by different companies or the same companies. Thirty-five percent stated they were put out by the same company." The court noted, on the other hand, "If the interviewee had been handed a Disney product, or plaintiff's fuse, and asked who put out the product, this survey would have been an acceptable measure of potential confusion."

21. *Sears, Roebuck and Co. v. All States Life Insurance Co.*, 246 F.2d 161, 171 (5th Cir. 1957). In *Sears*, the court found the question/answer to "What does 'Allstate' mean to you?" suggestive to the answer "Sears" and that this affected the subsequent and critical question "Who would you say owns All States Life Insurance Company?"

22. *Inc. Publishing Corp. v. Manhattan Magazine, Inc.*, 227 U.S.P.Q. 257, 274 (S.D.N.Y. 1985). The court found the following question was leading and encouraged guessing: "Do you think Manhattan, Inc. magazine might be a regional version of Inc. Magazine?"

23. *Jenkins Bros. v. Newman Hender & Company, Ltd.*, 289 F.2d 675, 678 (C.C.P.A. 1961). In *Jenkins*, the court found that the question "Who makes this valve?" did not indicate the degree to which responses related to the appearance of the valve versus the trademark imprinted on the valve.

24. For an insightful discussion of this subject, see Boal, "Techniques for Ascertaining Likelihood of Confusion and the Meaning of Advertising Communications," 73 *Trademark Reporter*, 405 (1983).

25. *Piper Aircraft Corp.*, 741 F.2d 925.

26. *Anti-Monopoly, Inc. v. General Mills Fun Group, Inc.*, 515 F. Supp. 448 (N.D. Cal. 1977). The survey was discussed after appeal, and remand and appeal, in *Anti-Monopoly, Inc. v. General Mills Fun Group* 684 F.2d 1316, 1323-24 (9th Cir. 1982).

27. *Squirt Company v. Seven-Up Company*, 207 U.S.P.Q. 12 (E.D. Mo. 1979), *aff'd sub nom, Squirt Co v. Seven-Up Company*, 628 F.2d 1086 (8th Cir. 1980).

28. 628 F.2d at 1089 n.3.

29. *Supra*, note 24.

30. *RJR Foods, Inc. v. White Rock Corp.*, 201 U.S.P.Q. 578 (S.D.N.Y. 1978), *aff'd*, 603 F.2d 1058 (2nd Cir. 1979).

31. *Kroger Co. v. Johnson & Johnson*, 570 F. Supp. 1055 (S.D. Ohio 1983).