**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

VICTORIA'S SECRET STORES
BRAND MANAGEMENT, INC.,

        Plaintiff,

        v.

SEXY HAIR CONCEPTS, LLC,

        Defendant.

Case No. 07cv-5804 (GEL)

ECF CASE

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND MOTION *IN LIMINE* TO PRECLUDE
THE TWO SURVEYS, RULE 26 REPORT AND DECLARATION AND
<u>SUPPLEMENTAL REPORT OF GERALD L. FORD, Ph.D.</u>**

**COLUCCI & UMANS**
Frank J. Colucci (FC-8441)
Richard P. Jacobson (RJ-2843)
218 East 50th Street
New York, New York 10022
Telephone: (212) 935-5700
Facsimile: (212) 935-5728
Email:  email@colucci-umans.com

Attorneys for Plaintiff

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ................................................................................... iii

I.    **PRELIMINARY STATEMENT** ...................................................... 1

II.   **SUMMARY OF ARGUMENT** ........................................................ 4

III.  **ARGUMENT** ................................................................................... 5

     A.    **Standard for Motions *In Limine* and Expert Surveys and Testimony** ............................... 5

     B.    **The Ford Surveys Are Thoroughly Reliable** .................. 7

          1.  *The Ford Surveys Were Properly Designed* ............... 7

          2.  *The Ford Surveys Utilized the Proper Universe* .......... 10

              a.  **The First Ford Survey** ........................... 10

              b.  **The Second Ford Survey** ....................... 14

          3.  *Respondents Were Properly Screened* ..................... 15

          4.  *The Ford Surveys Utilized a Proper Stimulus* ........... 16

              a.  **The First Ford Survey** ........................... 16

              b.  **The Second Ford Survey** ....................... 18

          5.  *The Survey Questions Were Non-Leading and Unbiased* ... 19

              a.  **The First Ford Survey** ........................... 19

              b.  **The Second Ford Survey** ....................... 22

          6.  *No Control Was Warranted in the First Ford Survey* ... 23

     C.    **Johnson Provides No Empirical Evidence to Support His Criticisms** ............................................. 24

     D.    **Pursuant to *Fed. R. Evid.* 702, the Ford Surveys and Accompanying Declarations Are Admissible** ......... 24

     **E.**    **Dr. Ford's Report and Surveys are Highly Probative and Pose No Risk of Prejudice or of Confusing the Court** .........................24

**IV.**  **<u>CONCLUSION</u>** .................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Anheuser-Busch, Inc. v. Caught-On-Bleu, Inc.*,
288 F. Supp. 2d 105 (D.N.H. 2003)................................................................7, 24

*American International Group, Inc. v. London American Int'l Corp.*,
664 F.2d 348 (2d Cir. 1981)................................................................9, 10

*Bacardi & Co. v. New York Lighter Co.*,
97 Civ. 7140, 2000 U.S. Dist. LEXIS 3547 (E.D.N.Y. Mar. 15, 2000) ............................5

*Barre-Nat'l, Inc. v. Barr Labs., Inc.*,
773 F. Supp. 735 (D.N.J. 1991) ................................................................19

*Boucher v. United States Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996) ................................................................6

*Carl Karcher Enters. v. Stars Restaurants Corp.*,
35 U.S.P.Q.2d 1125 (T.T.A.B. 1995) ................................................10, 11, 17, 18

*Command Cinema Corp. v. VCA Labs, Inc.*,
464 F. Supp. 2d 191 (S.D.N.Y. 2006)................................................................5

*Commerce Funding Corp. v. Comprehensive Habilitation Servs.*,
01 Civ. 3796, 2004 U.S. Dist. LEXIS 17791 (S.D.N.Y. Sept. 2, 2004)............................4

*Conopco, Inc. v. Cosmair, Inc.*,
49 F. Supp. 2d 242 (S.D.N.Y. 1999)................................................................6

*Cumberland Packing Corp. v. Monsanto Co.*,
32 F. Supp. 2d 561 (E.D.N.Y. 1999) ................................................................18, 23

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)................................................................5, 24

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
12 USPQ2d 1657 (E.D. Cal. 1989), *aff''d*, 967 F.2d (9th Cir. 1992) ............................20

*Empresa Cubana Del Tabaco v. Culbro Corp.*,
97 Civ. 8399, 2004 U.S. Dist. LEXIS 4935 (S.D.N.Y. Mar. 26, 2004)....................23

*Franklin Resources, Inc. v. Franklin Credit Management Corp.*,
No. 95 Civ. 7686, 1997 U.S. Dist. LEXIS 13278 (S.D.N.Y. Sept. 4, 1997)....................7

*Freisland Brands, B.V. v. Vietnam National Milk Co.*,
221 F. Supp. 2d 457 (S.D.N.Y. 2002)..................................................................6

*Highland Capital Mg't, LP v. Schneider*,
02 Civ. 8098, 2008 U.S. Dist. LEXIS 7019 (S.D.N.Y. Jan. 31, 2008)...............6

*Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ...................................5, 24

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 576 (S.D.N.Y. 2007) .............................................................23

*Loussier v. Universal Music Group, Inc.*,
02 Civ. 2447, 2005 U.S. Dist. LEXIS 45432 (S.D.N.Y. Aug. 24, 2005) .........23

*Masterfoods, USA v. Arcor USA, Inc. and Arcor S.A.I.C.*,
230 F. Supp. 2d 302 (W.D.N.Y. 2002) ...........................................................21

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995) .............................5

*McNeilab, Inc. v. American Home Products Corp.*,
848 F.2d 34 (2d Cir. 1988)................................................................................6

*McNeil-PPC, Inc. v. Merisant Co.*,
04 Civ. 1090, 2004 U.S. Dist. LEXIS 27733 (D.P.R. July 29, 2004) .......6, 7, 23

*Metlife, Inc. v. Metro. Nat'l Bank*,
388 F. Supp. 2d 223 (S.D.N.Y. 2005)............................................................7, 24

*Miles Laboratories Inc. v. Naturally Vitamin Supplements Inc.*,
1 U.S.P.Q.2d 1445 (T.T.A.B. 1987) .......................................10, 11, 12, 17, 18

*National Distillers Products Co., LLC, v. Refreshment Brands, Inc.*,
198 F. Supp. 2d 474 (S.D.N.Y. 2002) ...........................................................8, 9

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer
Pharmaceuticals Co.*, 129 F. Supp. 2d 351 (D.N.J. 2000) ...................19, 20, 22

*OMS Investments, Inc. v. Central Garden & Pet Co.*,
Opp. No. 91156249, 2006 TTAB LEXIS 274 (T.T.A.B. 2006) ..........11, 12, 17, 18

*Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218 (2d Cir. 1999)......................5, 6, 23

*Schieffelin & Co. v. Jack Co. of Boca, Inc.*, 850 F. Supp. 232 (S.D.N.Y. 1994)................7

*Skechers U.S.A., Inc. v. Vans, Inc.*,
07 Civ. 01703, 2007 U.S. Dist. LEXIS 88635 (C.D. Cal. Nov. 20, 2007).........8

