UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VICTORIA'S SECRET STORES BRAND MANAGEMENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> SEXY HAIR CONCEPTS, LLC, <br><br> Defendant. | No. 07-cv-5804 (GEL) |

**REPLY BRIEF IN RESPONSE TO OPPOSITION TO THE MOTION IN LIMINE OF DEFENDANTS SEXY HAIR CONCEPTS, LLC, TO PRECLUDE SURVEYS AND EXPERT REPORTS OF GERALD L. FORD**

The opposition filed by plaintiff Victoria's Secret Brand Management Inc. ("VSecret")[1] to defendant Sexy Hair Concept ("SHC's") motion in limine does nothing to rectify the countless flaws that are pervasive in and fatal to Ford's survey design and methodology. VSecret continues to ignore the sole issue before this Court, which is whether VSecret can register SO SEXY as a trademark for hair care products without restriction as to trade channels. In short, the defects identified in SHC's motion render Ford's surveys and reports completely unreliable so as to serve no probative value whatsoever in aiding the Court in its determination of the limited issue presented in this appeal.

    A. **Ford's Qualifications: Irrelevant in Assessing Reliability**

As a starting point, VSecret boasts about Ford's qualifications as an expert as if that would establish that his methodology here at issue "satisfies the criteria for admissibility of expert testimony set forth in [Rule 702] . . ." (Ford Op., at 4). However, Ford's resume, no

---

[1] Plaintiff's opposition is hereinafter referred to as "Ford Op."

matter how extensive, does nothing to shield shoddy ill-conceived work from receiving just scrutiny by this Court. As stated by Richard Leighton in the Trademark Reporter:

> Rule 702's qualifications requirement should not be confused with criticisms of the reliability of that expert's actual or proffered testimony in decisions in prior cases. There are few, if any experienced survey experts who have not suffered from judicial criticism, if not wrath. *Such criticisms invariably do not relate to basic competency under Rule 702.* They usually relate to what the court considers to be the expert's specific misapplication or non-application of accepted survey methodology, especially where the court was of the view that the expert knowingly behaved inappropriately.

Richard J. Leighton, *Using Daubert-Kuhmo Gatekeeping to Admit and Exclude Surveys in Lanham Act Advertising and Trademark Cases*, 92 TMR 743, 764 (2002) (emphasis added).[2]

Courts in this Circuit routinely exclude surveys by perfectly qualified survey experts who present work that simply does not meet the requirements for admissibility in the particular case. *See, e.g., Ortho Pharm. Corp. v. Cosprophar, Inc.*, 828 F. Supp. 1114, 1122 (S.D.N.Y. 1993) (excluding survey offered to show actual confusion); *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291 (S.D.N.Y. 2001) (excluding survey because prejudicial effect of survey outweighed probative value); *MasterCard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*, 2004 U.S. Dist. LEXIS 2485, Nos. 02 CIV 3691, 03 CIV 707 (S.D.N.Y. Feb. 23, 2004) (excluding survey because universe was too small; its questions never "reached" appropriate targets; and it bore little resemblance to the decision-making process it was meant to analyze); *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 663 (2d Cir. 1979) (affirming district court's rejection of survey offered to show secondary meaning); *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d. Cir. 1999) (affirming district court's exclusion of survey and finding that any probative value of survey outweighed potential to confuse issues).

---

[2] Mr. Leighton authored this article with the "review and suggestions of survey expert Gerald L. Ford, Ph.D."

Ford's surveys have been subject to criticism in other matters. *See, e.g., Wallach v. Longevity Network, Ltd.*, 2005 U.S. Dist. LEXIS 45937, No. 04-2404 (C.D. Ca. Nov. 27, 2005) (finding survey results immaterial); *Chrysler Corp. v. Vanzant*, 44 F. Supp. 2d 1062 (C.D. Cal. 1999) (survey criticized for failing to identify relevant market). In short, the survey methodology utilized in the instant matter remains fatally flawed irrespective of Ford's alleged qualifications or expertise in the field.

### B. Ford's Surveys:  Flawed Methodology

*(1) Flawed survey format*

It is Ford, not SHC's expert Philip Johnson, who initially characterized the first Ford survey as an Eveready design. In his initial Declaration and Rule 26 Report, Ford states that his first principal survey questions "were patterned after similar accepted questions" such as those found in the *Union Carbide Corp v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976) case. (Ford Rule 26 Report, at 8 fn 6, Exh. "A" to SHC's motion in limine). VSecret's attempt to justify the survey design fails where the facts not subject to dispute do not support it and the applicable law shows the design to be inappropriate.