*Starter Corp. v. Converse, Inc.*, 170 F.3d 286 (2d Cir. 1999) .........................................19

*Teaching Co. Ltd. Pshp. v. Unapix Entertainment, Inc.*,
87 F. Supp. 2d 567 (E.D. Va. 2000) ................................................................................7, 24

*Union Carbide Corp. v. Ever-Ready, Inc.*,
531 F.2d 366 (7th Cir. 1976), *cert. denied*, 429 U.S. 830, 50 L. Ed. 2d 94,
97 S. Ct. 91 (1976) ..............................................................................................................20

*United States v. Ozsusamlar*, 428 F. Supp. 2d 161 (S.D.N.Y. 2006) .................................5

*Verizon Directories Corp. v. Yellow Book USA, Inc.*,
331 F. Supp. 2d 134 (E.D.N.Y. 2004) .......................................................................6, 7, 25

*Whirlpool Props., Inc. v. LG Elecs. U.S.A., Inc.*,
1:03 Civ. 414, 2006 U.S. Dist. LEXIS 1378 (W.D. Mich. Jan. 10, 2006) ...................7, 24

*Woods v. Lecureux*,110 F.3d 1215 (6th Cir. 1997)…………………………………..20, 22

## RULES AND STATUTES

15 U.S.C. Section 1441…………………………………………………………………..10

*Fed. R. Evid.* 401 .................................................................................................................6

*Fed. R. Evid.* 402 .................................................................................................................5

*Fed. R. Evid.* 403 ............................................................................................................6, 25

*Fed. R. Evid.* 702....................................................................................................4, 5, 24, 25

Fed. R. Evid. 703………………………………………………………………………...25

## SUPPLEMENTAL AUTHORITIES

Federal Judicial Center, *Manual for Complex Litigation, Fourth*,
Section 11.493 (2004)...................................................................................................5, 6, 14

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*,
Vol. 6 §32:174, at 32-339, Rel. #42, 5/2007................................................................20, 22

## I.     PRELIMINARY STATEMENT

Plaintiff, Victoria's Secret Stores Brand Management, Inc. ("Victoria's Secret"),

hereby submits this memorandum in opposition to the motion *in limine* and accompanying

memorandum filed by defendant, Sexy Hair Concepts, LLC ("SHC"), to preclude the two

surveys, the *Fed. R. Civ. P.* 26 Report and Declaration, and the Supplemental Report and

Declaration of Gerald L. Ford, Ph.D. (collectively the "Ford Surveys").  Victoria's Secret also

relies upon and shall refer to herein the "Declaration of Dr. Gerald L. Ford In Opposition to

Defendant's Motion for Summary Judgment and Motion *In Limine* to Preclude Surveys, Rule 26

Report and Supplemental Report of Gerald L. Ford," hereinafter "Ford Decl.," which includes as

exhibits all of Dr. Ford's prior declarations and survey reports, and the "Declaration of Frank J.

Colucci," hereinafter "Colucci Decl.," filed contemporaneously with this memorandum.

The Trademark Trial and Appeal Board ("TTAB") decision upon which

Victoria's Secret initiated this appeal is based on the TTAB's finding that SHC owns a family of

trademarks in the word "sexy" for hair care products, and that since Victoria's Secret's SO

SEXY trademark for hair care products includes the word "sexy," the TTAB concluded that a

likelihood of confusion with SHC's family of marks exists.

The purpose of the Ford Surveys was to measure the degree, if any, to which the

SO SEXY brand of hair care products sold by Victoria's Secret is likely to cause confusion with

respect to SHC or its brands.  Dr. Ford designed and conducted two separate surveys in

connection with this appeal.  The results of both Ford Surveys did not evidence that an

appreciable number of likely purchasers of certain hair care products are likely to be confused as

to the source, authorization or approval of, or business affiliation or connection of the SO SEXY

brand with SHC or its brands.  Specifically, in the First Ford Survey,[1] fewer than 3% of the respondents identified SO SEXY as having any connection with SHC or its brands, and in the Second Ford Survey,[2] the results were even more negligible.

### *The First Ford Survey*

Dr. Ford designed the First Ford Survey to conform to the survey design requirement of the TTAB in which the marks are evaluated based solely on the elements of the affected application and registration, without regard to how the parties' respective goods actually may be perceived in the marketplace.  (Ford Decl., ¶¶ 4, 10)  In the First Ford Survey, 306 test cell interviewees were exposed to a card with the words SO SEXY in large plain block letters at the top and the list of hair care products that appear on Victoria's Secret's trademark application for the mark SO SEXY at the bottom.  (First Ford Report, ¶ 12; Ford Decl., ¶ 12)  Respondents were then asked about their state of mind with respect to the source, authorization or approval of, or business affiliation or connection of the products listed on the card with the name on the card (i.e., SO SEXY).  (Ford Decl., ¶ 13)  The results of this survey demonstrate that a mere 2.29% of respondents made reference to SHC in their answers.  (First Ford Report, ¶ 19)  Based upon the negligible results of the test cell survey, a control cell survey was not executed.  (First Ford Report, ¶ 10)

### *The Second Ford Survey*

Dr. Ford designed the Second Ford Survey to provide the Court with an opportunity to evaluate the issue of likelihood of confusion under actual marketplace conditions, which is the format generally accepted by the federal courts.  (Ford Decl., ¶¶ 6, 36)  In the

---

[1]  A copy of the Ford Rule 26 report and the first survey report are attached to the Ford Declaration as Exhibits A and B (Volumes I and II), respectively, and the report shall be referred to herein as the "First Ford Report."
[2]  A copy of the Ford Rule 26 report and the second survey report are attached to the Ford Declaration as Exhibits C and D (Volumes I and II), respectively, and the report shall be referred to herein as the "Second Ford Report."

Second Ford Survey, there were, in total, 590 interviews conducted, 306 in the "test" cell and 284 in the "control" cell. (Second Ford Report, ¶ 15)  The first survey stimulus for the test cell was a photograph of a display from a Victoria's Secret store showing a variety of the Victoria's Secret SO SEXY brand hair care products. (Second Ford Report, ¶ 20)  Respondents in the Second Ford Survey were then shown an actual bottle of SO SEXY shampoo, as sold by Victoria's Secret. (*Id.*)  The Second Ford Survey also employed a control.  The survey exhibits for the control cell were a photograph of the same display from a Victoria's Secret store showing a variety of the Victoria's Secret SO SEXY hair care products but with the name of the products in the photograph modified from SO SEXY to O! SO. (Ford Decl., ¶ 38)  Respondents in the control cell in the Second Ford Survey were shown a bottle of SO SEXY shampoo with a modified label where the SO SEXY mark had been replaced by the O! SO mark. (*Id.*)

After exposure to the survey stimuli (*i.e.*, a photograph of a display of hair care products bearing the SO SEXY or the O! SO marks and after being shown an actual bottle of shampoo bearing the SO SEXY or O! SO marks), respondents were asked their state of mind with respect to the source, authorization or approval of, or business affiliation or connection of the products bearing the mark shown on the product (*i.e.*, SO SEXY in the test cell or O! SO in the control cell). (Ford Decl., ¶ 39)  The results from this survey demonstrate that 0.63% of respondents made any reference to SHC in their responses. (Second Ford Report, ¶ 27)

The results of both Ford Surveys did not evidence that an appreciable number of likely purchasers of certain hair care products are likely to be confused as to the source, authorization or approval of, or business affiliation or connection of the SO SEXY brand with SHC or its brands.  Specifically, in the First Ford Survey, 2.29% of the respondents identified SO SEXY as having any connection with SHC or its brands, and in the Second Ford Survey, the

results were even more negligible.  SHC now moves to preclude the Ford Surveys by claiming that their methodology is flawed and that the risk of prejudice and confusion outweighs their probative value.  As set forth below, Victoria's Secret respectfully submits that SHC's motion is meritless and should be denied.