VSecret cannot dispute that the design is employed properly where, unlike this case, the parties make different products, and the question is whether the products are so related in the minds of the consumer that use of similar marks on such products is likely to create confusion as to source or affiliation. *See* McCarthy's statement that "[a] now-standard survey format used to prove likelihood of confusion in cases where plaintiff makes some products which defendant does not is the Eveready format." MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 32:174. VSecret attempts to convolute Johnson's testimony by stating that McCarthy does *not* say that the Eveready design *cannot* be used with "virtually identical marks" (Ford Op., at 8), and it offers this self-serving unsubstantiated statement with no citation to any authority. In fact,

3

the only cases on which it relies are cases involving *similar trade dress* (i.e. yellow packaging for sugar substitutes or checker board pattern on sneakers), which are factually distinguishable since here, the issue involves *similar word marks* (SO SEXY and SEXY HAIR) and identical products (hair care products), and trade dress is immaterial to the question of registrability of the SO SEXY mark. There is nothing that VSecret can point to in two trade dress infringement cases which would attest to the reliability of Ford's chosen survey format to address the question of registrability of a word mark.

*(2) Flawed Survey Universe*

One of the most important factors in assessing the validity of a survey is the adequacy of the survey universe; "that is, the persons interviewed must adequately represent the opinions which are relevant to the litigation." *American Basketball Ass'n v. AMF Voit, Inc.*, 358 F. Supp. 981, 986 (S.D.N.Y. 1973), *aff'd*, 487 F.2d 1393 (2d Cir. 1973), *cert. denied*, 416 U.S. 986 (1974). Ford attempts to justify the flawed survey universe by reliance on the TTAB's finding that VSecret's and SHC's hair care products "are sold in all of the normal channels of trade to all of the usual purchasers for goods of the type identified." (Ford Op., at 12). While this is a correct statement of the legal presumption that governs where as here the opposed application has no trade channel restrictions, VSecret misuses the legal standard to attempt to justify this fatal flaw in the survey design. The survey, simply, can establish nothing where the wrong universe is surveyed and here, the only proper universe for the purpose of a meaningful survey is that where there is an opportunity for confusion to occur. From a common sense and precedential standpoint, the survey must be conducted where the parties and their marks would be known. *See Jaret Int'l v. Promotion in Motion, Inc.*, 826 F. Supp. 69, 73 (E.D.N.Y. 1993) (excluding the plaintiff's survey directed to the issue of confusion where the survey was not conducted where the accused product was available); *Amstar Corp. v. Domino's Pizza, Inc.*, 615

F.2d 252, 264 (5th Cir. 1980), *cert. denied*, 449 U.S. 899 (1980) (finding probative value of survey "significantly reduced" where in eight out of ten cities surveyed, there were no "Domino's Pizza" stores, and in the remaining two, the "Domino's Pizza" stores had been opened for less than three months; therefore respondents would have had "little, if any" exposure to defendant's marks). There is no way to know from the Ford survey if and to what extent respondents included persons who purchase hair care products in salons, or on-line, or in any particular trade channel. Only people who happened to visit particular malls had a chance to be included in the survey universe. This is a convenience sample, not one intended to secure representation of purchasers from all of the appropriate trade channels. Richard J. Leighton, *supra*, at 774. Indeed, VSecret's interpretation of the law would have the "proper" survey universe include every class of purchaser of hair care products. As it is, the first Ford survey includes men and women 18 years of age and older who are likely to purchase certain hair care products, because "there is no restriction to trade channels." (*Id.*, at 15). Not only are younger purchasers excluded, but respondents were not screened to make certain there were included persons who purchased hair care products in *each* of the relevant trade channels, as opposed to those who just purchase in mall outlets. *See, e.g., Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1467 (D. Kan. 1996) (survey fatally under-inclusive where only consumers at college book stores were surveyed).