## II.   <u>SUMMARY OF ARGUMENT</u>

SHC attempts to exclude the Ford Surveys from the Court by attacking their underlying methodology based solely on the criticisms contained in two declarations of Philip Johnson ("Johnson").  As fully set forth below, each of Johnson's criticisms fail.

Dr. Ford is extremely well qualified to testify as an expert regarding the absence of a likelihood of confusion between Victoria's Secret's SO SEXY hair care products and SHC's brand of hair care products, having conducted a number of such surveys that have been introduced into evidence and relied upon by the courts.[3]  In conducting both of his surveys, Dr. Ford used reliable data and methods and applied the principles reliably to the facts of the case. Contrary to the allegations contained in SHC's motion and memorandum, Dr. Ford satisfies the criteria for admissibility of expert testimony set forth in *Fed. R. Evid.* 702 because he: (1) properly designed both surveys; (2) utilized the correct universe of relevant consumers pursuant to the TTAB's preference for such surveys; (3) properly screened all respondents; (4) employed an effective and proper stimulus; and (5) crafted clear, easily understood, non-leading and unbiased questions.  As discussed fully below, the Ford Surveys are relevant, probative, reliably derived, non-prejudicial and admissible.

---

[3] Ford Decl., ¶¶ 54-64, Ex. H.

## III.    ARGUMENT

### A.    Standard for Motions *In Limine* and Expert Surveys and Testimony

"Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." *Commerce Funding Corp. v. Comprehensive Habilitation Servs.*, 01 Civ. 3796, 2004 U.S. Dist. LEXIS 17791 at *12 (S.D.N.Y. Sept. 2, 2004). Pursuant to *Fed. R. Evid.* 702, the Supreme Court has held that, in order to be deemed admissible, expert testimony must be both relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *see Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137 (1999). It is also necessary for courts to take into account an expert's experience, training and/or education when determining whether an expert is qualified to render an opinion. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995).

Pursuant to the Supreme Court's decisions in *Daubert* and *Kuhmo Tire*, the Second Circuit has adopted a rather broad standard for the admissibility of expert witness testimony. *Bacardi & Co. v. New York Lighter Co.*, 97 Civ. 7140, 2000 U.S. Dist. LEXIS 3547, at *6 (E.D.N.Y. Mar. 15, 2000).

"[R]ejection of expert testimony is the exception rather than the rule." *Fed. R. Evid.* 702 advisory comm. notes. The Federal Rules of Evidence favor the admission of all relevant evidence. *See Fed. R. Evid.* 402. "A District court will 'exclude evidence on a motion in limine only when the evidence is clearly inadmissible on all potential grounds." *Command Cinema Corp. v. VCA Labs, Inc.*, 464 F. Supp. 2d 191, 200 (S.D.N.Y. 2006) (*citing United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164 (S.D.N.Y. 2006)).

"Surveys…are routinely admitted in trademark…cases to show actual confusion, genericness of a name or secondary meaning, all of which depend on establishing that certain

associations have been drawn in the public mind." *Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 225 (2d Cir. 1999). A survey is admissible into evidence if it tends "to make the existence of any fact that is of consequence to the action more probable or less probable than it would be without the evidence." *Fed. R. Evid.* 401. When a court assesses the trustworthiness of a survey:

> ...relevant factors include whether: the population was properly chosen and defined; the sample chosen was representative of that population; the data gathered were accurately reported; and the data were analyzed in accordance with accepted statistical principles...[i]n addition, in assessing the validity of a survey, the judge should take into account the following factors: whether the questions asked were clear and not leading; whether the survey was conducted by qualified persons following proper interview procedures; and whether the process was conducted so as to ensure objectivity...

*See* Federal Judicial Center, *Manual for Complex Litigation, Fourth*, Section 11.493, at 102-104 (2004). A survey is only inadmissible if its flaws destroy all of its relevance. *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 252-53 (S.D.N.Y. 1999); *see McNeilab, Inc. v. American Home Products Corp.*, 848 F.2d 34, 38 (2d Cir. 1988). Assertions of "'[m]ethodological' errors in a survey...bear exclusively on the weight to be given the survey rather than bearing on an admissibility determination under Fed. R. Evid. 403." *Freisland Brands, B.V. v. Vietnam National Milk Co.*, 221 F. Supp. 2d 457, 460 (S.D.N.Y. 2002); *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). "[I]n general, courts are loathe to exclude consumer surveys from evidence." *McNeil-PPC, Inc. v. Merisant Co.*, 04 Civ. 1090, 2004 U.S. Dist. LEXIS 27733, at *27 (D.P.R. July 29, 2004).

The general rule in conducting the *Fed. R. Evid.* 403 probative value/prejudice balancing test favors admission of the expert testimony. *Highland Capital Mg't, LP v. Schneider*, 02 Civ. 8098, 2008 U.S. Dist. LEXIS 7019, at *32 (S.D.N.Y. Jan. 31, 2008). Further, in a bench trial there is negligible, if any, risk of prejudice resulting from confusion of the trier of fact by admitting survey evidence, even if the probative value is nil. *See Verizon Directories*

*Corp. v. Yellow Book USA, Inc.*, 331 F. Supp. 2d 134, 136 (E.D.N.Y. 2004).  Moreover, since

SHC's challenge of the Ford Surveys and reports rests largely on the critique offered by SHC's

expert, Johnson, it is of little import because where a party has had the opportunity to conduct an

alternative survey in a trademark action and fails to do so, courts routinely disregard expert's

testimony if it merely seeks to discredit the methodology of the opposing party's survey.  *See*

*Whirlpool Props., Inc. v. LG Elecs. U.S.A., Inc.*, 1:03 Civ. 414, 2006 U.S. Dist. LEXIS 1378, at

*10-13 (W.D. Mich. Jan. 10, 2006); *Metlife, Inc. v. Metro. Nat'l Bank*, 388 F. Supp. 2d 223, 233-

234 (S.D.N.Y. 2005); *Anheuser-Busch, Inc. v. Caught-On-Bleu, Inc.*, 288 F. Supp. 2d 105, 122-

123 (D.N.H. 2003); *Teaching Co. Ltd. Pshp. v. Unapix Entertainment, Inc.*, 87 F. Supp. 2d 567,

583-585 (E.D. Va. 2000).