As to the second Ford survey, there is no basis to assume that women who purchase salon products even shop in malls, or for the exclusion of men if men are purchasers of hair care products. In short, Ford's "convenience sample" in his mall intercept protocol created a sample that is not shown in any way to be representative of the relevant purchasing public. *See, e.g., Rolodex Corp. v. Rubbermaid Commercial Prods., Inc.*, 230 U.S.P.Q. 198 (D.N.J. 1986) (convenience sample used in survey by plaintiff's expert failed to raise genuine issue of fact on

the existence of secondary meaning). There is no way of knowing if Ford surveyed the proper universe, rendering his survey results utterly meaningless.[3] As set forth in SHC's motion in limine, any purported measure of actual confusion is therefore irrelevant and serves no probative value in determining the issue of likelihood of confusion as to source or affiliation – the only relevant inquiry in determining the registrability of VSecret's SO SEXY trademark for hair care products without restriction as to trade channels. *See* SHC's Motion in Limine, at 15 and cases cited therein.

As for measures to control bias in the sample, the Ford survey falls woefully short: Ford never even screens potential respondents by asking what stores in the malls they have just visited, which would identify any respondents who had been in a VSecret store immediately prior to the survey. VSecret stores could be found in all but one of the malls in which the surveys were conducted, introducing yet another element of bias. *See Arche, Inc. v. Azaleia, U.S.A.*, 882 F. Supp. 334, 335 (S.D.N.Y. 1995) (survey location subject to criticism because it was near one of the plaintiff's stores and thus may have biased the result in the plaintiff's favor). Clearly, Ford's surveys evidence a fatal disregard in taking proper steps to ensure the reliability of the reported data and to ensure that his respondents were not subject to influences of bias.

*(3) Flawed Stimulus*

The stimulus in both Ford surveys suffers from fatal defects. The first Ford survey was so blatantly improper so as to run afoul of every criteria for assessing reliability that VSecret had a completely different survey done using an entirely different stimulus and protocol. The fact that VSecret decided it could not attempt to rely on the first Ford survey *before* receiving SHC's expert's critique speaks volumes. The survey used a card with the words SO SEXY and a list of

---

[3] While Ford could have designed one or more sub-universes within the umbrella of the broad universe to compare data to those from the broader universe, none has been identified, adding yet another factor to diminish the surveys' reliability. *Compare National Football League Props., Inc. v. Wichita Falls Sportswear*, 532 F. Supp. 651, 657 (W.D. Wash. 1982).

goods underneath the words, the list of goods which is not a part of the mark of the application and is not reflective of either party's product line. (Motion in Limine, at 16).

The second survey suffers from many of the same fatal defects. The stimulus in the test cell – a display from a VSecret store showing SO SEXY hair care products and an actual bottle of SO SEXY shampoo – is flawed in that it introduces other elements not at issue, and so cannot test for response to SO SEXY as a mark without reference to Victoria's Secret, which name is admittedly not a part of the mark for which plaintiff applied. VSecret seeks to register SO SEXY alone, and not "VICTORIA'S SECRET'S SO SEXY" OR "SO SEXY BY VICTORIA'S SECRET." By embellishing the stimulus and introducing extraneous elements, it makes it completely impossible to gauge reactions to the mark SO SEXY without the distraction. *See Hershey Foods Corp. v. Mars, Inc.*, 998 F. Supp. 500 (M.D. Pa. 1998) (discounting survey where presence of visual clues on candy bar wrappers was misleading); *Miles Labs., Inc. v. Naturally Vitamin Supplements, Inc.*, 1 U.S.P.Q.2d 1445, 1459 (TTAB 1986) ("a labeled . . . multivitamin tablets jar would have introduced irrelevant matter, thereby destroying any probative value of the survey for our purposes.").[4]

The stimulus is further flawed in that it invites respondents to examine closely and read from the bottle they are holding in their hands. Ford claims that if he took the bottle of SO SEXY shampoo away from the respondents before asking the questions, it would be "nothing more than a 'memory test.'" (Declaration of Dr. Gerald L. Ford in Opposition to Defendant's Motion for Summary Judgment and Motion in Limine (hereinafter "Ford Op. Decl.") at ¶ 49).

---

[4] In the recent Board decision in *Meier's Wine Cellers, Inc. v. Meyer Intellectual Props. Ltd.*, Cancellation No. 92044883, the Board found, among other things, that respondents focused on features of the bottle apart from the mark, such as the trade dress comprising the color and shape of the bottle and label and other data on the bottle, and that the survey was "without probative value for purposes of determining likelihood of confusion between the parties' marks." *Id.*, at 13-14. For the Court's convenience, a copy of the Board decision in *Meier's Wine Cellers* is attached hereto as Exh. "A."