      Even if Johnson's criticisms of the Ford Surveys were valid, which they are not,

courts routinely consider even "flawed" surveys when they have some probative value.  *See*

*Franklin Resources, Inc. v. Franklin Credit Management Corp.*, No. 95 Civ. 7686, 1997 U.S.

Dist. LEXIS 13278, at *6 (S.D.N.Y. Sept. 4, 1997) (survey with significant flaws in its universe

still has probative value); *Schieffelin & Co. v. Jack Co. of Boca, Inc.*, 850 F. Supp. 232, 246

(S.D.N.Y. 1994) (same).

    **B.**    **The Ford Surveys Are Thoroughly Reliable**

      *1.*    <u>*The Ford Surveys were Properly Designed*</u>

      Johnson criticizes the Ford Surveys by arguing that the survey design used in each

was an *Eveready* design and that such a survey design requires that the parties produce different

products using a similar name.  In this regard, Johnson is simply wrong.  The *Eveready* survey

design and questions can be easily modified to accommodate a situation where the parties

produce the same products.[4]  (Ford Decl., ¶ 26)   With respect to whether or not the Ford Survey

designs were appropriate when Victoria's Secret is alleged to use a similar mark to SHC,

Johnson is plainly incorrect.  Contrary to Johnson's misstatement, McCarthy's treatise does not

say that the *Eveready* survey design or the standard survey format cannot be used with, in

Johnson's words, "virtually identical" marks.[5]  (Ford Decl., ¶ 32)  In fact, Johnson himself

conducted a likelihood of confusion survey where the marks at issue were the same, the products

at issue were the same and there was only a moderate level of recognition in the marketplace.

*See Skechers U.S.A., Inc. v. Vans, Inc.*, 07 Civ. 01703, 2007 U.S. Dist. LEXIS 88635 (C.D. Cal.

Nov. 20, 2007).  Regardless, nowhere does the TTAB conclude that SO SEXY is the "same"

brand name as any of SHC's marks or brands, and it clearly is not.

        Second, Johnson argues that the use of an *Eveready* survey methodology requires

that the "senior user be a well known or famous mark, or at least known enough that you can

have a high degree of confidence that survey participants would have encountered it before."

Johnson contends that SHC's mark is "not a famous mark or household word."  Once again,

Johnson's argument fails.  McCarthy never takes the position that an *Eveready* survey design or

the standard survey format requires that the senior user must be either famous or a household

word.  (Ford Decl., ¶ 34)  In actuality, a recent case in the Southern District of New York relied

upon an *Eveready* design to find no likelihood of confusion with a mark that was neither famous

nor a household word.  *See National Distillers Products Co., LLC, v. Refreshment Brands, Inc.*,

---

[4]  Contrary to Johnson's position in this matter, Johnson has testified that he employed an *Eveready* design in a survey he conducted in which plaintiff's and defendant's products were both sugar substitutes.  *See McNeil-PPC, Inc. v. Merisant Company*, 2004 U.S. Dist. LEXIS 27733.

[5]  Nowhere in the TTAB opinion does the TTAB characterize Victoria's Secret's or SHC's marks as "virtually identical."  The TTAB only concludes that Victoria's Secret's mark is sufficiently similar to SHC's mark that it is likely to be perceived as part of SHC's family of marks.  (Compl., Ex. A; TTAB Op. at 29-30)

198 F. Supp. 2d 474 (S.D.N.Y. 2002) (determining no likelihood of confusion exists between TETON GLACIER and GLACIER BAY).

With respect to the commercial strength of SHC's marks, Johnson ignores SHC's position before the TTAB that its products have met with significant commercial success and acquired commercial strength, enjoy tremendous visibility in the media in magazines and on television and have been well known to the relevant public since prior to the filing date of Victoria's Secret's application, November 19, 2001.  (Ford Decl., ¶ 35) (citing SHC's TTAB Trial Br. at 5, 6, 12)

Finally, Johnson argues that:

> ...it is important for the survey research to measure confusion among those who have ***potentially*** been exposed to the brand.

(Second Johnson Decl., ¶ 6) (emphasis added).  While the First Ford Survey clearly provides an empirical test of the TTAB opinion without consideration of marketplace conditions, this is exactly what was accomplished in the Second Ford Survey.  Although SHC's products are sold in hair care salons as well as through resellers to variety and drug stores such as Target, Wal-Mart, Rite-Aid, CVS, and Costco, at the end of the Second Ford Survey, respondents were asked if they had, within the past six months, had their hair done at a salon, and if they were likely to have their hair done at a salon within the next six months.  (Ford Decl., ¶ 43)

These questions were designed to measure likelihood of confusion with respect to potential purchasers of the identified hair care products that have their hair done in a salon or beauty shop and thus, contrary to Johnson's criticisms, these respondents have been <u>potentially</u> exposed to the brand.  (*Id.*)  In the test cell, approximately seventy-four percent (73.86%) of the survey respondents have had their hair done at a salon and approximately eighty percent (80.39%) of the respondents indicated that they are likely to have their hair done at a salon.  (*Id.*)

Notably, Johnson makes no mention of these results.  In his deposition, Johnson takes the unwarranted position that the respondents actually had to purchase the products from a salon (Colucci Decl., ¶ 19, Ex. 17), but this is not the legal standard because likely purchasers need only have been *exposed* to the relevant products.  "Whether or not there is a likelihood of confusion is a question of fact as to the probable or actual actions and reactions of <u>prospective</u> <u>purchasers</u> of the goods or services of the parties."  *Am. Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir. 1981) (emphasis added); 15 U.S.C. Section 1441(1)(a).

Johnson also criticizes the design of the Ford Surveys by claiming they are biased because "[i]t is *likely* that a potential respondent could have just shopped at a Victoria's Secret store immediately prior to the survey, influencing his or her response."  (Mem. at 13)  It is completely nonsensical to state such an occurrence is *likely* when facts in the record reveal a *de minimis* amount of such occurrences.  It is, in fact, much more likely that a customer did not just come from a Victoria's Secret store.  Regardless, the presence of Victoria's Secret stores in shopping malls is a reality of our present day marketplace.  Furthermore, whether a respondent just shopped at a Victoria's Secret store should have no bearing because, as SHC frequently intones when doing so suits its position, trade channels and purchaser class are not to be considered.

   2. <u>*The Ford Surveys Utilized the Proper Universe*</u>

    *a.* ***The First Ford Survey***

When determining whether a mark is entitled to registration, the TTAB has repeatedly held that the trier of fact "must consider the identification of goods as set forth in the application and registrations, regardless of what the record may reveal as to the particular goods, channels of trade or purchasers."  *Miles Laboratories Inc. v. Naturally Vitamin Supplements Inc.*,

1 U.S.P.Q.2d 1445, 1450 (T.T.A.B. 1987) (citations omitted).  Where there is no limitation

placed on the identification of goods in the relevant applications/registrations, the proper

universe of survey participants encompasses all prospective purchasers of the identified goods.