He cites to *Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561 (E.D.N.Y. 1999) *aff'd.*, 2002 U.S. App. LEXIS 13339 (2d. Cir. May 21, 2002) to support his methodology; however, *Cumberland Packing* involves trade dress, not word marks, and involved a different question put to the respondents, and is therefore factually distinguishable. The case involves the artificial sweeteners SweetN'Low and Sweetmate. Respondents were shown a Sweetmate package from a distance of three feet and were not allowed to handle the box or view it up close. The package was then removed from view. Respondents were then asked "What is the name of the product you saw?" The court found the survey results unreliable, concluding that those who had forgotten the name were likely to guess and that they would tend to guess a name of a product that they had heard of – i.e. SweetN'Low. *Cumberland Packing*, 32 F. Supp. 2d at 578. Here, it bears noting that respondents were given a bottle of VSecret SO SEXY shampoo, so any guesswork would naturally elicit a Victoria's Secret response. And, while *Cumberland Packing* demonstrates that a memory test serves no probative value, the message applies with equal or greater force to a reading test. *Cumberland Packing* hurts VSecret's position; it does not advance it.

*(4) Flawed Questioning*

The questions in the first Ford Survey are biased and leading. The first question asks about a name, not a mark. Respondents are asked "Who, or what company, do you believe puts out this product with this name?" Respondents are led to believe that the answer is not the name given or brand or mark, but rather must necessarily be some other name or be some other company. (Motion in Limine, at 18). In *Tyco Industries v. Lego Systems Inc.*, 5 U.S.P.Q.2d 1023 (D.N.J. 1987), respondents were shown a box with "Tyco" written on it and were asked to identify the manufacturer of the toy. Only 55% of the respondents identified the manufacturer as "Tyco" even though the name was so plain on the box. The court gave "little weight" to the

study, concluding that, like the answer to the "Who is buried in Grant's Tomb" joke, "the respondent has a strong tendency not to answer with the obvious." *Tyco Indus.*, 5 U.S.P.Q.2d at *1045.

Ford's explanation that the question "only encourage[es] respondents to give a Sexy Hair Concepts response" (Ford Op. Decl., at ¶ 44) is completely nonsensical, a grasping at straws in an attempt to offer up any explanation for the flawed survey format, no matter how absurd. There was after all no step taken to ascertain whether the markets chosen were markets in which SHC has a presence. Moreover, and more to the point, VSecret fails to address the guessing that is invited in the first survey. The verbatim responses clearly evidence both guessing and a lack of understanding of the questions. For example, when a respondent answers "I don't know" to the first question, and then provides an answer to the second question: "What other brand names if any do you believe are used by the company that puts out the product with this name?", the respondent is clearly guessing. VSecret in its opposition offers no cogent explanation because, quite simply, there is none.

### C.   No Requirement to Conduct Survey

VSecret's criticism of Johnson's failure to conduct a survey is baseless. There is no requirement that a survey be conducted. *McDonald's Corp. v. Kelly*, 1998 TTAB LEXIS 427 (TTAB Nov. 24, 1998); *Getty Petroleum Corp. v. Island Transp. Corp.*, 878 F.2d 650, 656 (2d Cir. 1989). It is particularly difficult to conduct any reliable survey, even if the effort is made, where as here the issue involves an application for registration where the claim of exclusive right is broader than the current actual use of the mark by the junior user. In Johnson's professional opinion, the facts in this specific case did not allow the conduct of a proper survey given a situation with a registered trademark being used for identical goods with identical or virtually

identical names. Courts of this Circuit and other federal courts support this proposition. *See* SHC's Motion in Limine, at 11-12 and cases cited therein.

### D. CONCLUSION

For all of these reasons, and for the reasons stated in SHC's motion in limine and in Johnson's declarations, the methodology of the Ford Surveys evidences fatal flaws which render the data unreliable. Therefore, SHC respectfully requests that Ford's surveys, reports and his testimony at the time of trial should be precluded.

Respectfully submitted,

ECKERT SEAMANS CHERIN & MELLOTT, LLC

Date: June 6, 2008

_____
Roberta Jacobs-Meadway (RJ-M 5870)
Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, PA 19102
(215) 851-8400
rjacobsmeadway@eckertseamans.com
Co-Counsel for Sexy Hair Concepts, LLC
Our File: 297797-00081

cc:  Philip Furgang, Esq.
     FURGANG & ADWAR, LLP
     1325 Avenue of the Americas
     28th Floor
     New York, NY 10019
     Phone: (212) 725-1818