*Id.*; *see also Carl Karcher Enters. v. Stars Restaurants Corp.*, 35 U.S.P.Q.2d 1125, 1132-1133

(T.T.A.B. 1995); *OMS Investments, Inc. v. Central Garden & Pet Co.*, Opp. No. 91156249, 2006

TTAB LEXIS 274, at *13-14 (T.T.A.B. 2006).

  In the First Ford Survey, the universe was defined as males and females, eighteen

years of age or older, who within the next six months were likely to purchase one or more certain

hair care products.   SHC's registrations identify its products as being for "men, women and

children."  In this regard, it should be noted that the TTAB found, in the instant matter, that:

> ...both opposer's and applicant's identifications of goods are broadly
> worded, without any limitations as to channels of trade or classes of purchasers.
> We must presume that the hair care products of the applicant and opposer are sold
> in all of the normal channels of trade to all of the usual purchasers for goods of
> the type identified.

(Compl., Ex. A; TTAB Op. at 20)

  As stated above, the First Ford Survey was designed to conform to the survey

design preference of the TTAB.  *See Miles Laboratories*, 1 U.S.P.Q.2d at 1450; *Carl Karcher*,

35 U.S.P.Q.2d at 1132-1133; *OMS Investments*, 2006 TTAB LEXIS 274, at 13-14.  First,

according to the TTAB, when a word mark is sought to be registered without any special form of

lettering or design features, using a card on which the mark is displayed in block letters is the

only appropriate stimulus, even though this is not reflective of actual marketplace conditions.

*Miles Laboratories*, 1 U.S.P.Q.2d at 1460.  To include other features that may be associated with

the word mark in the marketplace (*e.g.*, product container, labeling, etc.), that are not part of the

matter sought to be registered, would impair the probative value of the survey.  *Id.* at 1459-1460;

*see also OMS Investments*, 2006 TTAB LEXIS 274, at *40. Second, when the opposer's registration and applicant's word mark application do not include any limitations as to channels of trade or classes of purchasers, it is presumed that the opposer's and applicant's products are sold in all normal channels of trade to all usual purchasers of goods of the type identified in the registration and the application. *Id.* As such, the first survey focused on likelihood of confusion based upon the specific mark and the specific goods identified in the SO SEXY trademark application.

In criticizing the First Ford Survey, Johnson states that the survey universe should have included: (1) only women (no men), (2) women who purchase hair care products through specialty stores, and (3) women who purchase hair care products on a "mid-level" price point. With respect to these criticisms, Johnson ignores the findings of the TTAB. Specifically, as noted above, the TTAB found that:

> ...both opposer's and applicant's identifications of goods are broadly worded, without any limitations as to channels of trade or classes of purchasers. We must presume that the hair care products of the applicant and opposer are sold in all of the normal channels of trade to all of the usual purchasers for goods of the type identified.

(Compl., Ex. A; TTAB Op. at 20)  Additionally, the TTAB found:

> ...Some of opposer's advertising is clearly directed to this retail consumer...

(*Id.* at 21)

> ...Regarding applicant, while the evidence shows that its identified goods are currently sold only through its own stores, the identification of goods, which determines our decision, is not so limited.

(*Id.*) and

> ...the evidence shows that salons carry hair care products from a variety of different producers to sell at retail to their clients, the general retail consumer...

(*Id.*)  Thus, because both SHC and Victoria's Secret have broadly worded identifications of goods, without any limitations as to channels of trade or classes of purchasers, the First Ford Survey included potential purchasers of one or more of the identified hair care products listed on the SO SEXY application, regardless of the channel of trade or retail pricing among, as the TTAB referred to them, the general retail consumer.  (Ford Decl., ¶ 18)

Additionally, Johnson also either ignores or disregards the positions that SHC previously advanced before the TTAB.  Although Johnson reports that he reviewed SHC's TTAB trial brief, as well as SHC's TTAB reply brief, he appears to ignore its arguments at the TTAB that SHC's names and marks are strong, that its registrations contain no restrictions on channels of trade, that Victoria's Secret's application contains no restrictions on channels of trade, and that the parties' goods are sold to the same and overlapping classes of purchasers. Specifically, in criticizing the survey universe, Johnson appears to ignore SHC's position that:

> ...Sexy Hair's names and marks are strong; the purchasers, channels of trade and promotional channels overlap; hair care products are inexpensive, the subject of frequent and repeat purchase, and not such as are purchased with great care or significant deliberation...

(Ford Decl., ¶ 19) (citing TTAB Trial Br. at 8)

> Sexy Hair's registrations contain no restrictions on trade channels.  While Sexy Hair directs its marketing efforts to professional channels, salons and salon distributors, its products, because of their popularity and wide consumer acceptance, find their way through resellers to variety and drug stores such as Target, Wal-Mart, Rite-Aid, CVS, and Costco...

(*Id.*) (citing  TTAB Trial Br. at 17)

> VS's application contains no restrictions on trade channels.  The goods must therefore be presumed to travel through all channels appropriate for goods of that type, including salons, and through resellers to variety and drug stores such as Target, Wal-Mart, Rite-Aid, CVS, and Costco...

(*Id*). (citing  TTAB Trial Br. at 17-18)

> On the facts of record, as well as on law, VS's arguments hold no weight.  VS's claim that SO SEXY hair care products are advertised in separate trade channels from SEXY HAIR products reflects neither the record nor reality.  The record

-13-

> shows that the parties in fact do promote their hair care products through the same and similar media: editorial mentions in magazines, public relations efforts directed to local television stations, and point of sale displays in retail outlets...

(*Id.*) (citing  TTAB Reply Br. at 2) and

> VS's argument that the parties' respective customers are different also ignores the reality of the record: the parties' goods are sold to the same and overlapping classes of purchasers...including those who both shop in retail stores and in salons...

(*Id.*) (citing  TTAB Reply Br. at 3)

By interviewing males and females, eighteen years of age or older, who are likely to purchase certain hair care products, Dr. Ford conducted the First Ford Survey within the proper and relevant universe of consumers.

### b.    *The Second Ford Survey*

The Second Ford Survey focused on likelihood of confusion based upon the SO SEXY mark as it is typically encountered under marketplace conditions.  (Ford Decl., ¶ 36)  This was designed to conform to the survey design generally accepted by the federal courts and in the instant matter was done to provide the Court with an opportunity to evaluate the issue of likelihood of confusion under actual marketplace conditions.  (*Id.*); *see* Federal Judicial Center, *Manual for Complex Litigation, Fourth*, Section 11.493, at 102-104 (2004).  In the Second Ford Survey, the universe was defined as females eighteen years of age or older, who within the next six months would be likely to purchase hair care products that are currently being sold by Victoria's Secret in its stores and on the Victoria's Secret website.  (Ford Decl., ¶¶ 6, 37)  These products were:  shampoo; conditioner; hair spray, styling gel, mousse, pomade, or style creme; straightening balm; curl-enhancing spray; or shine serum.  (*Id.*)

Johnson criticizes the Second Ford Survey by stating that the universe should have been limited by where respondents purchased hair care products or at what price

point they purchased hair care products.  Once again, Johnson is incorrect.  If one were to

conduct a test under true marketplace conditions, the respondents would have been told to

"Please look at this product as you would if you saw it in a Victoria's Secret store."  (Ford Decl,

¶ 46)  In defining the survey universe as the general retail consumer Dr. Ford recognized that the

TTAB found that Victoria's Secret's actual market encompasses essentially all general

consumers (Compl., Ex. A; TTAB Op. at 15) and that SHC's products are sold to "the general

retail consumer" (Compl., Ex. A; TTAB Op. at  21) and are sold at such mass retailers as Target,

Wal-Mart, CVS, and others.[6]  (Ford Decl., ¶ 46)  Accordingly, Dr. Ford also conducted the

Second Ford Survey within the proper and relevant universe of consumers because the universe

reflects the reality of purchasers of hair care products.

> 3.    *Respondents Were Properly Screened*

Johnson also criticizes the Ford Surveys by claiming that the potential

respondents should have been screened to determine whether they would ever be exposed to the

parties' products through shopping at a specialty store or hair salon.  Johnson's criticism is

baseless.  With respect to the first Ford Survey, this is irrelevant because there is no restriction

on trade channels, as explained above.  With respect to the Second Ford Survey, more than three

quarters of the respondents in both the control and test cells would have been exposed to SHC's

products since they had or planned to have their hair done in a salon within the past or future six

months.  (Ford Decl., ¶ 43)

Likewise, Johnson's criticism of the screeners as being implausible is completely

baseless.  It is difficult to believe that SHC, which offers a range of hair care products, would

presume that a customer would not want to enhance the curl of her hair one day and then

---

[6]  In its summary judgment motion, SHC claims that the volume of SHC diverted products sold to retail chains such
as Target and CVS amounted to over $11.8 million in 2004.  (SHC Summary Judgment Mem. at 7)

straighten her hair the next day, week or month.  As a matter of fact, more than 9% of respondents in both the test and control cells responded affirmatively to the screening questions of whether they had purchased in the past six months or were likely to purchase in the next six months both curl-enhancing spray and straightening balm.  (Second Ford Survey Report, Appendix A)  Just as SHC's founder has stated, "Sexy hair is exactly what we are about and I believed it was time to 'own' it...says O'Rourke."  (Colucci Decl., ¶ 6, Ex. 4)

Deserving of even less consideration is SHC's incredulous reaction to the three potential *male* respondents aged 55 or older who have purchased or intend to purchase all items from all seven categories listed in the screening process.[7]  All that bears mention, however, is that none of the three were used in the survey because they did not qualify.  (Ford Motion *In Limine*, Ex. H; VS Ford 0537, 0540, 0543)

    4.      *The Ford Surveys Utilized a Proper Stimulus*

    *a.*      **The First Ford Survey**

In the first survey, the survey exhibit (*i.e.*, survey stimulus), for the test cell, was a card that contained the words SO SEXY in plain block letters and below that a list of hair care products.[8]  (Ford Decl. ¶ 12)  The defined goods and the presentation of Victoria's Secret's brand were designed to reflect the specific mark and goods identified in the trademark application and to conform to the survey stimulus requirements of the TTAB.  (Ford Decl. ¶ 12)  Johnson argues that the survey stimulus (1) did not test the SO SEXY mark as used in commerce, (2) did not test the SO SEXY mark as shown on the application, and (3) did not test the SO SEXY mark in simple block letters.

---

[7] SHC's trademark registrations indicate that its products are intended for men, women, and children.  (Colucci Decl., Ex. 8)

[8] *See* trademark application of SO SEXY, Serial No. 78094035. (Ford Decl., Ex. E)

-16-

Johnson's criticism that the First Ford Survey did not test the SO SEXY mark as used in commerce is misguided and, again, evidences a lack of appreciation for the likelihood of confusion survey design required by the TTAB. Specifically, *Miles Laboratories Inc.*, 1 U.S.P.Q.2d 1445; *Carl Karcher Enterprises, Inc.*, 35 U.S.P.Q.2d 1125; and *OMS Investments, Inc.*, 2006 TTAB LEXIS 274, evidence the TTAB's preference that a likelihood of confusion survey test the face of the application (*i.e.*, a card with applicant's proposed mark and a list of products and/or services to be offered under the mark) and not the mark as used in commerce. (Ford Decl., ¶ 21) Dr. Ford relied on these precedents in the design of the First Ford Survey. (Ford Decl., ¶¶ 4, 10, 21)

A review of Victoria's Secret's trademark application of SO SEXY clearly evidences that the survey stimulus reflects the specific mark and goods identified in the application, including all of the products listed on the face of the application. (*See* Ford Decl., Ex. B, Volume I at 6 and Ex. E thereto) A review of the survey stimulus evidences that the SO SEXY mark and products were shown on the survey card in simple block letters. (*See* Ford Decl., Ex. B, Volume I at 6).

Johnson's criticisms reflect a complete lack of understanding or appreciation of the requirement of the TTAB to test the specific mark and goods identified in the trademark application. The survey stimulus card was an accurate reproduction of the particular mark and goods identified in the application. (Ford Decl., ¶ 25) Johnson then speculates that the survey exhibit card suggested a "mass market consumer package goods company rather than a specialty product manufacturer," yet he offers no empirical evidence to support this speculation. A review of the products included on the stimulus card indicates that they are only hair care products - clearly not indicative of a "mass market consumer package goods company" that would offer

more than specialty hair care products.  (*Id.*)  Accordingly, the stimulus employed by Dr. Ford in the First Ford Survey is entirely proper.  *See Miles Laboratories*, 1 U.S.P.Q.2d at 1450; *Carl Karcher*, 35 U.S.P.Q.2d at 1131-1133; *OMS Investments*, 2006 TTAB LEXIS 274, at *40.

### b.        The Second Ford Survey

Johnson criticizes the Second Ford Survey by arguing that respondents should not have been allowed to look at the SO SEXY bottle while answering the survey questions.  Johnson argues that such a procedure reduces the survey to a reading test.  Once again, Johnson is incorrect.

The methodology utilized in the Second Ford Survey replicates the marketplace.  (Ford Decl., ¶ 47)  Interviewers initially showed survey respondents a photograph of a display of Victoria's Secret's SO SEXY products from a Victoria's Secret store and were told:

> Would you please look at this picture as you would if you saw this display in a store.  Please take as much time as you like, and let me know when you are ready to continue.

(Ford Decl., ¶ 48)  Subsequently, respondents were handed a bottle of Victoria's Secret SO SEXY shampoo for normal hair and were told:

> This is a product from the display like the one you saw in the picture.  Please look at this product as you would if you saw it in a store and were considering purchasing this product.

(*Id.*)  Respondents were then asked the principal survey questions (e.g., "Who, or what company, do you believe puts out this product with this name?").  During the questions, the Victoria's Secret SO SEXY shampoo was not taken away from the respondent or hidden from sight.  (*Id.*)  This matches the marketplace circumstances.  Under normal marketplace circumstances, no one would, prior to purchase, take the product away and hide it.  *See Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 578 (E.D.N.Y. 1999).

To take the survey stimulus away or hide it from sight prior to asking the principal survey questions would result in a mere "memory test."  (Ford Decl., ¶ 49)  The Second

Circuit has affirmed the exclusion of a survey that removed the survey stimulus before the principal survey questions. *See Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir. 1999) (finding that survey where products were covered with cloth after enabling respondents to view products briefly rendered survey "little more than a memory test")  Additionally, other federal courts have also found that leaving the survey stimulus with the respondent during the principal survey questions best matches marketplace conditions. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 129 F. Supp. 2d 351, 364-366 (D.N.J. 2000) ("leaving the products for the respondents to examine rather than taking the products away replicates market conditions"); *Barre-Nat'l, Inc. v. Barr Labs., Inc.*, 773 F. Supp. 735, 745 n.20 (D.N.J. 1991) (noting survey is less probative where, among other things, materials are taken away during question period).

Finally, the results of the first survey, in which Victoria's Secret's name was not on the survey stimulus and thus could not be "read," are consistent with the results of the second survey.  Specifically, the results of the first and second surveys do not evidence that an appreciable number of likely purchasers of certain hair care products are likely to be confused as to the source, authorization or approval of, or business affiliation or connection of the SO SEXY brand with SHC or its brands.  (Ford Decl., ¶ 53)

     5.      *The Survey Questions Were Non-Leading and Unbiased*

        *a.*      **The First Ford Survey**

Dr. Johnson also criticizes the Ford Surveys by claiming that the questions posed to respondents were leading and biased.  Johnson states that the survey questions are biased and leading because they caused respondents to answer with a name that is not the same as the product name; yet, this directly contradicts his position that the survey is nothing more than a reading test of whether respondents can read a name off a bottle.  Regardless, Johnson's

criticisms, once again, fail.  None of the questions utilized in the First Ford Survey suggest an answer and, accordingly, they are not leading.  *Novartis*, 129 F. Supp. 2d at 365 (a question that does not suggest an answer is not leading) (*citing Woods v. Lecureux*, 110 F.3d 1215, 1221 (6th Cir. 1997) ("It is elementary that a leading question is one that suggests an answer"))

As Dr. Ford testified in his declaration and Rule 26 Report of January 31, 2008, the first principal survey questions, question series 6.0 and 6.1, were designed to address the issue of likelihood of confusion as to source or origin and were patterned after similar accepted questions.[9]  (Ford Decl., ¶ 27)  In the *Eveready* case, the first principal survey question was:

> Who do you think puts out the lamp shown here?

This question was followed by:

> What makes you think so?

In the First Ford Survey, the first principal survey question was:

> 6.0     Who, or what company, do you believe puts out the products on this card with this name?

This question was followed by:

> 6.1     Why do you say that?

(Ford Decl., ¶ 28)  Dr. Ford designed this question to measure likelihood of confusion with a "named" source.  (*Id.*)  This question was patterned after the first principal question in the *Eveready* case to measure likelihood of confusion with a named source.  (*Id.*)

In the *Eveready*, case the second principal question was:

---

[9] The first two principal survey questions (*i.e.*, question series 6.0 and 7.0) were designed to address the issue of likelihood of confusion as to source or origin and were patterned after similar accepted questions.  See *Union Carbide Corp. v. Ever-Ready. Inc.*, 531 F.2d 366 (7th Cir. 1976), *cert. denied*, 429 U.S. 830, 50 L. Ed. 2d 94, 97 S. Ct. 91 (1976); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 12 USPQ2d 1657, 1674 (E.D. Cal. 1989), *aff'd*, 967 F.2d (9th Cir. 1992); J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, Vol. 6 §32:174, at 32-339, Rel. #42, 5/2007.

> Please name any other products put out by the same concern which puts out the lamp shown here?

This question, in the original *Eveready* case, was asked to measure likelihood of confusion with an anonymous source. (Ford Decl., ¶ 29)  The second principal question in the First Ford Survey was also patterned after the second principal question in the *Eveready* case.  (*Id.*)  But, because both parties produce hair care products (shampoo, conditioner, etc.), the original *Eveready* question (*i.e.*, "What other products...") would provide no information on whether or not there was a likelihood of confusion with an anonymous source since both parties sold "hair care" products.  (*Id*).  The *Eveready* survey design can be easily modified to provide a measure of an anonymous source even when both parties sell the same products.  (*Id.*); *see Masterfoods, USA v. Arcor USA, Inc. and Arcor S.A.I.C.*, 230 F. Supp. 2d 302, 311 (W.D.N.Y. 2002) (in a matter in which both parties sold the same type of products, respondents were asked the follow-up question "What other brand name or names, if any, do you believe are used by the company that puts out these candies?").

> Thus, the second principal question in the First Ford Survey asked:

> 7.0    What other brand name or names, if any, do you believe are used by the company that puts out the products on this card with this name?

This question was also followed by:

> 7.1    Why do you say that   INSERT RESPONSE TO Q7.0   is another brand name used by the company that puts out these products with this name?

(Ford Decl., ¶ 29)  In a manner, similar to the *Eveready* case, question 7.0 in the First Ford Survey provides a measure of likelihood of confusion with an anonymous source, that is, respondents who do not know the name of the company that "puts out" the SO SEXY hair care products would have the opportunity to evidence likelihood of confusion with an anonymous source by responding to question 7.0 with the name of one or more of SHC's products (*i.e.*, BIG

SEXY HAIR, STRAIGHT SEXY HAIR, SHORT SEXY HAIR, CURLY SEXY HAIR,
HEALTHY SEXY HAIR, HOT SEXY HIGHLIGHTS, WILD SEXY HAIR, and SILKY SEXY
HAIR).[10]  (*Id.*)

### b.      The Second Ford Survey

Johnson goes on to criticize the Second Ford Survey by stating that the key survey

question, "Who, or what company, do you believe puts out this product with this name?" is

biased and leading.  Johnson alleges that the question implies that the source is not the same as

the product but rather must necessarily be some other company.  Johnson is wrong again.

First, Dr. Ford asked the question "Who, or what company..." to cast the widest

possible "net" to provide respondents with an opportunity to respond with answers like:  the

company that puts out Big Sexy Hair; the company that sells the Sexy Hair products in beauty

salons; or Sexy Hair Concepts.  (Ford Decl., ¶ 44)  This question does not suggest an answer and

is, therefore, not leading.  *Novartis*, 129 F. Supp. 2d at 365; *Woods v. Lecureux*, 110 F.3d at

1221.

Second, although Dr. Ford disagrees that the survey question implies the source is

not the same as the product name, to the degree to which that could have happened it would only

have encouraged respondents to answer with a response that referred to SHC.  (*Id.*)  If

---

[10]  The Ford Surveys also employed the standard survey format suggested by Professor McCarthy: "One often-used
two-part format for eliciting responses as to both source confusion and confusion as to sponsorship, affiliation and
connection is the following.  The respondent is shown the accused product or advertisement and is asked: 'What
company do you think makes this product?'  Responses naming the senior user evidence actual confusion as to
source.  Respondents who did not name the senior user are then asked a second question: 'Do you think this product
was approved, licensed or sponsored by another company or not?'  If the answer is yes, respondent is asked: 'What
company do you think this product is approved, licensed or sponsored by?'  Responses naming the senior user
evidence actual confusion as to sponsorship, affiliation or connection, which is actionable.  Both questions should be
followed up by the important question: 'Why do you say that?'  Often, an examination of the respondents' verbatim
responses to the 'why' question are the most illuminating and probative part of the survey, for they provide a
window into consumer thought processes in a way that mere statistical data cannot." [footnote omitted] J. Thomas
McCarthy, *McCarthy on Trademarks and Unfair Competition*, Vol. 6 §32:175 at 32-341-342, Rel. #42, 5/2007.

respondents gave the answer "So Sexy," the response would not be counted as an indication of confusion with SHC, since it does not sell products with the name "So Sexy."[11]  (*Id.*)

6.       *No Control Was Warranted in the First Ford Survey*

"A control...is used in trademark surveys to 'sufficiently account for factors [that are] legally irrelevant....'" *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 576, 595 (S.D.N.Y. 2007) (*quoting Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 574-75 (E.D.N.Y. 1999)).  "A control is not required in the case of every survey." *Schering Corp. v. Pfizer Inc.*, 98 Civ. 7000, 2000 U.S. Dist. LEXIS 7071, at *19 (S.D.N.Y. May 23, 2000) (finding that lack of a control is not a ground for giving surveys no weight); *see also Loussier v. Universal Music Group, Inc.*, 02 Civ. 2447, 2005 U.S. Dist. LEXIS 45432, at *10 (S.D.N.Y. Aug. 24, 2005) ("The [c]ourt is unpersuaded by Plaintiff's contention that the survey should have provided a 'control group.'")

Where, as here, the survey results measure a *de minimis* level of confusion (2.29% in this case), a control is unwarranted.  *Empresa Cubana Del Tabaco v. Culbro Corp.,* 97 Civ. 8399, 2004 U.S. Dist. LEXIS 4935, at *78 (S.D.N.Y. Mar. 26, 2004) (court was unable to determine how a control could be helpfully employed where the criticizing party failed to show that the survey, as designed, would significantly overstate actual results).  Even if Dr. Ford performed a control in the First Ford Survey, it would only have further reduced the 2.29% figure.  By refraining from using a control, the results of the First Ford Survey are, if anything, biased in favor of SHC, although the negligible figure of 2.29% fails to show any likelihood of confusion.  While criticizing Dr. Ford for not including a control, given the inconsequential

---

[11]  It is worth noting that the question asked in this matter is not substantially different than questions Johnson has asked when he has conducted surveys to measure likelihood of confusion. *See McNeil-PPC, Inc. v. Merisant Company*, 04 Civ. 1090, 2004 U.S. Dist. LEXIS 27733 (D. P.R. 2004) ("Based on what you just saw, do you or don't you know who or what brand or company makes or puts out the sugar substitute that I showed you?").

measurement of likely confusion, Johnson fails to articulate from which test results the "noise" measure would be subtracted.  This attempt by Johnson to discredit the First Ford Survey, without having conducted any survey himself to prove otherwise, falls flat.

### C.   Johnson Provides No Empirical Evidence to Support His Criticisms

Johnson offers no empirical evidence to support his criticisms with respect to either the First or Second Ford Survey.  If Johnson's criticisms were material and would have produced a different result, Johnson could easily have done his own survey or even a small pilot survey to provide empirical support for his criticisms.  There is no question that SHC has the capability to have pursued conducting its own survey; yet, its failure to do so warrants disregarding its attempts to discredit Dr. Ford's surveys and reports.  *E.g.*, *Whirlpool Props.*, 2006 U.S. Dist. LEXIS 1378, at 10-13; *Metlife*, 388 F. Supp. 2d at 233-234; *Anheuser-Busch*, 288 F. Supp. 2d at 122-123; *Teaching Co*, 87 F. Supp. 2d at 583-585.  Instead we are left with simply nothing more than Johnson's *ipse dixit*.

### D.   Pursuant To *Fed. R. Evid.* 702, the Ford Surveys and Accompanying Declarations Are Admissible

For all the reasons set forth above, Dr. ford's surveys and declarations are relevant to the central issue of this appeal, are based on reliable data and methodology and there is no question, based on his background and experience, that Dr. Ford is qualified to provide an expert opinion.  Accordingly, Dr. Ford's surveys and declarations are admissible evidence pursuant to *Daubert*, *Kuhmo Tire* and *Fed. R. Evid.* 702.

### E.   Dr. Ford's Report and Surveys are Highly Probative and Pose No Risk of Prejudice or of Confusing the Court

The Ford Surveys are highly probative evidence that there is no likelihood of confusion between Victoria's Secret's SO SEXY hair care products and SHC or any one of its

hair care products or brands.  Admission of Dr. Ford's surveys and their accompanying reports and declarations pose no risk of prejudice to SHC or confusion to the trier of fact, especially where, as here, the case will be tried before the Court without a jury.  *See Verizon Directories Corp.*, 331 F. Supp. 2d at 136.  Accordingly, the probative value of Dr. Ford's surveys and reports far outweighs any risk of prejudice or confusion, and the surveys and declarations should be admitted pursuant to *Fed. R. Evid.* 403, 702 and 703.

## IV.    CONCLUSION

For all of the reasons set forth above, Victoria's Secret respectfully requests that the Court deny SHC's motion to preclude the surveys and declarations of Dr. Ford in its entirety.

Dated:       New York, New York
             May 23, 2008

                                        **COLUCCI & UMANS**

                                        By: _Frank J. Colucci_
                                        Frank J. Colucci (FC-8441)
                                        Richard P. Jacobson (RJ-2843)
                                        218 East 50th Street
                                        New York, New York 10022
                                        Telephone: (212) 935-5700
                                        Facsimile: (212) 935-5728
                                        Email:  email@colucci-umans.com

                                        Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION *IN LIMINE* TO PRECLUDE THE TWO SURVEYS, RULE 26 REPORT AND DECLARATION AND SUPPLEMENTAL REPORT OF GERALD L. FORD, Ph.D.** was served on counsel for defendant, Roberta Jacobs-Meadway, Eckert Seamans, Two Liberty Place, 50 South 16th Street, 22nd Floor, Philadelphia, Pennsylvania 19102, by FedEx, on the 23rd day of May, 2008.

Katherine Lyon